# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DANNY WENG; CHRISTOPHER HART;
MARKUS VALLASTER; SARAH ZESCH;
JOHN STANTON; MICHAEL GOULD; and
COMMONWEALTH SECOND
AMENDMENT, INC.,

               Plaintiffs,

       -against-

WILLIAM B. EVANS, in his Official Capacity
as Commissioner of the Boston Police
Department; and DANIEL C. O'LEARY, in his
Official Capacity as Chief of the Brookline
Police Department,

               Defendants.

CIVIL ACTION NO.
1:16-cv-10181-FDS

## PLAINTIFFS' OPPOSITION TO DEFENDANT
## EVANS' MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

I)    Pertinent Massachusetts Gun Laws ................................................................. 1

II)   Plaintiffs' Claims are Ripe ........................................................................... 4

III)  Exhaustion is Not Required ......................................................................... 6

IV)   Plaintiffs State a Valid Second Amendment Claim ........................................... 8

      a.  The First Circuit has not Limited the Second Amendment to the Home ..................... 8

      b.  Defendant's Remaining Authorities and Arguments are Readily and
          Properly Distinguished ................................................................................ 12

      c.  Defendant Has Not Demonstrated the Constitutionality of its Unknown
          Policy, Practice, or Custom, Whether "Facial" or Not ................................. 15

V)    Claims Germane to the Equal Protection and Due Process Components of
      the Fourteenth Amendment Depend on Facts to be Developed in Discovery .................. 16

VI)   Conclusion ............................................................................................... 17

## TABLE OF AUTHORITIES

### CASES

Bonidy v. United States Postal Serv., 790 F.3d 1121 (10th Cir. 2015) ..................................... 10

Chief of Police v. Holden, 470 Mass. 845, 26 N.E.3d 715 (2015) .................................... 12-13

Citizens United v. FEC, 558 U.S. 310 (2010) ................................................................. 15

Commonwealth v. Gouse, 461 Mass. 787, 965 N.E.2d 774 (2012) ...................................... 13-14

Commonwealth v. Seay, 376 Mass. 735, 383 N.E.2d 828 (1978) ................................................. 2

District of Columbia v. Heller, 554 U.S. 570 (2008) ...............................................8-9, 12

Doe v. Reed, 561 U.S. 186 (2010) ................................................................................... 16

Dunkin' Donuts Franchised Rests. LLC v. Nader, no. 13-13023, 2014 U.S. Dist.
    LEXIS 130291 (D. Mass. Sept. 17, 2014) .............................................................. 16

Fletcher v. Haas, 851 F. Supp. 2d 287 (D. Mass. 2012) ................................................... 14

Gastronomical Workers Union Local 610 v. Dorado Beach Hotel Corp., 617 F.3d 54
    (1st Cir. 2010) ................................................................................................... 5

Hightower v. City of Boston, 693 F.3d 61 (1st Cir. 2012) ................................................... *passim*

Hightower v. City of Boston, 822 F. Supp. 2d 38 (D. Mass. 2011), aff'd,
    693 F.3d 61 (1st Cir. 2012) ................................................................................. 5, 8

Horsley v. Trame, 808 F.3d 1126 (7th Cir. 2015) ............................................................. 7

Kachalsky v. Cacace, 817 F. Supp. 2d 235 (S.D.N.Y. 2011), aff'd sub nom.
    Kachalsky v. County of Westchester, 701 F.3d 81 (2d Cir. 2012) ....................................... 5, 7

McDonald v. Chicago, 561 U.S. 742 (2010) ..................................................................... 5

Morial v. Judiciary Comm'n of Louisiana, 565 F.2d 295 (5th Cir. 1977)................................. 17

Morin v. Leahy, no. 4:15-CV-40048, 2016 U.S. Dist. LEXIS 65490 (D. Mass.
    May 18, 2016), appeal pending no. 16-1904 (1st Cir. notice filed Jul. 1, 2016) ..................... 14

Norman v. State, 159 So. 3d 205 (Fla. Dist. Ct. App. 2015) ................................................ 9

O'Connell v. Walsh, no. 15-10096, 2015 U.S. Dist. LEXIS 173021
    (D. Mass. Dec. 30, 2015) ................................................................................. 6, 8

Patsy v. Bd. of Regents, 457 U.S. 496 (1982) ................................................................. 7

Patterson v. Novartis Pharms. Corp., 909 F. Supp. 2d 116 (D.R.I. Aug. 28, 2012)..................... 16

Peruta v. County of San Diego, 824 F.3d 919 (9th Cir. 2016) ............................................. 9

Peterson v Martinez, 707 F.3d 1197 (10th Cir. 2013) ....................................................... 9

Powell v. Tompkins, 783 F.3d 332 (1st Cir. 2015) ....................................................... 11-12

R.I. Ass'n of Realtors v. Whitehouse, 199 F.3d 26 (1st Cir. 1999) ....................................... 5

Shepard v. Madigan, 734 F.3d 748 (7th Cir. 2013) ........................................................... 9

Smith v. Mass. Bay Transp. Auth., 462 Mass. 370, 968 N.E.2d 884 (2012)................................ 4

Steffel v. Thompson, 415 U.S. 452 (1973) ..................................................................... 7

### STATUTES

1906 Mass. Acts c. 172 ............................................................................................. 2

1957 Mass. Acts c. 688 ............................................................................................. 2

1968 Mass. Acts c. 737 ............................................................................................. 2

1998 Mass. Acts c. 180 ............................................................................................. 3

2014 Mass. Acts ch. 284 ........................................................................................... 4

28 U.S.C. § 1343 ................................................................................................................... 7
28 U.S.C. § 2254 ................................................................................................................. 11
42 U. S. C. § 1983 ................................................................................................................. 7
M.G.L. c. 140, § 121 ............................................................................................................ 3
M.G.L. c. 140, § 129B .......................................................................................................... 3
M.G.L. c. 140, § 129C .......................................................................................................... 2
M.G.L. c. 140, § 131 ......................................................................................................... 3-4
M.G.L. c. 269, § 10 .............................................................................................................. 2

## OTHER AUTHORITIES

Brian MacQuarrie, "Want a gun license in Massachusetts? Much depends on where
    you live," <u>Boston Globe</u> (Mar. 10, 2013) ................................................................. 4
Chief Ron Glidden & Atty. Jack Collins, <u>Firearms Licensing Problem Areas</u> (2014).................. 4
Ronald C. Glidden & John M. Collins, <u>Law Enforcement Guide to Firearms Laws</u>
    (14th ed. 2009)................................................................................................................ 4

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. II................................................................................................... *passim*
U.S. Const. amend. XIV ........................................................................................... 1, 16

Defendant has in no way established entitlement to judgment on the pleadings. Defendant's argument that Plaintiffs' claims "are not ripe because Plaintiffs do not allege that they have exhausted their remedies" is misplaced and meritless, regardless of whether Defendant is raising claims of ripeness or exhaustion. And Defendant's argument that Plaintiffs' claims fall entirely outside the scope of the Second Amendment is wholly unsupported. The decisions of the First Circuit do *not* establish any holding that the right to keep and bear arms stops at the threshold of one's home, and indeed, the First Circuit has actually been careful to avoid make statements that could be so construed. Rather, Defendant's argument that Plaintiffs are outside of the scope of the Second Amendment relies on a misconstruction of the state laws that currently govern firearms licenses. Finally, since this is a pleading-stage motion, rather than a motion that considers actual evidence, there is plainly no basis for the Court to analyze Defendant's policy, practice, or custom—which remains a secret—and then uphold it as constitutional, as Defendant invites. Just the same, there is no basis on which the Court could possibly reach the conclusion that Defendant's undisclosed policy, practice, or custom is or is not invalid facially and does or does not give rise to claims arising under the equal protection and due process components of the Fourteenth Amendment.

The past and present parameters of Massachusetts firearms laws are essential to evaluating some of the persuasive authorities that Defendant has cited. Thus, Plaintiffs begin by detailing the pertinent legislative history and then proceed to address Defendant's arguments.

## I)  **Pertinent Massachusetts Gun Laws**

The activities that each type of Massachusetts firearms license authorizes has changed over time—a fact that is critical to properly interpreting both the burdens at issue in this case and the import of certain judicial decisions. Plaintiffs detail the pertinent changes from 1906 to 2014 to establish the following basic points:

- For the 30-year period from 1968 through 1998, a Firearms Identification card ("FID") authorized people to keep handguns in their homes (but only in their homes).

- Since 1998, an FID has *not* authorized the possession of any type of handgun, whether at home or away from the home, subject only to (immaterial) exceptions allowing possession at certain firing ranges. Since 1998, a person must have a license to carry firearms ("LTC") in order to possess or carry a handgun anywhere.

- From 1998 through 2014, Massachusetts law provided for two types of LTCs:

  o a "Class B" LTC that authorized the carry of handguns in open view, but not concealed and did not allow ownership of "large capacity" handguns; and

  o a "Class A" LTC that authorized the carry of handguns in any manner (open or concealed) and did not distinguish on the basis of capacity.

- Massachusetts law has prohibited the issuance, renewal or application for "Class B" LTCs since August 11, 2014. Since this date, people can only obtain "Class A" licenses.

The Massachusetts General Court first enacted a ban on carrying guns in any manner (open or concealed) in 1906. See 1906 Mass. Acts c. 172. The language of this original enactment was so broad it appeared to cover the act of carrying a gun within one's home, and as a result, the General Court amended the law in 1957 to exempt the possession or carry of a handgun inside one's home. See 1957 Mass. Acts c. 688; see also Commonwealth v. Seay, 376 Mass. 735, 741-42 & n.5, 383 N.E.2d 828, 832 & n.5 (1978).

In 1968 the General Court enacted legislation requiring anyone in possession of any type of gun (rifle, shotgun, or handgun) to obtain a Firearms Identification card ("FID"). See 1968 Mass. Acts c. 737, § 7, sec. 129C, codifed as amended at M.G.L. c. 140, § 129C. From this point going forward, a person with an FID could keep a handgun at home without violating § 129C, but the person would violate M.G.L. c. 269, § 10 if they took the handgun outside of their home without an LTC.

In 1998 the General Court changed this framework in two material respects. First, the 1998 act eliminated the ability to possess a handgun at home with an FID. Specifically, the

General Court amended M.G.L. c. 140, § 129B to include the restriction that an FID "shall not entitle a holder thereof to possess:  (i) a large capacity firearm . . . ; or (ii) a non-large capacity firearm. . . ."  1998 Mass. Acts c. 180, § 29, codified at M.G.L. c. 140, § 129B(6).  Under Massachusetts law, a "firearm" is (*inter alia*) a handgun, but not (generally) a rifle or shotgun. See M.G.L. c. 140, § 121.  And a "large capacity" firearm is one that (*inter alia*) is "capable of accepting" an ammunition magazine holding more than 10 rounds, while a "non-large capacity" firearm is one that cannot (*i.e.* the whole of the rest of the field).  See id.  Thus, since 1998 Massachusetts law has expressly provided that an FID does *not* authorize the possession of any type of handgun, whether at home or anywhere else.  Materials from the Governor's File for the 1998 act reflect this intention.  For example, the sponsoring state senators released a press release explaining that the act "[c]reates a new licensing structure for all guns," and that under this new structure, an "FID card:  [was] for all non-large capacity rifles and shotguns," but that LTCs alone would now authorize the possession of "handguns."  See Dec. of David Jensen, ex. 1, at 1.  The Executive Bill Summary the House of Representatives prepared explained that FID cards would now allow "the possession of only . . . Non-Large Capacity Rifles & Shotguns."  Id. ex. 2, at 5.  The House's summary further clarified that "[a]n FID Card shall not allow the holder to purchase any Firearm (e.g. Handgun) or any Large Capacity Weapon."  Id. at 6.  Finally, a summary by the Executive Department of Public Safety reiterated that an FID would now allow the possession of "firearms, only at a gun club . . . under direct supervision of" an LTC holder, and that an FID "shall not allow the holder to purchase any firearm (handgun) or any large capacity weapon."  Id. ex. 3, at 6.

The second significant change from the 1998 act was an amendment to § 131 to create two categories of LTCs—"Class A" and "Class B."  See 1998 Mass. Acts ch. 180, sec. 41.  Put

simply, a Class B license was a limited version of a Class A license—and one that offered no benefit or advantage that a Class A license did not.  A Class B license did not authorize its holder to:  (1) possess "large capacity firearms;" or (2) "to carry or possess a loaded firearm in a concealed manner in any public way or place."  M.G.L. c. 140, § 131(b).  Thus, a person with a Class B LTC can carry a gun in open view, but not concealed, while a person with a Class A LTC can carry a gun in either manner.

The final legislative change took place in 2014, when the General Court prospectively eliminated the Class B license.[1]  See generally 2014 Mass. Acts ch. 284.  The 2014 Act provided that, effective immediately (i.e. August 11, 2014),[2] no "licensing authority . . . shall issue, renew or accept application for a Class B license to carry."  Id. sec. 101.  Previously issued Class B LTC's will remain in effect until they expire, or until July 31, 2020 at the latest.  See id.  The Act deletes remaining statutory references to "Class A" and "Class B" on January 1, 2021.  See id. sec. 24, 46, 60, 68, 71, 91, 112.

## II)   Plaintiffs' Claims are Ripe

Plaintiffs' claims are ripe because "the necessary factual predicate is sufficiently matured to allow a court to resolve the issue presented."  Gastronomical Workers Union Local 610 v.

---

[1] The Class B LTC was problematic.  In order to distinguish between "large capacity" and "non-large capacity" firearms the Commonwealth had to maintain lengthy rosters of firearms that Class B licensees could purchase or possess.  In a release prepared by Chief Glidden (the author of Law Enforcement Guide to Firearms Laws, an authoritative source on Massachusetts firearms law), the Massachusetts Chiefs of Police Association had recommended that departments not issue Class B licenses so as to avoid confusion.  See Chief Ron Glidden & Atty. Jack Collins, Firearms Licensing Problem Areas (2014), attached to Jensen Dec. as Exhibit 4; see also Ronald C. Glidden & John M. Collins, Law Enforcement Guide to Firearms Laws p. 74 (14th ed. 2009). Notably, only a very small proportion (around 1%) of LTCs were issued with the "Class B" designation.  See Brian MacQuarrie, "Want a gun license in Massachusetts? Much depends on where you live," Boston Globe (Mar. 10, 2013).

[2] The act's emergency preamble makes its provisions effective immediately, unless another day is set.  See generally Smith v. Mass. Bay Transp. Auth., 462 Mass. 370, 377, 968 N.E.2d 884, 891 (2012).

Dorado Beach Hotel Corp., 617 F.3d 54, 61 (1st Cir. 2010).  "[S]tanding is a question of who"

can bring a claim, while ripeness "is a question of when," but "standing and ripeness may

substantially overlap."  R.I. Ass'n of Realtors v. Whitehouse, 199 F.3d 26, 33 (1st Cir. 1999).

Here, it is plain as day that Defendant's decision is final—the Plaintiffs have asked for LTCs

without "Hunting and Target" restrictions, and the Defendant has said, "no."  There is

accordingly no occasion to address whether considerations of hardship might justify reviewing a

matter that is otherwise not fit.

Courts have repeatedly rejected similar ripeness agreements.  One notably example is

Kachalsky v. Cacace, 817 F. Supp. 2d 235 (S.D.N.Y. 2011), aff'd sub nom. Kachalsky v. County

of Westchester, 701 F.3d 81 (2d Cir. 2012), where the plaintiffs challenged the defendant's

decision to place target-shooting restrictions on their New York handgun licenses.  See id. at

243-44.  The defendants argued that the claims were not ripe both because some plaintiffs had

"failed to apply for full-carry [unrestricted] permits post-McDonald, and because [some

plaintiffs'] claims precede any state court ruling interpreting New York's 'proper cause'

requirement post-McDonald. . . ."  Id. at 248 (citing McDonald v. Chicago, 561 U.S. 742

(2010)).  The court rejected the argument, explaining that the "denial of the Individual Plaintiffs'

permit applications constitutes an actual and ongoing injury because it forestalls the exercise of

their alleged constitutional rights."  Id. at 249.

Defendant's own citations bear this out.  Defendant relies primarily on Hightower v. City

of Boston, 693 F.3d 61 (1st Cir. 2012), but there both the First Circuit and the district court

actually *rejected* the City of Boston's argument that the plaintiff's claim was unripe.  See id. at

71; see also Hightower v. City of Boston, 822 F. Supp. 2d 38, 52 (D. Mass. 2011) ("There is

little difficulty in finding an actual controversy if all of the acts that are alleged to create liability

have already occurred." (quotations and citations omitted)), aff'd, 693 F.3d 61 (1st Cir. 2012).

The specific issue in that case was the revocation of an unrestricted, Class A license the plaintiff

had previously held.  See Hightower, 693 F.3d at 70-71.  The city argued that her claim was not

ripe because she had not attempted to apply for another license, even though there were some

indications it would be granted if she did, and furthermore, because she had never applied for or

held a Class B license, which was still available at the time.  See id.  The court rejected the

ripeness argument, ruling that "the fact that Hightower can apply for" a Class B license "does not

render her claim unripe."  Id. at 71.  Rather, the court's view was that the claim *was* ripe, but that

the plaintiff only had standing to challenge the "denial of the additional benefits granted by an

unrestricted Class A license, over and above those granted by a Class B license"—concealed

carry and the possession of "large capacity" handguns.  See id. at 70-71.  While a substantial part

of this reasoning is now out the window—as people no longer have the ability to apply for a

Class B license—this only bolsters the conclusion that the claim is ripe.  There is no longer any

other license that plaintiffs could apply for.

Even more telling is the district court's decision in O'Connell v. Walsh, no. 15-10096,

2015 U.S. Dist. LEXIS 173021 (D. Mass. Dec. 30, 2015), where a pro se plaintiff challenged

various aspects of the LTC application process—but had never applied for a license.  See id. at

*2-3.  The court had little difficulty concluding that "O'Connell's failure to apply for a license to

carry a firearm renders his claim unripe."  Id. at *5.  This is manifestly not analogous to the

circumstances presented here, as all Plaintiffs applied for LTC's—and further, they specifically

requested LTC's that would allow them to bear arms for the purpose of protection.

## III)   Exhaustion is Not Required

Defendant's first point of argument appears to blend the concepts of ripeness and

exhaustion by arguing (p. 5) that Plaintiffs' claims "are not ripe because Plaintiffs do not allege

that they have exhausted their remedies."  Defendant finishes this argument with the conclusion (p. 6) that the Court should dismiss "for Plaintiffs' failure to exhaust available state law remedies." To the extent Defendant is arguing for an exhaustion requirement, the argument is meritless.

It is well established that "[t]here is no general duty to exhaust state judicial or administrative remedies before pursuing an action under 42 U.S.C. § 1983." Patsy v. Bd. of Regents, 457 U.S. 496, 516 (1982).  "When federal claims are premised on 42 U. S. C. § 1983 and 28 U.S.C. § 1343(3)—as they are here—we have not required exhaustion of state judicial or administrative remedies, recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights.". Steffel v. Thompson, 415 U.S. 452, 472-73 (1973).

For example, in Kachalsky—which (again) concerned the imposition of "target" restrictions on New York handgun licenses—the district court relied on Steffel to reject the argument the defendant's argument that the plaintiffs needed to exhaust available state law remedies. See Kachalsky, 817 F. Supp. 2d at 250.  Similarly, in Horsley v. Trame, 808 F.3d 1126 (7th Cir. 2015), a plaintiff challenged the age requirement for a firearms license under Illinois law. Id. at 1127-28.  The plaintiff there had attempted to apply for a license, but state officials had returned her application due to the age restriction she challenged. See id. at 1127. The Seventh Circuit ruled that "to the extent that [defendant] is arguing that we should not review this case on the basis that [plaintiff] failed to exhaust her administrative remedies, we disagree." Id. at 1129.  The court relied on Patsy for the proposition that "[t]here is no general duty to exhaust." Id. (citing Patsy, 457 U.S. at 516).

None of Defendant's cases are on-point.  Neither of the <u>Hightower</u> opinions contain the word "exhaust," nor does the district court's decision in <u>O'Connell v. Walsh</u>.  Regardless of whether Defendant's argument is premised on ripeness or exhaustion, it is devoid of merit.

**IV)   Plaintiffs State a Valid Second Amendment Claim**

The Second Amendment provides that "the right of the people to keep and bear arms, shall not be infringed."  U.S. Const. amend. II.  The Supreme Court has ruled that "[a]t the time of the founding, as now, to 'bear' meant to 'carry,'" but that "[w]hen used with 'arms,' . . . the term has a meaning that refers to carrying for a particular purpose—confrontation."  <u>District of Columbia v. Heller</u>, 554 U.S. 570, 584 (2008).  The Court's decision rested on the rationale that self-defense is the "the *central component* of the right itself."  <u>Id.</u> at 599 (emphasis in source); <u>see also</u> <u>United States v. Rene E.</u>, 583 F.3d 8, 11 (1st Cir. 2009) (quoting <u>Heller</u>, 554 U.S. at 584).  The restrictions that Defendant imposed on Plaintiffs' LTCs prevent the Plaintiffs from using handguns for this core purpose anywhere but inside their home.  <u>See</u> Amended Complaint ¶¶ 1, 63-64.  This states a prima facie case.

**a.   The First Circuit has not Limited the Second Amendment to the Home**

Defendant's entire motion is premised on its claim (p. 6) that the "Target & Hunting" restrictions it has imposed "protect and even go beyond the full scope of the Second Amendment rights recognized in the First Circuit."  Since these restrictions concededly do not permit the act of bearing arms for the core Second Amendment purpose of self-protection anywhere but one's home, Defendant's argument could only have merit if the First Circuit had *held* that the Second Amendment only applies within one's home.  And contrary to Defendant's claim, the First Circuit has not so held.

Certainly the First Circuit did not so hold in <u>Hightower</u>, as the court specifically warned that it was "not reach[ing] the question of what standard of scrutiny applies here."  <u>Hightower</u>,

693 F.3d at 74.  As discussed *supra*, the issue in that case was bearing arms in a concealed manner, not bearing arms in any manner, as the court had concluded that the plaintiff only had standing to challenge "the additional benefits granted by an unrestricted Class A license, over and above those granted by a Class B license."  Id. at 71.  Yet the court declined to hold that this additional benefit—concealed carry—was categorically outside protection.  Compare Peruta v. County of San Diego, 824 F.3d 919, 927 (9th Cir. 2016) ("there is no Second Amendment right for members of the general public to carry concealed firearms in public") and Peterson v Martinez, 707 F.3d 1197, 1201 (10th Cir. 2013) (holding that carry in a concealed manner "does not fall within the scope of the Second Amendment's protections.") with Shepard v. Madigan, 734 F.3d 748, 749-50 (7th Cir. 2013) (Illinois legislation that was a "'concealed carry' law; that is, in contrast to 'open carry' laws, the gun must not be visible to other persons" was "[c]onsistent with" the court's prior decision that overturned Illinois' complete ban on carrying guns) and Norman v. State, 159 So. 3d 205, 219 (Fla. Dist. Ct. App. 2015) ("Florida's ban on open carry, while permitting concealed carry, does not improperly infringe on Florida's constitutional guarantee, nor does it infringe on 'the central component' of the Second Amendment—the right of self-defense." (quoting Heller, 554 U.S. at 599)).

Significantly, while there is a developing split of authority—on the question of whether concealed carry is categorically unprotected such that states must allow open carry, even if they prefer concealment—none of these courts have adopted the view that there is simply no right to carry at all.  The Ninth Circuit declined to rule on the existence of a right to carry openly, reasoning that the issue was not before the court, while the Tenth Circuit suggested that a plaintiff seeking the specific right of open carry would have been entitled to relief.  See Peruta, 824 F.3d at 939; Peterson, 707 F.3d at 1209 ("had [the plaintiff] challenged the Denver

ordinance [that prohibits open carry], he may have obtained a ruling that allows him to carry a firearm openly while maintaining the state's restrictions on concealed carry").  Of course, there is now only one form LTC available, and this LTC does not mandate concealment, but instead also allows carry in open view—so this split of authority would not provide a basis for resolving this matter.  It suffices to say that while there is some disagreement about precisely if and how concealed carry is protected, there is relatively little disagreement that "[o]nly an unrealistic reading of that language [of the Second Amendment] could restrict the right to the home. . . ." Bonidy v. United States Postal Serv., 790 F.3d 1121, 1131 (10th Cir. 2015).

In any event, to resolve Hightower the First Circuit did not hold the Second Amendment homebound, but instead "assum[ed] there is some Second Amendment interest in carrying the concealed weapons at issue." Hightower, 693 F.3d at 74.  And moving beyond this presmise, the only substantive issue before the court was whether the Boston Police Department could constitutionally revoke the license "on the basis of providing false information" on an application form.  Id. at 74.  Not surprisingly, the court ruled that it could, as "[a] requirement that information on firearms license applications be accurate is an important government interest." Id.  Indeed, the court indicated that it would only be able to find such a requirement unconstitutional if the very premise of licensing was itself constitutional, as "[u]nder our analysis of Heller, as follows, the government may *regulate* the carrying of concealed weapons outside of the home." Id. at 73 (emphasis added).

Thus, the First Circuit plainly did not hold in Hightower that there was no Second Amendment right outside the home.  Moreover, the decision in Hightower addressed a different regulatory scheme that imposed substantially different burdens.  Since August 2014, the only burden at issue has been the ability to bear arms in *some* manner, including in the open, and thus,

much of Hightower's rationale has only tangential relevance.   Suffice it to say that even if the relevance was more than tangential, the decision still would not stand for the broad holding Defendant attempts to attach to it.

And the First Circuit also did not limit the Second Amendment to the home in Powell v. Tompkins, 783 F.3d 332 (1st Cir. 2015).  First and foremost, this case was a habeas corpus petition under which the petitioner was not entitled to relief in the absence of "conflict[] with clearly established Supreme Court precedent."  Id. at 335; see also 28 U.S.C. § 2254(d)(1).  The issue there was a 2008 conviction for carrying a handgun without a license, and the petitioner's essential claim—grounded primarily in due process—was that the state could not constitutionally put the burden of producing a license on him.  See Powell, 783 F.3d at 334-35.  Thus, the basic issues in that case were significantly different from the issues here, and moreover, the case concerned the situation that previously existed from 1998 through 2014, when an individual could apply for either a Class A or Class B license.  See id. at 338 & n.2 ("Our survey of Massachusetts law in this opinion generally adheres to the laws in effect at the time of Powell's criminal conduct.").  The court's unsurprising ruling was that even if the burden-of-production question were a close one, it would not cross "the threshold required for establishing an objectively unreasonable application of federal law under AEDPA."  Id. at 343.  The court then addressed the petitioner's claim that the Second Amendment independently invalidated the burden-of-production scheme and rejected this claim under the "clearly established" standard. See id. at 347-48.  The court reasoned that "[w]hile the Supreme Court spoke of a right of law-abiding, responsible citizens to keep and bear arms 'in case of confrontation' outside the context of an organized militia, it did not say, and to date has not said, that *publicly* carrying a firearm unconnected to defense of hearth and home and unconnected to militia service is a definitive

right of private citizens protected under the Second Amendment," a point on which "[d]ebate continues among courts." Id. at 348 (quoting Heller, 554 U.S. at 582-92; other citations and quotations omitted) (emphasis in source).

It may be sufficient for purposes of the "clearly established" standard to observe that the Supreme Court has not yet "definitively" ruled on the issue, as indicated by ongoing debate among lower courts—but this is not sufficient for a non-habeas case where the issue is the actual scope of the law.  And on this point, what matters about Powell is what the First Circuit took the time to qualify:  "This circuit has yet to weigh in on 'the scope of the Second Amendment as to carrying firearms outside the vicinity of the home without any reference to protection of the home.'"  Id. at 348 (quoting Hightower, 693 F.3d at 72).

### b. Defendant's Remaining Authorities and Arguments are Readily and Properly Distinguished

Defendant's remaining authorities are persuasive, not binding—making them a dubious source of authority for a motion for judgment on the pleadings.  In any event, a proper analysis of these authorities, paying particular attention to the current and past statutory burdens detailed *supra* Point I, readily distinguishes them.

For example, Defendant cites (p. 9) Chief of Police v. Holden, 470 Mass. 845, 853, 26 N.E.3d 715, 723 (2015) for the proposition that "there is no Second Amendment right to carry a concealed weapon outside the home" and that "'the denial of a Class A license to carry a concealed firearm . . . falls outside the Second Amendment.'"  The defect in this analysis is that Holden concerned conduct that took place in 2005, well before the 2014 legislation that prospectively eliminated two separate classes of license, meaning that it did not address the current situation in which there is only one license available, and that license makes no

distinction between whether a person carries concealed or in the open.  See id. at 848.[3]  Setting

this aside, Holden conflicts with binding authorities from the First Circuit that decline to

categorically rule that no protections attached to Class A licenses during the pre-2014 period.

Indeed, most of Defendant's case citations are nothing more than an attempt to

*misconstrue* the current parameters of state law.  For example, Defendant cites (pp. 9, 16) the

First Circuit's decision in Rene E., 583 F.3d at 12, for the proposition that there is no right to

possess "high-capacity firearms," but this wholly ignores the fact that "high-capacity firearms"

are not at issue here.  The complaint does not claim there is a constitutional right to possess

"high-capacity firearms," and it is no longer a situation where an individual could choose to

apply for some different license that would not apply to such guns.  Notably, the decision in

Rene E. also concerned conduct that took place well before the General Court had prohibited the

future issuance of Class B licenses.  See id. at 9 (events took place in 2008).

Defendant's citation (p. 7) to Commonwealth v. Gouse, 461 Mass. 787, 799 n.14, 965

N.E.2d 774, 785 n.14 (2012), exemplifies the problem of cavalierly citing decisions without

regard to whether the statutes at issue have changed.  The criminal defendant in that case had

been found in possession of a handgun inside a vehicle.  See id. at 788, 965 N.E.2d at 777.  One

point of his appeal was his argument that the court should reverse his conviction because there

had been no proof that he lacked an FID.  See id. at 799 n.14, 965 N.E.2d at 785 n.14.  Of

course, an FID has not authorized the possession of a handgun *anywhere* since 1998, so it was

obviously no basis on which to appeal the conviction.  But when the court rejected this claim in a

---

[3] Curiously, while the court in Holden noted that the 2014 legislation had amended the statute
and would eliminate the remaining references to "Class A" and "Class B" in 2021, it failed to
take note that the 2014 legislation already prohibits the issuance of Class B licenses.  See
Holden, 470 Mass. at 851 nn.5-6, 26 N.E.3d at 721-22 nn.5-6.  To be fair, the issue was not
essential to the court's ruling.

footnote, it unfortunately used language indicating that an FID still authorized home possession, even though the law had changed.  See id.  But again, this point was irrelevant dicta to the defendant's appeal.

But then another decision that Defendant cites (pp. 2, 7, 9, 11-12) seizes on this incorrect dicta to deny relief on the merits.  See Morin v. Leahy, no. 4:15-CV-40048, 2016 U.S. Dist. LEXIS 65490, *7 (D. Mass. May 18, 2016), appeal pending no. 16-1904 (1st Cir. notice filed Jul. 1, 2016).  The decision in Morin concerned whether it was constitutional to deny LTCs to individuals who had been convicted of non-felony offenses related to the carry of firearms, and the plaintiff in that case had been arrested while carrying a gun out-of-state under his valid Massachusetts LTC.  See id. at *2.  Although the case concerned an application that the plaintiff had submitted in 2015, after it was no longer possible to apply for a Class B license, the court inexplicably analyzed the issue using the pre-2014 regulatory framework and reasoned that a Class A license was merely the additional privilege of concealed carry.  See id. at *5-7. Furthermore, the court relied on Gouse to opine that the plaintiff could still obtain an FID that would allow him to possess a "firearm"—which under Massachusetts law is a handgun—at his home or business.  See id. at *7.  From these two erroneous premises, the court then reached the conclusion that "Hightower is directly applicable, and the Second Amendment issue must be resolved in favor of the Commonwealth."  Id. at *12.  But the court's predicate conclusions, grounded largely in dicta, *directly contravene* the express language of both the 1998 and 2014 acts, as well as the related materials from the Governor's File.  See also Fletcher v. Haas, 851 F. Supp. 2d 287, 288-89 (D. Mass. 2012) (correctly observing that an FID allows possession of certain rifles and shotguns, while and LTC authorizes the possession of handguns).  The plaintiff could not have applied for a Class  B license, and the licensing authority could not have issued

him one.  Moreover, an FID would not have allowed the plaintiff to possession a handgun in his home.

### c. Defendant Has Not Demonstrated the Constitutionality of its Unknown Policy, Practice, or Custom, Whether "Facial" or Not

Although there is not a shred of evidence before the Court, and although the Court previously found that issues of fact prevented it from reaching a ruling on the merits in <u>Davis v. Grimes</u>, Defendant makes the last-ditch argument that its policy, practice, or custom conclusively survives constitutional review.  Defendant cites authority to support the generic proposition that the societal interest in public safety is important or significant, but this does nothing to establish that its policy, practice, or custom has an adequate degree of fit, or any degree of fit.  How could it?  None of the parameters of Defendant's policy, practice, or custom are even before the Court.  For example, Defendant's policy, practice, or custom *might* be to issue unrestricted licenses to every third applicant.  Or, it *might* be to issue unrestricted licenses to people in "professional" occupations or who make a certain amount of money.  Or, it *might* be to issue unrestricted licenses to all applicants that meet nondiscretionary qualifications related to training or competence.  Indeed, the possibilities are virtually endless, but the actual parameters are essential to the analysis—which is why discovery is needed in the first place.

Defendant's arguments regarding facial invalidity (pp. 16-17) are likewise nothing but a distraction.  The concepts of "facial" and "as-applied" relief are not pleading requirements, but instead relate to the breadth of relief the Court grants.  <u>See</u> <u>Citizens United v. FEC</u>, 558 U.S. 310, 331 (2010).  A statute is invalid "as-applied" if the Court finds it invalid in specific circumstances, and it is "facially" invalid if the Court finds the deficiencies go beyond the circumstances presented and leave the statute with no plainly legitimate sweep.  <u>See</u> <u>Doe v.</u>

Reed, 561 U.S. 186, 194 (2010).  "The label is not what matters."  Id.  And indeed, the Amended

Complaint does not even use these terms.

The fundamental problem with Defendant's claim of facial validity is that there is no

evidence of Defendant's policy, practice, or custom before the Court—indeed, Defendant has not

even disclosed this information yet.  So how could the Court possibly make a ruling that

definitively determined that the *unknown* policy, practice, or custom was valid or invalid in all its

applications or only in some of them?  The court cannot determine the scope of the deficiency

before it even knows what the deficiency is.

**V)     Claims Germane to the Equal Protection and Due Process Components of the
         Fourteenth Amendment Depend on Facts to be Developed in Discovery**

Defendant's claim that the Court should dismiss any and all claims premised on the equal

protection or due process components of the Fourteenth Amendment (pp. 12-15) is premature.

Preliminarily, it must be observed that the Amended Complaint does not raise a procedural due

process claim and does not contain the phrase "procedural due process."  However, "a dismissal

under Rule 12 is a final decision on the merits."  Patterson v. Novartis Pharms. Corp., 909 F.

Supp. 2d 116, 120 (D.R.I. Aug. 28, 2012).  It would be unfair to dismiss a claim that plaintiffs

have not even raised on the merits—particularly given that the discovery that Defendant has yet

to provide could reveal the basis for such a claim.

A Rule 12 motion is premature where the parties have not engaged in serious discovery

and the plaintiff has indicated a willingness to amend the complaint, if necessary.  See Dunkin'

Donuts Franchised Rests. LLC v. Nader, no. 13-13023, 2014 U.S. Dist. LEXIS 130291, *4 (D.

Mass. Sept. 17, 2014); see also Smothers v. Benitez, 806 F. Supp. 299, 302 & n.5 (D.P.R. 1992);

Black v. Franklin County, no. 3:05-18, 2005 U.S. Dist. LEXIS 26362, *8 (E.D. Ky. Aug. 16,

2005).  Put simply, Plaintiffs have no basis on which to reach a conclusion about whether the

facts state a plausible claim premised on equal protection.  While Defendant argues that such a claim could only be based on evidence of disparate treatment, the reality is that equal protection analysis "retains independent worth" because it "serves to illumine the state's interest in burdening those of the plaintiff's class and the necessity of doing so in order to advance that interest."  <u>Morial v. Judiciary Comm'n of Louisiana</u>, 565 F.2d 295, 304 (5th Cir. 1977) (en banc).  There is no basis for dismissing this claim without the opportunity for further discovery, and this is especially the case where Defendant will need to participate in discovery, anyway.

**VI)   Conclusion**

Defendant is not entitled to judgment on the pleadings.  Rather, if Defendant seeks to assert that its policy, custom, and/or practice passes judicial review, it must provide information in discovery sufficient to enable this review to take place.

Dated: February 20, 2017

Respectfully submitted,

**DAVID JENSEN** PLLC

By: _____

David D. Jensen, Esq.
111 John Street, Suite 420
New York, New York 10038
Tel:  212.380.6615
Fax:  917.591.1318
david@djensenpllc.com

Patrick M. Groulx, Esq.
BBO No. 673394
Grolman, LLP
321 Columbus Avenue
Boston, Massachusetts 02116
Tel:  617.859.8966
Fax:  617.859.8903
patrick@grolmanllp.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 20, 2017.

/s/ David D. Jensen
David D. Jensen, Esq.