## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANNY WENG; CHRISTOPHER HART; MARKUS VALLASTER; SARAH ZESCH; JOHN STANTON; MICHAEL GOULD; and COMMONWEALTH SECOND AMENDMENT, INC., | ) ) ) ) ) ) |
| | CIVIL ACTION NO. 1:16-cv-10181-FDS |
| Plaintiffs, | ) ) |
| -against- | ) ) |
| WILLIAM B. EVANS, in his Official Capacity as Commissioner of the Boston Police Department; and DANIEL C. O'LEARY, in his Official Capacity as Chief of the Brookline Police Department, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND & MATERIAL FACTS ............................................................................ 2

I)    The Laws at Issue .......................................................................................................... 2

    a.    Massachusetts Law Prohibits Carry in Any Manner without an LTC ............... 2

    b.    An LTC Authorizes "Carry" in any Manner (Open or Concealed) ................... 2

    c.    Police Chiefs Issue LTCs and have Broad Authority to Impose Restrictions ... 3

    d.    Pertinent Statutory History ................................................................................ 3

II)    The Policies and Practices at Issue ............................................................................. 5

    a.    Both Departments Presumptively Impose Restrictions ..................................... 5

    b.    The Restrictions Preclude Defensive Carry ...................................................... 6

    c.    Current Practices ................................................................................................ 6

III)    Application of the Laws, Policies, and Practices Against the Plaintiffs ...................... 7

    a.    Plaintiff Danny Weng (Boston) ........................................................................ 8

    b.    Plaintiff Chris Hart (Boston) ............................................................................. 9

    c.    Plaintiff Sarah Zesch (Boston) ........................................................................ 10

    d.    Plaintiff John Stanton (Boston) ....................................................................... 10

    e.    Plaintiff Michael Gould (Brookline) ............................................................... 11

    f.    Commonwealth Second Amendment (Comm2A) ........................................... 12

ARGUMENT ..................................................................................................................... 13

I)    The Right to Keep and Bear Arms is the Right to Possess and Carry Weapons ........ 13

II)    Other Circuits Have Taken Varied Approaches ........................................................ 14

III)    This Court's Ruling in Batty v. Albertelli ................................................................. 16

IV)    The D.C. Circuit's Decision in Wrenn v. District of Columbia .......................... 17

    a.    The Law at Issue in Wrenn ............................................................................. 18

    b.    Carrying Arms is a "Core" Activity ............................................................... 19

    c.    The Standard of Review ................................................................................... 19

CONCLUSION ................................................................................................................... 20

## TABLE OF AUTHORITIES

**CASES**

Batty v. Albertelli, no. 15-10238, 2017 U.S. Dist. LEXIS 26124
  (D. Mass. Feb. 24, 2017)......................................................................3, 13, 16-17
Commonwealth v. O'Connor, 89 Mass. 583 (1863)..................................................... 4
Commonwealth v. Powell, 459 Mass. 572, 964 N.E.2d 114 (2011) ............................. 2
Commonwealth v. Seay, 376 Mass. 735, 383 N.E.2d 828 (1978)................................. 4
District of Columbia v. Heller, 554 U.S. 570 (2008)........................................... passim
Drake v. Filko, 724 F.3d 426 (3d Cir. 2013) ...................................................... 15, 17
Grace v. District of Columbia, 187 F. Supp. 3d 124 (D.D.C. 2016),
  vacated sub nom. Wrenn v. District of Columbia, no. 16-7025,
  2017 U.S. App. LEXIS 13348 (D.C. Cir. Jul. 25, 2017) .................................... 18
Hightower v. City of Boston, 693 F.3d 61 (1st Cir. 2012) ......................................... 16
Kachalsky v. County of Westchester, 701 F.3d 81 (2d Cir. 2012) .............................. 15
McCullen v. Coakley, 134 S. Ct. 2518 (2014)......................................................... 20
Moore v. Madigan, 702 F.3d 933 (7th Cir. 2013)..................................................... 16
Morin v. Leahy, 862 F.3d 123 (1st Cir. 2017) ....................................................2-3, 14
Norman v. State, 159 So. 3d 205 (Fla. Dist. Ct. App. 2015) ..................................... 16
Palmer v. District of Columbia, 59 F. Supp. 3d 173 (D.D.C. 2014)........................... 18
Peruta v. County of San Diego, 824 F.3d 919 (9th Cir. 2016) ................................... 16
Peterson v Martinez, 707 F.3d 1197 (10th Cir. 2013) .............................................. 16
Powell v. Tompkins, 783 F.3d 332 (1st Cir. 2015) ................................................... 14
Shepard v. Madigan, 734 F.3d 748 (7th Cir. 2013) ................................................. 16
United States v. Armstrong, 706 F.3d 1 (1st Cir. 2013) ........................................... 15
United States v. Booker, 644 F.3d 12 (1st Cir. 2011)............................................... 17
Woollard v. Gallagher, 712 F.3d 865 (4th Cir. 2013)............................................... 15
Wrenn v. District of Columbia, no. 16-7025, 2017 U.S. App. LEXIS 13348
  (D.C. Cir. Jul. 25, 2017) ........................................................................ 15, 17-20

**STATUTES**

D.C. Code § 22-4506 .......................................................................................... 18
D.C. Code 22-4506 ............................................................................................ 17
61 D.C. Reg. 1944, 1955-56 (Feb. 13, 2015)......................................................... 18
M.G.L. c. 140, § 121 ........................................................................................... 2
M.G.L. c. 140, § 129B .......................................................................................... 2
M.G.L. c. 140, § 129C .......................................................................................... 2
M.G.L. c. 140, § 131 .....................................................................................2-3, 18
M.G.L. c. 140, § 131P .......................................................................................... 3
M.G.L. c. 140, §§ 121, 131 ................................................................................... 3
M.G.L. c. 269, § 10 ............................................................................................. 2
M.G.L. c. 269, §10 .............................................................................................. 2
1850 Mass. Acts c. 194 ........................................................................................ 4
1859 Mass. Acts, c. 199 ....................................................................................... 4

1880 Mass. Acts c. 257 ......................................................................... 4

1906 Mass. Acts c. 172 ...................................................................... 3-4

1919 Mass. Acts c. 207 ......................................................................... 4

1925 Mass. Acts c. 284 ......................................................................... 4

1936 Mass. Acts c. 302 ......................................................................... 4

1957 Mass. Acts c. 688 ......................................................................... 4

1998 Mass. Acts ch. 180 .................................................................... 2-3

2014 Mass. Acts c. 284 ......................................................................... 4

2014 Mass. Acts ch. 284 ....................................................................... 3

Md. Code Ann., Pub. Safety § 5-306 .................................................. 18

N.J. Stat. Ann. 2C:58-4 ....................................................................... 18

N.Y. Penal L. § 400.00 ........................................................................ 18

## OTHER AUTHORITIES

D.C. Council, Comm. on the Judiciary and Public Safety, Report on Bill 20-930 (2014)........... 18

**INTRODUCTION**

Both the Boston and Brookline Police Departments normally issue Licenses to Carry Firearms ("LTCs") subject to "Sporting," "Target," and/or "Hunting" restrictions—which expressly do *not* allow people to carry handguns for the purpose of self-defense, except within their homes.  State law authorizes the practice of imposing restrictions on LTCs, but does not require it.  Neither Police Department uses any restriction that would allow people to carry handguns for their own protection outside the home, and an "unrestricted" LTC is the only option available for an individual who wishes to exercise this right.

Both the Boston and Brookline Police Departments issue unrestricted LTCs to applicants who they consider to have demonstrated a "good reason to fear injury" that distinguishes them from the general population.  Otherwise stated, an ordinary person who does not distinguish himself or herself will not qualify for an unrestricted LTC.  Significantly, both Boston and Brookline routinely issue unrestricted LTCs to people in certain occupations—most notably, lawyers, doctors, and members of law enforcement.  But people who are not in these lines of work are unlikely to obtain an unrestricted LTC.  Indeed, when these three categories of people are excluded, both Police Departments issue unrestricted LTCs to less than 25% of licensees.

The Defendants are the chief police officers of the respective Police Departments, each of whom is the statutorily designated "licensing authority" responsible for issuing LTCs.  For everyone within their jurisdiction who is unable to satisfy the requirements they have set—that is, for the majority of law-abiding, responsible citizens who fall within the Second Amendment's protection—the Defendants' policies and practices stand as complete bar to the ability to bear arms outside the home.  This cannot be squared with the Second Amendment's enumerated guarantee of the right to "bear Arms."

## BACKGROUND & MATERIAL FACTS

### I)     The Laws at Issue

#### a.  Massachusetts Law Prohibits Carry in Any Manner without an LTC

The criminal laws of Massachusetts prohibit the unlicensed possession of handguns in two ways.  First, M.G.L. c. 269, § 10(a) makes the "possession" of a "firearm" (defined as a handgun, but not an ordinary rifle or shotgun) a crime unless the person holds an LTC.  See M.G.L. c. 269, § 10(a)(2); see also M.G.L. c. 140, § 121 ("firearm" definition).  This statute does not apply to possession in one's residence or place of business.  See M.G.L. c. 269, § 10(a)(1). The statutory punishment for a violation is imprisonment from two and one-half to five years. See id.  Next, subpart (h) of the same statute criminalizes the possession of any handgun, rifle, or shotgun, at any location, without either an LTC or a Firearms Identification Card ("FID").  See id. § 10(h)(1); see also M.G.L. c. 140, § 129C.  The statutory punishment for a first offense is imprisonment of up to two years or a fine of up to $500.  See M.G.L. c. 269, § 10(h)(1).  There has been some debate over whether an FID authorizes handgun possession in the home, but this debate is irrelevant here, as the issue here is carry outside the home.[1]

#### b.  An LTC Authorizes "Carry" in any Manner (Open or Concealed)

A "Class A" LTC—the only form of LTC that is presently available—uses broad language to "entitle a holder thereof to purchase, rent, lease, borrow, possess and carry" handguns, without regard to concealment.  M.G.L. c. 140, § 131(a).  Indeed, the original 1906 law took this same approach—using broad language to prohibit "carr[y] on [one's] person," and similarly broad language to authorize "a license . . . to carry a loaded pistol or revolver."  See

---

[1] The debate centers on tension between 1998 statutory language providing that an FID "shall not entitle a holder thereof to possess" any type of "firearm," see M.G.L. c. 140, § 129B(6); 1998 Mass. Acts ch. 180, sec. 29, and certain court decisions stating to the contrary, see Morin v. Leahy, 862 F.3d 123, 127 (1st Cir. 2017); Commonwealth v. Powell, 459 Mass. 572, 587-88, 964 N.E.2d 114, 128 (2011).

1906 Mass. Acts c. 172, sec. 1-2.  Notably, a different "Class B" LTC was available from 1998

through 2014, and by statute this LTC *did* restrict carry on the basis of concealment—it did "not

entitle the holder thereof to carry or possess a loaded firearm in a concealed manner in any

public way or place."  Id. § 131(b); see also 1998 Mass. Acts ch. 180, sec. 41.  However, this

LTC has not been available since August 11, 2014.  See 2014 Mass. Acts ch. 284, sec. 101; see

also Morin v. Leahy, 862 F.3d 123, 126 n.8 (1st Cir. 2017); Batty v. Albertelli, no. 15-10238,

2017 U.S. Dist. LEXIS 26124, *3 n.3 (D. Mass. Feb. 24, 2017).[2]

### c.  Police Chiefs Issue LTCs and have Broad Authority to Impose Restrictions

To obtain an LTC, a person applies to the designated "licensing authority," which is the

chief law enforcement officer where the person lives or has a business.  See M.G.L. c. 140, §

131(d).[3]  An applicant must meet various background and suitability requirements, complete a

safety course, and pass a fingerprint-based background check.  See id. §§ 131(d)-(e), 131P(a).

These requirements are not at issue here.

At issue here is the power that § 131 gives to licensing authorities to issues LTCs

"subject to such restrictions relative to the possession, use or carrying of firearms as the licensing

authority deems proper."  Id. § 131(a).  The Defendants relied on this authority to impose

restrictions on the LTC's they issued to the Plaintiffs in this case.  If a person violates an LTC

restriction, they face suspension or revocation of their LTC and a fine of up to $10,000.  See id.

### d.  Pertinent Statutory History

Massachusetts first prohibited the unlicensed carry of handguns in any manner in 1906,

using statutory language that broadly proscribed any person who "carries on his person a loaded

---

[2] The Act deletes remaining statutory references to "Class A" and "Class B" on January 1, 2021. 2014 Mass. Acts ch. 284, sec. 24, 46, 60, 68, 71, 91, 112.
[3] The "licensing authority" is a person's "chief of police or the board or officer having control of the police in a city or town, or persons authorized by them."  M.G.L. c. 140, § 121.

pistol or revolver." See 1906 Mass. Acts c. 172, sec. 2.  The language of the original 1906 law was so broad that, until an amendment in 1957, it covered the act of carrying a gun within one's home.  See Commonwealth v. Seay, 376 Mass. 735, 741-42 & n.5, 383 N.E.2d 828, 832 & n.5 (1978); see also 1957 Mass. Acts c. 688.  Massachusetts had prohibited individuals from carrying "dangerous weapons" if they were engaged in criminal acts or were wanted on a criminal warrant since 1850, see 1850 Mass. Acts c. 194, sec. 1; see also 1859 Mass. Acts, c. 199, but the purpose of this "was to prohibit and restrain the carrying of weapons by offenders," rather than by the general public, see Commonwealth v. O'Connor, 89 Mass. 583, 584 (1863).[4]

Under the 1906 statute, a license broadly authorized its holder "to carry a loaded pistol or revolver," without regard to whether the gun was carried concealed or in the open.  See 1906 Mass. Acts c. 172, sec. 1.  The statute provided that various local officials "may . . . issue a license . . . if it appears that the applicant has good reason to fear an injury to his person or property, and that he is a suitable person to be so licensed."  Id.  These essential parameters remain in place today.  Notably, the General Court amended the statute in 1919 to provide that licenses could also be issued "for any other proper purpose," see 1919 Mass. Acts c. 207, sec. 1, and in 1936, it added language explicitly providing that "the carrying of a pistol or revolver for use for target practice only shall be held to be a proper purpose aforesaid," 1936 Mass. Acts c. 302.  Finally, in 2014, the "suitable person" requirement became a requirement that an applicant not be "unsuitable," although this does not appear to be a substantive change (and is in any event irrelevant to the matter at bar).  See 2014 Mass. Acts c. 284, sec. 48.  In the interim, the legislature had added various additional background requirements and qualifications.  See, e.g., 1925 Mass. Acts c. 284, sec. 4.

---

[4] Massachusetts had also prohibited "tramps" from "carrying any firearm or other dangerous weapon" since 1880.  See 1880 Mass. Acts c. 257, sec 4.

## II)     The Policies and Practices at Issue

### a.  Both Departments Presumptively Impose Restrictions

The Boston Police Department's Licensing Unit only issues unrestricted LTCs to individuals who either "show 'good reason to fear injury' that distinguishes them from the general population" or "are engaged in certain occupations."  Plf. 56.1 ¶ 2.  An individual's "training, experience, or qualification with firearms would not bear on the decision to impose a restriction."  Plf. 56.1 ¶ 6.  Occupations that normally qualify for unrestricted LTCs include: lawyers; medical doctors; active or retired full-time law enforcement officers; and others "whose job requires them to carry a firearm."  Plf. 56.1 ¶ 3.  The Licensing Unit will also issue an unrestricted LTC to an applicant who already holds an unrestricted LTC issued in Massachusetts.  Plf. 56.1 ¶ 4.  If an individual does not satisfy one of these requirements, then the Licensing Unit normally issues their LTC with a "Target & Hunting" restriction.  Plf. 56.1 ¶ 5.

The Brookline Police Department will only issue an unrestricted LTC to an applicant who provides "a showing of need" that indicates "good reason to fear injury to his person or property outside of his home at almost any time" or "in many circumstances."  Plf. 56.1 ¶ 7.  Some occupations, such as judges hearing criminal cases, are more likely to receive unrestricted LTCs on the rationale that their "positions . . . could be deemed dangerous at any time, not just while working."  Plf. 56.1 ¶ 8.  In contrast to the policy in place in Boston, an individual's training, experience, and qualification with a firearm *is* a material component of the decision to grant an unrestricted LTC.  Plf. 56.1 ¶ 9.  Furthermore, an applicant renewing an LTC is generally at least somewhat more likely to received one that is unrestricted.  Plf. 56.1 ¶ 10.  An applicant who does not show "need" for an unrestricted LTC receives an LTC subject to one or more restrictions.  Plf. 56.1 ¶ 11.

### b.  The Restrictions Preclude Defensive Carry

The "Target & Hunting" restriction that the Boston Police Department's Licensing Unit normally imposes authorizes possession and carry at (and while traveling to and from) authorized target and hunting activities, and it also authorizes possession and carry inside the home.  But otherwise, the restriction does not authorize carry in any manner outside the home.  Plf. 56.1 ¶ 12.  It does not matter whether a gun is carried concealed or in the open.  Plf. 56.1 ¶ 15.  The Licensing Unit also issues some LTCs subject to a "Sporting" restriction that authorizes carry during more "sporting" activities, but this still does not authorize carry for the purpose of personal protection.  Plf. 56.1 ¶ 13.  Finally, the Licensing Unit issues some LTCs subject to "Employment" restrictions, but these only allow carry in public for purposes related to employment—not for personal protection on its own.  Plf. 56.1 ¶ 14.  None of the restrictions the Licensing Unit uses allow carry for the purpose of self-defense outside the home.  Plf. 56.1 ¶ 12-14.  The only option is an unrestricted LTC.

The Brookline Police Department uses six restrictions:  Target; Hunting; Transport; Sporting; Employment; In Home; and, Collecting.  Plf. 56.1 ¶ 16.  In terms of carry for self-defense, each restriction authorizes the activity:  "[i]n the home"; while engaged in the authorized activity; and, during "unforeseen circumstances arising while traveling to and from" the activity.  There is no restriction that allows carry for the purpose of self-defense outside the home.  Plf. 56.1 ¶ 17.  Again, the only option is an unrestricted LTC.

### c.  Current Practices

From January 1, 2015 through July 18, 2017, the Boston Police Department issued 3,684 LTCs, of which 2,108 (57.2%) were restricted and 1,576 (42.8%) were unrestricted.  Plf. 56.1 ¶ 21.  However, restriction rates vary significantly by occupation.  90.7% of attorneys received unrestricted LTCs, while the rate was 72.5% for physicians and 95.25% for law enforcement

officers.  Plf. 56.1 ¶¶ 22-24.  And significantly, when these three categories are excluded, only 23.5% of the 2,674 LTCs the Boston Police Department issued were unrestricted.  Plf. 56.1 ¶ 25. The most common restriction was "Target & Hunting," which the Licensing Unit placed on 1,815 LTCs.  Boston also issued 17 LTCs with "Sporting" restrictions, and 34 LTCs with "Employment" restrictions.  Plf. 56.1 ¶ 26.  Finally, Boston issued 242 LTCs with some combination of Sporting, Target, Hunting, and/or Employment restrictions.  Id.

During this same period, the Brookline Police Department a total of 191 LTCs, of which 68 (35.6%) were unrestricted.  Plf. 56.1 ¶ 27.  Brookline issued unrestricted LTCs to 66.7% of lawyers, 69.2% of physicians, and 96.0% of law enforcement officers.  Plf. 56.1 ¶¶ 28-30.  Once these three groups are excluded, Brookline issued 21.1% (31) of the 147 LTCs that Brookline issued were unrestricted.  Plf. 56.1 ¶ 31.  The most common restrictions were "Target" (41 LTCs), "Sporting" (37 LTCs), and "Target & Hunting" (21 LTCs).  Brookline also issued 23 LTCs with combined restrictions of "Employment," "Hunting," "Target," "Transport," and/or "Sporting," and it issued 1 LTC with a restriction of "In Home Only."    Plf. 56.1 ¶ 32.

Throughout Massachusetts as a whole, restriction rates are generally much lower.  During the year 2015, 345 licensing authorities issued 41,519 LTCs, and 92% of those LTCs were unrestricted.  Plf. 56.1 ¶ 33.  Over the course of the year, 301 licensing authorities (87.2%) imposed restrictions on less than one-tenth of the LTCs they issued, and 238 (69.0%) did not impose any restrictions at all.  In contrast, only 14 licensing authorities (4.1%) imposed restrictions on more than 50% of the LTCs they issued.  Plf. 56.1 ¶ 34.

### III)    Application of the Laws, Policies, and Practices Against the Plaintiffs

The Defendants issued each individual Plaintiff an LTC with a "Target & Hunting" "Sporting," and/or "Employment" restriction, even though each expressly requested an LTC that was unrestricted—and often made the request more than once.  But for these restrictions, each

Plaintiff would carry a handgun in public for the purpose of self-defense.  Plf. 56.1 ¶ 35.

Furthermore, each of the Plaintiffs would comply with reasonable conditions or restrictions, such

as a requirement that they carry guns in a particular manner (*e.g.* open or concealed), or that they

not carry guns in specifically delimited sensitive areas.  Plf. 56.1 ¶ 36.

### a.   Plaintiff Danny Weng (Boston)

Plaintiff Danny Weng is a 28 year-old software engineer who is an honorably discharged

veteran of the U.S. Army.  Plf. 56.1 ¶ 37.  On January 13, 2014, by appointment, Mr. Weng

submitted an LTC application to the Boston Police Department's Licensing Unit.  When he

arrived, Licensing Unit personnel gave him a one-page form ("LICENSE TO CARRY FIREARMS

WORK SHEET / CIVILIAN") and instructed him to complete the information on the form's left side.

In response to the question, "For what purpose do you require a License to Carry Firearms?" Mr.

Weng wrote, "All lawful purposes / Target shooting."  Plf. 56.1 ¶ 38.  When the clerk reviewed

his form, she told Mr. Weng that he would not receive an unrestricted LTC.  Plf. 56.1 ¶ 39.

Mr. Weng then met with a police officer, who took his fingerprints, interviewed him, and

completed an application on his behalf in the Massachusetts Instant Record Check System

computer system ("MIRCS").  Plf. 56.1 ¶ 40.  When she completed his application in MIRCS,

the officer wrote, "TARGET AND HUNTING" in the field denominated "Reason(s) for requesting the

issuance of a card or license."  Plf. 56.1 ¶ 42.  The officer printed out a 3-page paper copy of the

MIRCS application, which Mr. Weng signed.  Mr. Weng saw that the application form included

the "Target & Hunting" reference, but he thought he had no realistic choice but to sign the

application as it had been completed.  Plf. 56.1 ¶ 43.

The Licensing Unit issued Mr. Weng an LTC on February 18, 2014, with the restriction

of "Target & Hunting."  Plf. 56.1 ¶ 44.  On November 14, 2014, Mr. Weng sent a letter to Lt.

Det. McDonough and requested the removal of the "Target & Hunting" restriction.  Mr. Weng

cited both his desire for personal protection and his experience in the military.  Plf. 56.1 ¶ 45.

On March 13, 2015, Mr. Weng sent a second letter to Lt. Det. McDonough and again requested

the removal of the "Target & Hunting" restriction, citing personal protection, his desire for

greater flexibility in competitive shooting, and his experience in the military.  Plf. 56.1 ¶ 46.  On

April 4, 2015, Lt. Det. McDonough sent Mr. Weng a letter denying his request because "you

could not show that you have proper purpose to possess said license."  Plf. 56.1 ¶ 47.

### b.  Plaintiff Chris Hart (Boston)

Plaintiff Chris Hart is a 43 year-old man who works as the general manager of a

restaurant in Boston.  Plf. 56.1 ¶ 48.  Mr. Hart lived previously in Connecticut, where he

obtained a Connecticut "State Permit to Carry Pistols and Revolvers."  Mr. Hart has also held

handgun carry licenses from Florida, Maine, and New Hampshire.  Plf. 56.1 ¶ 49.  Mr. Hart

submitted his LTC application on June 4, 2014, and underwent essentially the same procedure as

Mr. Weng.  In response to the question "For what purpose do y[o]u require a License to Carry

Firearms?" he wrote, "Personal protection both in/out of my home."  Plf. 56.1 ¶ 50.  Officer

Angela Coleman interviewed Mr. Hart and told him that he would likely have a "Target &

Hunting" restriction.  Plf. 56.1 ¶ 51.  Officer Coleman wrote "TARGET AND HUNTING" in the

"Reason(s)" field of the MIRCS application.  Plf. 56.1 ¶ 52.  Unlike Mr. Weng, Mr. Hart did not

see the "Target & Hunting" reference when he signed the printed-out MIRCS form.  Plf. 56.1 ¶

53.  When Mr. Hart applied, he submitted a letter addressed to Lt. Det. McDonough that

requested the issuance of an unrestricted LTC for the purpose of self-defense.  Plf. 56.1 ¶ 54.

The Licensing Unit issued Mr. Hart an LTC on July 2, 2014, with the restriction of

"Target & Hunting."  Plf. 56.1 ¶ 56.  Mr. Hart never received a response to his letter.  Plf. 56.1 ¶

55.  In August 2014, Mr. Hart visited the Licensing Unit in person and asked about the

possibility of removing the restriction.  Personnel told him that he might be able to obtain an

"Employment" restriction if he submitted financial records and a letter from his employer, but his employer declined to provide the requested documentation, so Mr. Hart did not pursue the matter further.  Plf. 56.1 ¶ 57.

### c.  Plaintiff Sarah Zesch (Boston)

Plaintiff Sarah Zesch is a 23 year-old Boston native who recently graduated from college and began working for a state agency.  Plf. 56.1 ¶ 58.  Ms. Zesch submitted an LTC application for an LTC on January 6, 2015, and underwent essentially the same procedure as Mr. Weng and Mr. Hart.  However, Ms. Zesch did not complete all of the left side of the one-page "FIREARMS WORK SHEET" form, and among other things, did not write out a response to the question "For what purpose do you require a License to Carry Firearms?"  Plf. 56.1 ¶ 59.  During her interview, Ms. Zesch told Officer Coleman that she wanted an unrestricted LTC for the purpose of personal protection, and Officer Coleman told her that the LTC would have a "Target & Hunting" restriction, but that she could request removal of the restriction by submitting a letter.  Plf. 56.1 ¶¶ 60-61.  Officer Coleman completed an application for Ms. Zesch in the MIRCS system and wrote "TARGET AND HUNTING" in the "Reason(s)" section.  Plf. 56.1 ¶¶ 61, 63.  Ms. Zesch saw the "Target & Hunting" reference when she signed the printed-out MIRCS form, but she thought she had no realistic choice but to sign and send the referenced letter.  Plf. 56.1 ¶ 64.

After her interview, Ms. Zesch sent a letter to Lt. Det. McDonough that stated that "[e]ven though 'Target and Hunting' restrictions were entered on the application, I would like a license with no restrictions."  Ms. Zesch cited her desire for personal protection.  Plf. 56.1 ¶ 65.  The Licensing Unit issued Ms. Zesch an LTC on March 10, 2015, with the restriction of "TARGET & HUNTING."  Plf. 56.1 ¶ 66.  Ms. Zesch never received a response to the letter she had sent to Lt. Det. McDonough.  Plf. 56.1 ¶ 67.

### d.  Plaintiff John Stanton (Boston)

Plaintiff John Stanton is a 30 year-old professional musician who is engaged to be married.  Plf. 56.1 ¶ 68.  Mr. Stanton submitted an LTC application on December 15, 2014, and underwent essentially the same procedure as the previous Plaintiffs.  In response to the question "For what purpose do you require a License to Carry Firearms?" Mr. Stanton wrote, "Self Defense, Target Shooting, Hunting, and all other lawful purposes."  Plf. 56.1 ¶ 69.  Officer Coleman interviewed Mr. Stanton and told him that he would have a "Target & Hunting" restriction, but that he could request removal of the restriction by submitting a letter.  Plf. 56.1 ¶¶ 70-71.  Officer Coleman wrote "TARGET AND HUNTING" in the "Reason(s)" field in MIRCS.  Plf. 56.1 ¶¶ 71-72.  Mr. Stanton saw the "Target & Hunting" reference when he signed the form, but he did not think he had any practical choice but to sign and send the letter.  Plf. 56.1 ¶ 73.

The Licensing Unit issued Mr. Stanton an LTC on January 15, 2015, with the restriction of "Target & Hunting."  Plf. 56.1 ¶ 74.  On March 13, 2015, Mr. Stanton sent a letter to Let. Det. McDonough that requested removal of the restriction, as well as advising of an address change.  Plf. 56.1 ¶ 75.  Lt. Det. McDonough denied Mr. Stanton's request on June 9, 2015, "because you could not show that you have proper purpose to possess said license."  Plf. 56.1 ¶ 76.  On July 30, 2015, following a theft, Mr. Stanton again wrote to Lt. Det. McDonough to request removal of the restriction and he again cited his desire for personal protection.  Plf. 56.1 ¶ 77.  Lt. Det. McDonough denied the request on August 6, 2015, again "because you could not show that you have proper purpose to possess said license."  Plf. 56.1 ¶ 78.

### e.  Plaintiff Michael Gould (Brookline)

Plaintiff Michael Gould is a 46 year-old married father who works as a professional photographer.  Plf. 56.1 ¶ 79.  Mr. Gould previously lived in Weymouth, Massachusetts, where he had obtained an LTC from the Weymouth Police Department with the restriction of "TARGET HUNTING EMPLOYMENT."  Plf. 56.1 ¶ 80.  On July 8, 2014, having moved to Brookline, Mr.

Gould submitted an application to renew his LTC to the Brookline Police Department. As with the Boston Police Department, an officer with the Brookline Police Department (Sgt. Chris Malinn) interviewed Mr. Gould and completed an application in MIRCS on Mr. Gould's behalf. Plf. 56.1 ¶ 81. Mr. Gould specifically requested an unrestricted LTC for the purpose of self-defense, and when Sgt. Malinn completed the "Reason(s)" field in the MIRCS application he wrote, "ALL LAWFUL PURPOSES." Sgt. Malinn told Mr. Gould that to pursue his application, he should submit documentation pertaining to his business. Plf. 56.1 ¶ 82.

On September 29, 2014, while his application was pending, Mr. Gould submitted a letter to Defendant Chief O'Leary that detailed his request for an unrestricted LTC and his experience with firearms. As instructed, Mr. Gould focused on matters pertinent to his business and sent reference letters, invoices, and other business documentation. Plf. 56.1 ¶ 83. On October 16, 2014, Chief O'Leary sent Mr. Gould a letter advising him that "we do not believe you have provided enough information that would demonstrate a need for an unrestricted license," but offering to issue an LTC with "Sporting" and "Employment" restrictions. Plf. 56.1 ¶ 84. On October 23, 2014, after receiving the letter, Mr. Gould asked Sgt. Malinn whether he could provide additional information, and Sgt. Malinn responded that "I do not believe that additional information would lead to an LTC for All Lawful Purposes." Plf. 56.1 ¶ 85. On November 10, 2014, at the Department's request, Mr. Gould signed forms acknowledging that he could "carry a weapon only" while engaged in the specified activities, and that during travel, "weapons [must be] unloaded and encased." Plf. 56.1 ¶ 86. On November 20, 2014, the Department issued Mr. Gould an LTC with the restriction of "EMPLOYMENT & SPORTING." Plf. 56.1 ¶ 87.

### f.   Commonwealth Second Amendment (Comm2A)

Commonwealth Second Amendment ("Comm2A") is a Massachusetts non-profit corporation with its principal place of business in Natick, Massachusetts. Plf. 56.1 ¶ 88.

Comm2A's organizational purposes include education, research, publishing, and legal action focusing on the constitutional right of the people to possess and carry firearms. Plf. 56.1 ¶ 89. Each of the individual Plaintiffs in this case is a member of Comm2A. Plf. 56.1 ¶ 90.[5] Comm2A has other members who hold LTCs that the Boston Police Department Licensing Unit has issued with "Target," "Hunting," "Sporting," and/or "Employment" restrictions, including 7 members who have given Comm2A permission to identify them by name. Plf. 56.1 ¶ 92. Aside from representing the interests of its members, Comm2A also seeks redress for the injuries that Defendants' policies and practices cause to Comm2A directly. Plf. 56.1 ¶ 93.

## ARGUMENT

While we acknowledge and respect the Court's previous ruling, it is undeniable that the issues presented here have divided courts. Indeed, judicial recognition of the Second Amendment's protections has continued to evolve since this Court issued its ruling in <u>Batty v. Albertelli</u>, no. 15-10238, 2017 U.S. Dist. LEXIS 26124 (D. Mass. Feb. 24, 2017). Thus, we provide a brief overview of the Second Amendment's protections, its treatment thus far, and the ruling the Court made in <u>Batty</u>. We then discuss the D.C. Circuit's recent decision.

### I)      The Right to Keep and Bear Arms is the Right to Possess and Carry Weapons

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. By its terms, this protects two distinct activities—those of *keeping* and *bearing* arms. In <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008), the Supreme Court interpreted both guarantees. The Court explained that the right to "keep Arms" is the right to "have" or "possess[]" weapons. See <u>id.</u> at 582-83. In contrast, the right to "bear" arms is the right to "carry" them for the purpose "'of being armed and ready for

---

[5] Comm2A voted to offer 5-year memberships to each Plaintiff at the beginning of this case, but inadvertently failed to communicate the offer to them. Comm2A has since extended this offer to each of the individual Plaintiffs, and each has agreed to join the organization. Plf. 56.1 ¶¶ 90-91.

offensive or defensive action in a case of conflict with another person.'" Id. at 584 (quoting Muscarello v. United States, 524 U.S. 125, 143 (1998)).

This reasoning was essential to the Court's resolution of Heller, for the Court relied on its interpretations to reject the District of Columbia's argument that the right to keep and bear arms arose only in the context of organized military service. See id. ("Although the phrase implies that the carrying of the weapon is for the purpose of 'offensive or defensive action,' it in no way connotes participation in a structured military organization."); see also id. at 586 ("'bear arms' was not limited to the carrying of arms in a militia").

Another essential aspect of its Heller is that "the core lawful purpose" of the Second Amendment is "self-defense." Id. at 630; see also id. at 592, 599; United States v. Rene E., 583 F.3d 8, 11 (1st Cir. 2009) (quoting Heller, 554 U.S. at 592, 630). Indeed, in McDonald v. Chicago, 561 U.S. 742 (2010), the Court described Heller as having "held that individual self-defense is 'the central component' of the Second Amendment right." McDonald, 561 U.S. at 767 (quoting Heller, 554 U.S. at 599) (emphasis in source). An essential ground of McDonald itself was that "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day. . . ." Id. at 767. McDonald repeatedly referred to personal protection as the "core" or "central" consideration of the Second Amendment. See id. at 767-68, 780, 787.

## II)     Other Circuits Have Taken Varied Approaches

Since the Supreme Court incorporated the Second Amendment against the states in McDonald, five federal appellate circuits have decided cases that squarely concerned preclusions on carrying handguns in public places for the purpose of personal protection. The First Circuit has (pointedly) not addressed the issue of carry outside the home. See Morin v. Leahy, 862 F.3d 123, 125 n.2 (1st Cir. 2017); Powell v. Tompkins, 783 F.3d 332, 348 (1st Cir. 2015). Furthermore, the First Circuit has declined to adopt "intermediate scrutiny" as the framework

that governs burdens on the right to keep and bear arms.  See Powell, 783 F.3d at 347 n.9; United

States v. Armstrong, 706 F.3d 1, 8 (1st Cir. 2013).

Outside the First Circuit, three circuits have used competing rationales to uphold laws

and policies that prohibit people from bearing arms absent some sort of special showing of need.

The Second Circuit ruled that New York's "proper cause" requirement was "outside the core

Second Amendment protections identified in Heller," and that an intermediate standard of

scrutiny applied because "the regulation does not burden the 'core' protection of self-defense in

the home makes eminent sense."  Kachalsky v. County of Westchester, 701 F.3d 81, 94 (2d Cir.

2012).  The Fourth Circuit reached the same essential conclusion regarding Maryland's

permitting law, although with the caveat that the court "merely assume[d] that the Heller right

exists outside the home . . . because the good-and-substantial-reason requirement passes

constitutional muster under . . . intermediate scrutiny."  See Woollard v. Gallagher, 712 F.3d

865, 876 (4th Cir. 2013).  And the Third Circuit, in contrast, upheld New Jersey's "justifiable

need" requirement on the primary rationale that it was a "longstanding" and "presumptively

lawful" restriction that fell wholly outside the scope of protection.  See Drake v. Filko, 724 F.3d

426, 434 (3d Cir. 2013).  In the alternative, the Third Circuit found an intermediate scrutiny

approach appropriate because "the right to carry a handgun outside the home for self-defense . . .

is not part of the core of the Amendment."  Id. at 436 (quoting district court).

On the other hand, two circuits have overturned general prohibitions as unconstitutional.

Recently, and as will be discussed further, the D.C. Circuit found a "good reason to fear injury"

standard unconstitutional.  See Wrenn v. District of Columbia, no. 16-7025, 2017 U.S. App.

LEXIS 13348 (D.C. Cir. Jul. 25, 2017).  And previously, the Seventh Circuit overturned

Illinois's general prohibition on carrying guns in public on the essential rationale that "the

amendment confers a right to bear arms for self-defense, which is as important outside the home as inside." <u>Moore v. Madigan</u>, 702 F.3d 933, 942 (7th Cir. 2013).  The Seventh Circuit expressly disagreed with the Second Circuit's home-centered approach.  <u>See</u> <u>id.</u> at 941.

Aside from these five rulings, an en banc Ninth Circuit panel concluded that California's "good cause" standard for a license to carry a *concealed* weapon was outside the scope of the Second Amendment on the rationale that "there is no Second Amendment right for members of the general public to carry concealed firearms in public."  <u>See</u> <u>Peruta v. County of San Diego</u>, 824 F.3d 919, 927 (9th Cir. 2016).  This was so even though state law did not allow carry in an open manner.  <u>See</u> <u>id.</u> at 949 (Callahan, J., dissenting).  The court declined to address the existence of "a Second Amendment right for a member of the general public to carry a firearm openly in public."  <u>Id.</u> at 939; <u>see also</u> <u>Peterson v Martinez</u>, 707 F.3d 1197, 1201 (10th Cir. 2013) (carry in a concealed manner "does not fall within the scope of the Second Amendment's protections.").  <u>But see</u> <u>Norman v. State</u>, 215 So. 3d 18, 41 (Fla. 2017) (upholding Florida law that prohibits open carry in favor of concealed carry); <u>see also</u> <u>Shepard v. Madigan</u>, 734 F.3d 748, 749-50 (7th Cir. 2013) (Illinois legislation that allowed concealed carry, but not open carry, was "[c]onsistent with" the prior ruling that overturned the a complete ban on bearing arms).

### III)   This Court's Ruling in <u>Batty v. Albertelli</u>

In <u>Batty v. Albertelli</u>, this Court ruled that the LTC restriction policies of Winchester Police Chief Ken Albertelli were consistent with the Second Amendment.  <u>See</u> <u>Batty</u>, 2017 U.S. Dist. LEXIS 26124 at *33.  The court's decision includes the following five conclusions of law:

1.  The "core" of the Second Amendment is "the possession of operative firearms for use in defense of the home."  <u>Id.</u> at *18 (quoting <u>Hightower v. City of Boston</u>, 693 F.3d 61, 72 (1st Cir. 2012)).

2.  The Court will "follow the approach taken by the Second, Third, and Fourth Circuits, and assume for analytical purposes that the Second Amendment extends to protect the right of armed self-defense outside the home."  <u>Id.</u> at *21.

3. Although the First Circuit has expressly declined to adopt "intermediate scrutiny," the "language [in <u>United States v. Booker</u>, 644 F.3d 12 (1st Cir. 2011)] has been interpreted as a description of intermediate scrutiny." <u>Id.</u> at *22 (citations omitted). Thus, without using the label of intermediate scrutiny, "the Court's analysis will focus on whether defendant has shown a 'substantial relationship between the restriction and an important governmental objective.'" <u>Id.</u> at *25 (quoting <u>Booker</u>, 644 F.3d at 25).

4. The Winchester Police Chief's "policy of imposing target and hunting restrictions on the licenses of first-time applicants who fail to show a specific 'reason to fear,'" <u>id.</u> at *26, is "essentially the same" as the licensing standards in New York, New Jersey, and Maryland in that an "applicant must show a special need for self-defense distinguishable from that of the population at large, often through a specific and particularized threat of harm," <u>id.</u> at *32 (quoting <u>Drake</u>, 724 F.3d at 442 (Hardiman, J., dissenting)).

5. The Winchester Police Chief's policy "is substantially related to the state's important objective in protecting public safety and preventing crime." <u>Id.</u> at *30. "[T]he Massachusetts legislature has balanced the need to reduce the number of firearms in public with the needs of individuals who have a heightened need to carry firearms in public for self-defense." <u>Id.</u> at *32.

While Plaintiffs disagree with various aspects of these conclusions, we concede that, if accepted and applied again here, they ought to be dispositive of the present case. For while the restriction policies and practices of the Boston and Brookline Police Departments are not quite the same as those in Winchester, they are the same on one key point: all of these Police Departments presumptively impose "Target & Hunting" (or similar) restrictions unless people establish some sort of a "need" for personal protection. If the right to bear arms can be limited only to those citizens who have a special "need" to exercise their right, then there is really no good reason that Winchester's policy and practice would pass muster, while the policies and practices in Boston and Brookline would not.

But we respectfully submit that the Court's prior conclusions of law should be reassessed.

## IV)     The D.C. Circuit's Decision in <u>Wrenn v. District of Columbia</u>

The District of Columbia law at issue in <u>Wrenn</u> restricted licenses to carry handguns using a "good reason" standard similar to the standard at issue here. <u>See</u> D.C. Code 22-4506(a);

Wrenn, 2017 U.S. App. LEXIS 13348 at *7-8.  And significantly, the D.C. Circuit disagreed

with the Second, Third, and Fourth Circuits, instead concluding that the discretionary law was

incompatible with the right to bear arms.

### a.   The Law at Issue in Wrenn

The District of Columbia enacted a discretionary licensing law after a federal district

court ruled that its "complete ban on the carrying of handguns in public is unconstitutional."

Palmer v. District of Columbia, 59 F. Supp. 3d 173, 183 (D.D.C. 2014).  The District's licensing

law allowed an individual to obtain a license "if it appears that the applicant has good reason to

fear injury to his or her person or property or has any other proper reason for carrying a pistol,

and that he or she is a suitable person to be so licensed."  See 61 D.C. Reg. 1944, 1955-56 (Feb.

13, 2015); D.C. Code § 22-4506(a).  In adopting this language, the D.C. Council indicated that it

sought to "follow the models of states such as New York, New Jersey, and Maryland, which

have adopted a similar licensing scheme and which have withstood Constitutional challenges in

federal courts of appeal."  D.C. Council, Comm. on the Judiciary and Public Safety, Report on

Bill 20-930, at 2 (2014), available at http://lims.dccouncil.us/Download/32576/B20-0930-

CommitteeReport1.pdf (last visited Aug. 23, 2017); see also Grace v. District of Columbia, 187

F. Supp. 3d 124, 130 (D.D.C. 2016), vacated sub nom. Wrenn, 2017 U.S. App. LEXIS 13348.

Significantly, however, the language of the District's licensing law came nearly verbatim

from Massachusetts law, rather than from the laws of Maryland, New Jersey, or New York.  The

standard in Maryland is "good and substantial reason." Md. Code Ann., Pub. Safety § 5-

306(a)(6)(ii).  And in New Jersey, the standard is "a justifiable need to carry a handgun."  N.J.

Stat. Ann. 2C:58-4(c)-(d).  Finally, in New York the standard is "proper cause."  N.Y. Penal L. §

400.00(2)(f).  Only the Massachusetts law aligns with the District's by requiring "good reason to

fear injury" to one's person or property or "any other reason."  M.G.L. c. 140, § 131(d).

### b.   Carrying Arms is a "Core" Activity

The D.C. Circuit's most essential conclusion was that "carrying beyond the home, even in populated areas, even without special need, falls within the Amendment's coverage, *indeed within its core*." Wrenn, 2017 U.S. App. LEXIS 13348 at *29 (emphasis added). The D.C. Circuit focused first on the core purpose the Second Amendment serves: self-defense. See id. at *12-13. As the court observed, "the need for that might arise beyond as well as within the home." Id. at *13. Next, the Court observed that the Court's decision in Heller gave the activities of "keeping" and "bearing" arms "independent and seemingly equal treatment[]." Id. at *13. Given the definition the Court used for the right to "bear" arms, "the Amendment's core must span, in the Court's own words, the 'right to possess *and carry* weapons in case of confrontation.'" Id. at *14 (quoting Heller, 554 U.S. at 584 (internal quotation omitted)) (emphasis in source). And finally, the strong consensus of the historical authorities that Heller relied upon to construe the Second Amendment was that "the Second Amendment squarely covers carrying beyond the home for self-defense." Id. at *14.

This conclusion—that the Second Amendment protects the bearing of arms as a core activity, rather than a peripheral one—distinguishes the approaches of Second, Third, and Fourth Circuits. All of these courts defined the right at issue by reference to the facts in Heller, rather than by reference to the language of the constitutional guarantee:  "to keep and bear Arms."

### c.   The Standard of Review

The D.C. Circuit's conclusion also had significant ramifications for the standard and framework of review. The court declined to analyze the "good reason" requirement using the framework of intermediate and strict scrutiny, although it recognized that the approach could properly apply elsewhere. See Wrenn, 2017 U.S. App. LEXIS 13348 at *34-35. The court explained that, under Heller, "'complete prohibition[s]' of Second Amendment rights are always

invalid," and that courts can strike them down "without bothering to apply tiers of scrutiny because no such analysis could ever sanction obliterations of an enumerated constitutional right." Id. at *33 (quoting Heller, 554 U.S. at 629).

Equally significant is that the court found the "good reason" requirement to stand as the equivalent of a complete prohibition. See id. at *30-35. The Second Amendment protects the right of self-defense of all "responsible and law-abiding citizens," and so it must at a minimum "enable armed self-defense by commonly situated citizens: those who possess common levels of need and pose only common levels of risk." Id. at *30-31. And although licenses were theoretically available to anyone, the law was "necessarily a total ban on most D.C. residents' right" because it "by design" sought to "destroy[] the ordinarily situated citizen's right to bear arms." Id. at *34-35. By its terms, the law limited the right only to those with "needs 'distinguishable' from those of the community." See id. at *35.

Finally, while the court declined to use tiers of scrutiny, it also noted that "[b]ans on the ability of most citizens to exercise an enumerated right would have to flunk any judicial test that was appropriately written and applied[.]" See id. at *35. The point is significant. Even if under principles of intermediate scrutiny are used, the policies at issue here should not pass muster because they are not "narrowly tailored to serve a significant government interest," and they do not "leave open ample alternative channels." See McCullen v. Coakley, 134 S. Ct. 2518, 2529 (2014) (quotations omitted).

**CONCLUSION**

Defendants' policies and practices completely prohibit the Plaintiffs—and all others without a special need—from exercising their right to bear arms in public. This contravenes the Second Amendment's explicit protection of the right to "bear Arms," and it cannot stand.

Dated:  August 30, 2017

Respectfully submitted,

**DAVID JENSEN** PLLC

By: _____

David D. Jensen, Esq.
111 John Street, Suite 420
New York, New York 10038
Tel:  212.380.6615
Fax:  917.591.1318
david@djensenpllc.com

Patrick M. Groulx, Esq.
BBO No. 673394
Isenberg Groulx LLP
368 W Broadway, Suite 2
Boston, Massachusetts 02127
Tel:  617.859.8966
Fax:  617.859.8903
pmgroulx@gmail.com


## CERTIFICATE OF SERVICE


I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on August 30,

2017.


/s/ David D. Jensen
David D. Jensen, Esq.