UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANNY WENG; CHRISTOPHER HART; MARKUS VALLASTER; SARAH ZESCH; JOHN STANTON; MICHAEL GOULD; AND COMMONWEALTH SECOND AMENDMENT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAM B. EVANS, in his Official Capacity as Commissioner of the Boston Police Department; and DANIEL C. O'LEARY, in his Official Capacity as Chief of the Brookline Police Department, <br><br> Defendants, <br><br> and <br><br> COMMONWEALTH OF MASSACHUSETTS, <br><br> Defendant-Intervenor. | C.A. No. 16-10181-FDS |

**OPPOSITION OF DEFENDANT-INTERVENOR TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
<u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

Defendant-Intervenor, the Commonwealth of Massachusetts, hereby opposes Plaintiffs'

Motion for Summary Judgment [Doc. No. 56], and cross-moves for summary judgment in favor

of the defendants.

This case concerns the policies and procedures by which the City of Boston and the

Town of Brookline issue Licenses to Carry Firearms ("LTCs") under a state statute, Mass. G.L.

c. 140, § 131.  In a virtually identical challenge to the issuance of LTCs by the Town of

1

Winchester, this Court held that "the policy that requires applicants to show a specific reason to fear in order to be issued unrestricted firearms licenses, and its authorizing statute, are constitutional." *Batty v. Albertelli*, No. 15-cv-10238-FDS, slip op. at 24 (D. Mass. Feb. 24, 2017). Plaintiffs concede that the Boston and Brookline policies at issue here are indistinguishable in all material respects from the Winchester policies upheld in *Batty*, and that if this Court applies the same reasoning and conclusions it applied in that case, "they ought to be dispositive of the present case." Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment [Doc. No. 57] ("Pls.' Mem.") at 17.

Instead, plaintiffs argue that an intervening 2-1 decision from the United States Court of Appeals for the D.C. Circuit, *Wrenn v. District of Columbia*, 864 F.3d 650 (July 25, 2017), should lead this Court to reach the opposite conclusion. In *Wrenn*, the D.C. Circuit struck down a law limiting licenses for the concealed carry of handguns to those showing a "good reason to fear injury to [their] person or property" or "any other proper reason for carrying a pistol." *Id.* at 655. As a basis for this conclusion, that court held that (1) "the individual right to carry common firearms beyond the home for self-defense—even in densely populated areas, even for those lacking special self-defense needs—falls within the core of the Second Amendment's protections", *id.* at 661, even though the Supreme Court has never said so explicitly; and (2) any law that prohibits some (but not all) citizens from exercising this right is categorically unconstitutional, without regard to any level of scrutiny, *id.* at 665-66.

As explained further below, *Wrenn* is simply inconsistent with the approach taken by the First Circuit to the Second Amendment after the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and it is inconsistent with the holdings in cases from other circuits—including the Second, Third, and Fourth Circuits—upon which this Court relied

in *Batty*. Nothing in *Wrenn* should cause this Court to depart from its careful reasoning and its faithful application of First Circuit precedent in *Batty*. Instead, this Court should rely upon its own decision in *Batty*, rather than the unpersuasive decision from the D.C. Circuit in *Wrenn*, and it should enter judgment in favor the defendants, upholding the policies challenged here.

## BACKGROUND

**The Massachusetts Licensing Scheme.** The Commonwealth relies upon, and incorporates by reference, this Court's comprehensive summary in *Batty* of the regulatory framework governing licenses to carry firearms in Massachusetts—including the State Legislature's 2014 amendments to the licensing scheme. *See Batty*, slip op. at 2-5. Relevant here, the licensing statute, Mass. G.L. c. 140, § 131, gives the "licensing authority"—usually the local police chief or the board or officer having control of the police in a city or town—authority to issue a license to carry "firearms[1] … subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper." *Id.* § 131(a).[2] A violation

---

[1] A "firearm" is defined as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured", with some exceptions not relevant here. Mass. G.L. c. 140, § 121.

[2] The statute previously distinguished between "Class A" licenses, which permitted an individual to carry a concealed firearm in public and to carry "large-capacity" firearms, *id.* § 131(a), and "Class B" licenses, which prohibited concealed carrying of loaded firearms in public and the carrying of large-capacity firearms, *id.* § 131(b). In 2014, however, the State Legislature amended the law to phase out Class B licenses by 2021 in favor of a single, unitary license to carry. From the date of the law's enactment until 2021, new and renewed licenses will be issued only as Class A licenses, and Class B licenses will no longer be issued. *See Batty*, slip op. at 2 n.3; *see also* Mass. St. 2014, c. 284, § 101.

by the licensee of any restriction imposed upon the license by the licensing authority is grounds for suspension or revocation of the license, and is punishable by a fine of up to $10,000.  *Id.*[3]

Upon an application for a LTC, the licensing authority "may issue" a license if "it appears" both that the applicant is not a "prohibited person", and that the applicant has "good reason to fear injury to the applicant or the applicant's property or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to the restrictions expressed or authorized under this section." *Id.* § 131(d).  In resolving the first inquiry and determining whether the applicant is a "prohibited person", the licensing authority determines whether the applicant falls within a number of categorical exclusions from possessing a firearm (such as for minors and persons convicted of violent crimes) and, if the applicant is not categorically ineligible, whether the person is "unsuitable to be issued or to continue to hold a license to carry." *Id.* § 131(d).  A determination that the applicant is "unsuitable" may be based on "reliable and credible information that the applicant or licensee has exhibited or engaged in behavior that suggests that, if issued a license, the applicant or licensee may create a risk to public safety", or "existing factors that suggest that, if issued a license, the applicant or licensee may create a risk to public safety." *Id.*  This first inquiry under the statute is not at issue here, as there is no dispute that none of the individual plaintiffs was deemed a prohibited person, either categorically or as an unsuitable person.  *See* Pls.' Mem. at 7-12 (noting that each individual plaintiff was issued an LTC, but with restrictions).

If the applicant is not a prohibited person, the licensing authority then proceeds to the second inquiry and determines whether the applicant has a proper purpose for obtaining a permit.

---

[3] In contrast, possessing a firearm in public without a license is a crime punishable by at least 18 months in prison.  Mass. G.L. c. 269, § 10(a).

*Batty*, slip op. at 3.  A proper purpose would include "good reason to fear injury to the applicant or the applicant's property or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to the restrictions expressed or authorized under this section."  Mass. G.L. c. 140, § 131(d).  *See generally Ruggiero v. Police Comm'r of Boston*, 18 Mass. App. Ct. 256, 260-61 (1984) (holding that prior version of statute, containing substantially similar language, conferred authority on licensing authority to impose restrictions on permit, and did not require police commissioner to issue unrestricted license to applicant based on his generalized assertion that he "is a potential victim of crimes against his person").

**Boston and Brookline Licensing Policies.**  Both Boston and Brookline routinely impose restrictions on LTCs that limit (or prohibit) the ability to carry a firearm in public, whether in a concealed or open manner.  An unrestricted LTC would be the only way in which to be licensed to carry a firearm in public, in either a concealed or open manner, since the license available under the current version of the statute contains no limitation on concealed or open carry, but is subject to the licensing authority's discretion to impose such restrictions on use and carry as it deems proper.  Mass. G.L. c. 140, § 131(a); *see also* note 2, above.

Boston typically issues unrestricted LTCs only to applicants who show good reason to fear injury that distinguishes them from the general population; who are engaged in certain professions (such as lawyers, doctors, and full-time active law enforcement officers); or who already possess unrestricted licenses.  Plaintiffs' Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried [Doc. No. 58] ("Pls.' Facts") ¶ 2; Boston Answer to Interrogatory No. 9 [Doc. No. 58-1].  Applicants who do not fall into any of these categories will typically be issued a LTC with a "Target & Hunting" restriction, *id.*, which restricts possession of a firearm "to the purpose of lawful recreational shooting or competition; for use in the lawful

pursuit of game animals and birds; for personal protection in the home; and for the purpose of collecting", including "travel to and from [the] activity location". Doc. No. 58-1, at p.12. Alternative restrictions include a "Sporting" restriction, which allows all of the activities in the Target & Hunting restriction, plus "outdoor recreational activities such as hiking, camping, cross country skiing, or similar activities"; and an "Employment" restriction, which restricts possession to a "business owner engaged in business activities, or to an employee while engaged in work related activities, and maintaining proficiency, where the employer requires carrying of a firearm (i.e. armored car, security guard, etc.)", including travel to and from such activities. *Id.*

Brookline uses six categories of restrictions: Target; Hunting; Transport; Sporting; Employment; In Home; and Collecting. Pls.' Facts ¶ 16; Brookline Answer to Interrogatory No. 3 [Doc. No. 58-2]. Each of these restrictions allows for carrying in the home, while outside the home but engaged in the authorized activity, and during "unforeseen circumstances" while traveling to and from the authorized activity (since the firearm must ordinarily be unloaded and encased during travel to and from the authorized activity). Pls.' Facts ¶¶ 17-18. Brookline will typically issue an unrestricted LTC only to an applicant who demonstrates "good reason to fear injury to his person or property outside his home at almost any time" or in "most circumstances". *Id.* ¶ 7; Brookline Answers to Interrogatory Nos. 8-9, 14. Some professions—such as judges hearing criminal cases—are also somewhat more likely to receive an unrestricted LTC. Pls.' Facts ¶ 8. Also, in Brookline, a person with more demonstrated training and experience with a firearm is more likely to receive an unrestricted LTC, and individuals applying for a renewal (as opposed to an original) license are at least somewhat more likely to receive unrestricted LTCs. *Id.* ¶¶ 9-10. For applicants who do not receive an unrestricted LTC, Brookline imposes one or more of the restrictions on the license listed above. *Id.* ¶ 11.

**The Individual Plaintiffs.** Each of the individual plaintiffs desires to carry a handgun in public for self-defense. Pls.' Mem. at 7-8. Each of the plaintiffs was issued a LTC with a "Target & Hunting", "Sporting", and/or "Employment" restriction by Boston or Brookline, despite having requested an unrestricted LTC. *Id.* Each of the plaintiffs claims that he or she would comply with reasonable conditions or restrictions, such as carrying the handgun in a particular manner (i.e., open or concealed), and refraining from carrying a handgun in certain specifically identified sensitive areas. *Id.*

## ARGUMENT

Plaintiffs' central claim in this case is that their Second Amendment rights are violated by a scheme—authorized by Mass. G.L. c. 140, § 131, and implemented by Boston and Brookline in this case—that requires them to make an individualized showing that they fear injury to themselves before receiving an unrestricted license to carry a handgun in public. *See* Pls.' Mem. at 17. But this Court has already rejected a substantially similar challenge to the licensing scheme implemented by the Town of Winchester in *Batty*, and plaintiffs concede the Boston and Brookline's policies are, in material respects, indistinguishable from Winchester's. *Id.* The Court should therefore reach the same conclusion in this case.

In *Batty*, this Court considered the Town of Winchester's policies and procedures for issuing LTCs under Mass. G.L. c. 140, § 131. As with Boston and Brookline, Winchester typically issues an unrestricted LTC only if the applicant can demonstrate a reason to fear for his or her safety; otherwise the police chief typically issues a restricted license, such as for "Employment", "Target and Hunting", or "Sporting". *Batty*, slip op. at 5-6. At issue in *Batty*, as here, was plaintiffs' claim that "the Second Amendment squarely protects the right of law-abiding citizens to carry handguns in public for the purpose of self-defense, which defendant has

infringed by requiring them to show a specific 'reason to fear' in order to receive unrestricted licenses." *Id.*, slip op. at 14.

In *Batty*, this Court undertook a careful and thorough examination of the First Circuit decisions interpreting the scope of the Second Amendment after *Heller*. *Batty*, slip op. at 12-15. After noting that the First Circuit had declined to decide whether the Second Amendment confers a right to carry firearms outside the home for self-defense, and that decisions from other circuits on the issue offered only "mixed guidance", *id.*, slip op. at 15, this Court importantly proceeded to "heed the caution urged by the First Circuit that the Second Amendment is an area that 'courts should enter only upon necessity and only then by small degree." *Id.*, slip op. at 16 (quoting *Hightower v. City of Boston*, 693 F.3d 61, 74 (1st Cir. 2012)).[4] Doing so, the Court assumed without deciding that the Second Amendment extends beyond the home, and then analyzed whether Winchester's policies, and the statute authorizing them, bore a "substantial relationship"

---

[4] This quoted language from *Hightower*—in which the First Circuit declined to decide what standard of scrutiny applied to plaintiff's claim that the "suitability" requirement in Mass. G.L. c. 140, § 131, infringed upon her asserted Second Amendment right to carry a firearm outside the home for self-defense, because plaintiff's provision of false information on her license renewal application justified the revocation of her license under any standard of scrutiny—is itself borrowed from a decision of the Fourth Circuit in *United States v. Masciandaro*, 638 F.3d 458, *cert. denied*, 565 U.S. 1058 (2011), which the First Circuit endorsed in *Hightower*. The full passage in *Masciandaro*, from which the First Circuit's admonition in *Hightower* comes, is worth reiterating here: "On the question of *Heller*'s applicability outside the home environment, we think it prudent to await direction from the Court itself. … If the Supreme Court … meant its holding to extend beyond home possession, it will need to say so more plainly. There may or may not be a Second Amendment right in some places beyond the home, but we have no idea what those places are, what the criteria for selecting them should be, what sliding scales of scrutiny might apply to them, or any one of a number of other questions. It is not clear in what places public authorities may ban firearms altogether without shouldering the burdens of litigation. The notion that self-defense has to take place wherever [a] person happens to be … appears to us to portend all sorts of litigation over schools, airports, parks, public thoroughfares, and various additional government facilities. … The whole matter strikes us as a vast *terra incognita* that courts should enter only upon necessity and only then by small degree." *Masciandaro*, 638 F.3d at 475 (opinion of Wilkinson, J., for the Court as to Part III.B) (citations and internal quotation marks omitted)

to "an important governmental objective." *Id.*, slip op. at 19 (quoting *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2012)).  The Court found that Winchester's licensing policies were in fact "substantially related to the state's important objective in protecting public safety and preventing crime." *Id.*, slip op. at 23.  Thus, "the policy that requires applicants to show a specific reason to fear in order to be issued unrestricted firearm licenses, and its authorizing statute, are constitutional. *Id.*, slip op. at 24.

There is no reason to reach a different result here.  Indeed, even plaintiffs concede that, if the Court were to apply the same reasoning here that it did in *Batty*, there is nothing about Boston's and Brookline's licensing policies vis-à-vis Winchester's that would compel a different result.  Pls.' Mem. at 17.  Instead, plaintiffs argue that the intervening 2-1 decision from the D.C. Circuit in *Wrenn*[5] is a basis for this Court to reconsider its prior decision. *Id.* at 17-20.  It is not.

Most importantly, *Wrenn* employed a sweeping, categorical approach to the carrying of firearms outside the home that is simply inconsistent with the First Circuit's decisions employing an appropriately more cautious, incremental approach.  *Wrenn* held that "the individual right to carry common firearms beyond the home for self-defense—even in densely populated areas, even for those lacking special self-defense needs—falls within the core of the Second Amendment's protections", 864 F.3d at 661, even though the Supreme Court has never said so explicitly.  *See*, *e.g.*, *Heller*, 554 U.S. at 628 (home is where "the need for defense of self, family, and property is most acute"); *id.* at 635 (Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of *hearth and home*") (emphasis added); *accord McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010).  *Compare Wrenn*, 864 F.3d at 661 (right to carry firearms outside the home falls within the "core" of Second Amendment), *with*

---

[5] On September 28, 2017, the D.C. Circuit denied a petition for rehearing *en banc* in *Wrenn*.

*Powell v. Tompkins*, 783 F.3d 332, 348 (1st Cir. 2015) (the Supreme Court "did not say [in *Heller* or *McDonald*], and to date has not said, that *publicly* carrying a firearm unconnected to defense of hearth and home and unconnected to militia service is a definitive right of private citizens protected under the Second Amendment") (emphasis in original), *cert. denied*, 136 S. Ct. 1448 (2016), *and Hightower*, 693 F.3d at 72 ("Courts have consistently recognized that *Heller* established that the possession of operative firearms for use in defense of the *home* constitutes the "core" of the Second Amendment.") (emphasis added), *and Booker*, 644 F.3d at 25 n.17, *cert. denied*, 565 U.S. 1204 (2012). As the First Circuit observed in *Hightower*, "we should not engage in answering the question of how *Heller* applies to possession of firearms outside of the home, including as to 'what sliding scales of scrutiny might apply.'" 693 F.3d at 74 (quoting with approval *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir.), *cert. denied*, 565 U.S. 1058 (2011)). *Wrenn* ignores the caution that the First Circuit (and other circuits) have typically employed in adjudicating Second Amendment claims outside the home, and it should be deemed unpersuasive for doing so.

  *Wrenn* is also out of step with the First Circuit's approach in holding that any law that prohibits some (but not all) citizens from exercising the "core" right to carry firearms outside the home is categorically unconstitutional, without regard to any level of scrutiny. 864 F.3d at 665-66. As this Court observed in *Batty*, although the First Circuit has declined to place a label on the scrutiny it has applied to laws limiting or restricting the right to bear arms, in practice the court has typically applied intermediate scrutiny, asking whether the challenged enactment bears a substantial relationship to an important governmental interest. *Batty*, slip op. at 17-19 (citing, *e.g.*, *Booker*, 644 F.3d at 25). As the First Circuit observed in *Booker,* "a categorical ban on gun ownership by a class of individuals"—even one that would be presumptively lawful under

*Heller*, such as a ban on possession by persons convicted of domestic violence misdemeanors—"must be supported by some kind of strong showing, necessitating a substantial relationship between the restriction and an important governmental objective." 644 F.3d at 25 (citation and internal quotation marks omitted). But in *Wrenn*, the D.C. Circuit allowed for no such analysis of the government's objectives and the means it employed to achieve them. Instead, it simply assumed that there exists a "core" right to possess firearms outside the home—even though the Supreme Court has not said so explicitly—and then struck down the D.C. law at issue as categorically unconstitutional because it prohibited some (but not all) citizens from exercising that right. The *Wrenn* court thus did not subject the D.C. law to intermediate scrutiny or even strict scrutiny—it instead invalidated the law without further inquiry. This is further evidence of the sweeping approach employed by the court in *Wrenn* that is simply inconsistent with the First Circuit's approach, as recognized by this Court in *Batty*.

Here, the policies and procedures employed by Boston and Brookline to implement Mass. G.L. c. 140, § 131, subject some (but not all) applicants to restrictions on their ability to carry firearms outside the home. Importantly, all of the restrictions challenged here allow for possession and carrying of firearms *in the home* for self-defense. *See*, *e.g.*, Boston Interrogatory Answers [Doc. No. 58-1] at p.12; Brookline Interrogatory Answers [Doc. No. 58-2], Answer to Interrogatory No. 5. Thus, the actual "core" Second Amendment rights of plaintiffs as recognized in *Heller*—to armed self-defense in the home—are in no way infringed by these policies. And, "[i]nstead of banning the carrying of firearms in public outright, the Massachusetts legislature has balanced the need to reduce the number of firearms in public with the needs of individuals who have a heightened need to carry firearms in public for self-defense." *Batty*, slip op. at 24. Application of intermediate scrutiny (even if the First Circuit does not use

that label explicitly) allows the Commonwealth and Boston and Brookline to demonstrate that the statute, and the policies and procedures they have implemented thereunder, are substantially related to the undeniable governmental interest in public safety and crime prevention. The categorical approach adopted in *Wrenn*—based on a dramatic expansion of the "core" of the Second Amendment—does not. It should thus be rejected by this Court.

Finally, it is worth noting that *Wrenn* is contrary to the weight of decisions from other circuits on this precise issue. This Court in *Batty* relied in part on decisions from the Second, Third, and Fourth Circuits that had upheld similar restrictions on the possession and carrying of firearms in public. *Id.*, slip op. at 24 (citing *Kachalsky v. County of Westchester*, 701 F.3d 81, 100-01 (2d Cir. 2012) (upholding "proper cause" requirement for unrestricted licenses in New York); *Drake v. Filko*, 724 F.3d 426, 440 (3d Cir. 2013) (upholding "justifiable need" requirement for licenses in New Jersey); *Woollard v. Gallagher*, 712 F.3d 865, 881 (4th Cir. 2013) (upholding "good-and-substantial reason" requirement for licenses in Maryland). Until *Wrenn*, these cases reflected an emerging consensus that reasonable limitations on the right to carry firearms in public—including requiring applicants to make a heightened showing of need, separate and distinct from that of the general public—were permissible under the Second Amendment. *Wrenn* is thus an outlier, one that is inconsistent not only with the weight of authority elsewhere, but also with the careful, incremental approach employed by the First Circuit generally, and by this Court in *Batty* specifically. It should therefore be rejected as unpersuasive by this Court.

## CONCLUSION

For the reasons set forth above, the Commonwealth respectfully requests that this Court deny Plaintiffs' Motion for Summary Judgment [Doc. No. 56], and instead enter summary judgment in favor of the defendants.

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL

*/s/ Timothy J. Casey           /*
Timothy J. Casey (BBO No. 650913)
Assistant Attorney General
Government Bureau
One Ashburton Place
Boston, MA 02108
(617) 963-2043

October 6, 2017                              Timothy.Casey@state.ma.us

## CERTIFICATE OF SERVICE

I certify that this document, filed through the Court's ECF, system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants by first-class mail on October 6, 2017.

*/s/ Timothy J. Casey*
Timothy J. Casey
Assistant Attorney General