UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:16-cv-10181-FDS

DANNY WENG, CHRISTOPHER HART,
MARKUS VALLASTER, SARAH ZESCH,
JOHN STANTON, MICHAEL GOULD, and
COMMONWEALTH SECOND AMENDMENT,
INC.,

        Plaintiffs,

v.

WILLIAM B. EVANS, in his Official Capacity as
Commissioner of the Boston Police Department,
and DANIEL C. O'LEARY, in his Official
Capacity as Chief of the Brookline Police
Department,

        Defendants.

**DEFENDANT COMMISSIONER EVANS' MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Defendant William B. Evans ("Commissioner Evans")[1] hereby moves the Court, pursuant

to Federal Rule of Civil Procedure 56, for summary judgment in his favor on all claims brought

against him in the instant case by Plaintiffs Danny Weng, Christopher Hart, Markus Vallaster,

Sarah Zesch, John Stanton, Michael Gould, and Commonwealth Second Amendment, Inc.

---

[1] Under 42 U.S.C. § 1983, a lawsuit against Commissioner Evans in his official capacity is treated as a lawsuit against the City of Boston itself.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent[.]").  Among other requirements, Plaintiffs must identify a policy or custom of the City that violates their rights.  Los Angeles Cty. v. Humphries, 562 U.S. 29, 39 (2010).

(collectively, "Plaintiffs"),[2] and Commissioner Evans hereby opposes Plaintiffs' Motion for Summary Judgment, ECF No. 56.   Plaintiffs bring two claims against Commissioner Evans pursuant to 42 U.S.C. § 1983 for violations of their Second and Fourteenth Amendment rights. Amended Compl., ECF No. 7, at ¶¶ 62-68 (Apr. 14, 2016) ("Amd. Compl."). The gravamen of these claims is a purely legal dispute about the scope of the Second Amendment to the United States Constitution ("Second Amendment"), and the applicable legal standard is this Court's recent decision in Batty v. Albertelli, No. 15-cv-10238-FDS, 2017 WL 740989, at *11-13 (D. Mass. Feb. 24, 2017).

Applying this Court's analysis in Batty v. Albertelli, Commissioner Evans' policy of placing "Target & Hunting" restrictions on the licenses of applicants who do not demonstrate special circumstances is "substantially related to the important governmental objective of public safety, and therefore does not violate the Second Amendment." Id. at *13.   Moreover, Plaintiffs' restricted licenses to carry do not violate their Second Amendment rights because the Second Amendment does not entitle Plaintiffs to unrestricted Class A licenses for self-defense inside or outside the home.   Specifically, First Circuit precedent is clear that carrying firearms outside the home is not within the core of the Second Amendment's individual right.   The First Circuit has also held that the Second Amendment does not entitle Plaintiffs to certain specific benefits of unrestricted Class A licenses, such as concealed carry.   Along with their Second Amendment claim, Plaintiffs bring an equal protection claim, but as in Batty, it is undeveloped and fatally deficient.   Furthermore, Plaintiff Commonwealth Second Amendment, Inc. ("Comm2A") lacks standing to bring any of its claims, and as a result, they must be dismissed.   Therefore,

---

[2] Plaintiff Gould does not allege any facts against Commissioner Evans.   Amended Compl., ECF No. 7, at ¶¶ 52-56 (Apr. 14, 2016) ("Amd. Compl."). As to Plaintiff Vallaster, counsel for Plaintiffs and counsel for Commissioner Evans agreed in their conference pursuant to D. Mass. Local Rule 7.1(a)(2) to dismiss Plaintiff Vallaster's claims as moot.

Commissioner Evans respectfully requests that the Court render summary judgment in his favor, dismiss with prejudice all claims and counts against him, and deny Plaintiffs' Motion for Summary Judgment.

## II.     RELEVANT FACTS

Under Massachusetts law, a licensing authority may issue a Class A license to carry firearms "if it appears that the applicant . . . has good reason to fear injury to the applicant or the applicant's property or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to the restrictions expressed or authorized under this section."  Mass. Gen. Laws c. 140, § 131(d).  This provision is known as the statute's "proper purpose" or "reason" requirement.[3]  See Pineiro v. Gemme, 937 F. Supp. 2d 161, 167 (D. Mass. 2013); Davis v. Grimes, 9 F. Supp. 3d 12, 16-17 (D. Mass. 2014).  The licensing authority is further authorized to impose "such restrictions" on a Class A license to carry as it "deems proper," and pursuant to this grant of authority, it "may restrict a license to those uses for which the authority determines there to be an appropriate reason, even if it is not the reason proposed by the applicant."  Mass. Gen. Laws c. 140, § 131(a); Davis, 9 F. Supp. 3d at 17; Pineiro, 937 F. Supp. 2d at 167.

The Boston Police Department issues unrestricted Class A licenses, as well as Class A licenses with "Target & Hunting," "Sporting," and "Employment" restrictions, and it sometimes issues Class A licenses with a combination of those restrictions.  Commissioner Evans' Statement of Undisputed Material Facts, at ¶ 2 (Oct. 6, 2017) ("Evans' SOF").  The scope of these restrictions is defined in a document entitled "LTC Restrictions and Definitions."  Id. at

---

[3] An earlier version of the statute used the phrase "proper purpose" instead of "reason," but there is no substantial difference between these formulations.  Davis v. Grimes, 9 F. Supp. 3d 12, 29 n.20 (D. Mass. 2014).

¶ 3, Exhibit 4.  A person with a "Target & Hunting" restriction, or any other restriction, can carry open or concealed on his person within the limitations of his restrictions.  Id. at ¶ 4.

In assessing an applicant's proper purpose or reason for requesting an unrestricted license, the Licensing Unit of the Boston Police Department ("Licensing Unit") conducts an individual, case-by-case analysis of each applicant, and its determination depends upon the reasons supplied by the individual applicant.  Id. at ¶ 1.  Although there is no internal written policy regarding the "proper purpose" or "reason" analysis, there are general guidelines used by the Licensing Unit to make these determinations.  Id. at ¶¶ 5-6.

Relevant to the instant motion, the Licensing Unit issues unrestricted Class A licenses to otherwise qualified individuals who show "good reason to fear injury" that distinguishes them from the general population, and the Licensing Unit requires documentation to verify or support such claims.  Id. at ¶ 7; Mass. Gen. Laws c. 140, § 131(d).[4]  For purposes of "good reason to fear injury," the Licensing Unit draws a distinction between victims of random crime and victims who were specifically targeted, with the former being less likely to establish "good reason to fear injury."  Evans' SOF, at ¶ 10.  Moreover, "good reason to fear injury" is generally not determined by high-crime areas.  Id. at ¶ 11.  Unless a special showing is made that an otherwise qualified applicant has good reason to fear injury (or that the applicant fits into one of the

_____

[4] Plaintiffs specifically challenge the "good reason to fear injury" requirement and appear to waive argument as to any other differences from the policy at issue in Batty.  Plaintiffs' Mem. of Law, ECF No. 57, at 21 (Aug. 31, 2017).  Beyond "good reason to fear injury," the Licensing Unit also issues unrestricted Class A licenses to otherwise qualified individuals who are lawyers, medical doctors, full-time law enforcement officers who are active or who retired in good standing, and others whose job requires them to carry a firearm.  Evans' SOF, at ¶ 8.  In each case, the Licensing Unit will require documentation or take other steps to verify the applicant's occupation.  Id.  The Licensing Unit also issues unrestricted Class A licenses to otherwise qualified individuals who already possess unrestricted Class A licenses.  Id. at ¶ 9.

categories described in <u>Footnote 3</u>), the Licensing Unit will issue a Class A license subject to a "Target & Hunting" restriction. <u>Id.</u> at ¶ 12.

Applicants requesting an unrestricted license to carry a firearm (or those requesting a particular restriction or combination of restrictions) are permitted and instructed to submit a letter detailing their request, along with any supporting documentation, to the head of the Licensing Unit, Lt. Det. John McDonough. <u>Id.</u> at ¶ 13.[5] Lt. Det. McDonough reviews these documents, and he makes an individual determination as to whether an applicant will receive an unrestricted Class A license. <u>Id.</u> at ¶ 14. This process does not distinguish between first-time and renewal applicants. <u>Id.</u> at ¶ 15. What is more, the submission, review, and determination of these requests can occur even before the initial license is issued. <u>Id.</u> at ¶¶ 16-17; <u>see also</u> Plaintiffs' Statement of Material Facts, ECF No. 58, at ¶ 54 (Aug. 31, 2017) ("Pls.' SOF") (Plaintiff Hart submitted a letter requesting an unrestricted license at the time of his application).

## III.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." <u>Carroll v. Xerox Corp.</u>, 294 F.3d 231, 236 (1st. Cir. 2002) (citing Fed. R. Civ. P. 56(c)). The nonmoving party "may not rest upon mere allegation or denials . . . , but must set forth specific facts showing that there is a genuine issue of material fact as to each issue on which he would bear the ultimate burden of proof at trial." <u>Sensing v. Outback Steakhouse of Florida, LLC</u>, 575 F.3d 145, 152 (1st. Cir. 2009) (internal quotations omitted). "A genuine issue is one that could be resolved in favor of either party, and a material fact is one that has the potential of

---

[5] Commissioner Evans is the City's licensing official for purposes of Mass. Gen. Laws c. 140, § 131, and he has delegated this authority to Lt. Det. McDonough. Evans' SOF, at ¶ 13.

affecting the outcome of the case." Id. (internal quotations omitted).  "The test is whether, as to each essential element, there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Id. (internal quotations omitted).

## IV.  ARGUMENT

### A.  Commissioner Evans' Policy Does Not Violate the Second Amendment.

Commissioner Evans' policy does not violate the Second Amendment, and Plaintiffs' restricted Class A licenses issued pursuant to that policy are perfectly constitutional.  As Plaintiffs forthrightly concede, these conclusions are compelled by the Court's analysis in Batty v. Albertelli, No. 15-cv-10238-FDS, 2017 WL 740989, at *11-13 (D. Mass. Feb. 24, 2017). Indeed, Plaintiffs agree that if accepted and applied, Batty would be dispositive of their claims:

> [W]e concede that, if accepted and applied again here, [the Court's conclusions in Batty] ought to be dispositive of the present case . . . .  If the right to bear arms can be limited only to those citizens who have a special "need" to exercise their right, then there is really no good reason that Winchester's policy and practice would pass muster, while the policies and practices in Boston and Brookline would not.

Plaintiffs' Mem. of Law, ECF No. 57, at 21 (Aug. 31, 2017) ("Plaintiffs' Mem.").  As Commissioner Evans' policy is substantially related to the important governmental objective of public safety, it does not violate the Second Amendment.  See Section A.1., infra.  Moreover, there is no Second Amendment right to an unrestricted Class A license for purposes of self-defense, either inside or outside the home.  See Section A.2., infra.  For these reasons, Plaintiffs' Second Amendment claims against Commissioner Evans must fail.

### 1.  Commissioner Evans' Policy Is Substantially Related To The Important Governmental Objective Of Public Safety.

Commissioner Evans' policy of placing "Target & Hunting" restrictions on the licenses of applicants who do not demonstrate special circumstances is "substantially related to the

important governmental objective of public safety, and therefore does not violate the Second Amendment." Batty, 2017 WL 740989, at *13. Although the First Circuit has not adopted intermediate scrutiny for Second Amendment challenges, it has found that "a categorical ban on gun ownership by a class of individuals must be supported by . . . a substantial relationship between the restriction and an important governmental objective." United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011). Where certain conduct imposes a burden on Second Amendment rights, the test of its constitutionality is whether such a substantial relationship exists. Batty, 2017 WL 740989, at *10; Draper v. Healey, 98 F. Supp. 3d 77, 84-85 (D. Mass. 2015) (citing Davis, 9 F. Supp. 3d at 24-25), aff'd, 827 F.3d 1 (1st Cir. 2016).

The restrictions imposed by Commissioner Evans pursuant to Mass. Gen. Laws c. 140, § 131 plainly relate to the important governmental objective of protecting the safety of the City's citizens against firearm violence. Evans' SOF, at ¶ 27. The U.S. Supreme Court "has recognized that the government interest in public safety is both 'compelling' . . . and 'significant.'" Chief of Police v. Holden, 470 Mass. 845, 858 (2015) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987) and Schenck v. Pro-Choice Network of W.N.Y., 519 U.S. 357, 376 (1997)). These are the very same compelling interests advanced by the statutory scheme at issue in this case. Evans' SOF, at ¶ 27. Massachusetts courts have explained the purpose of Section 131 as follows:

> The goal of firearms control legislation in Massachusetts is to limit access to deadly weapons by irresponsible persons. A wide range of methods has been adopted by the Legislature to accomplish this goal, including the requirement of licenses for the sale or possession of firearms and ammunition . . . From a realization that prevention of harm is often preferable to meting out punishment after an unfortunate event, G.L. c. 140, § 131, was enacted as a first-line measure in the regulatory scheme. It has been said about § 131 that it was intended to have local licensing authorities employ every conceivable means of preventing deadly weapons in the form of firearms [from] coming into the hands of evildoers.

Ruggiero v. Police Comm'r, 18 Mass. App. Ct. 256, 258-59 (1984) (internal quotations omitted) (upholding refusal to issue unrestricted license as valid exercise of statutory discretion under Mass. Gen. Laws c. 140, § 131); see also Batty, 2017 WL 740989, at *11-12; Davis, 9 F. Supp. 3d at 16 n.2.  As this Court noted in Pineiro v. Gemme, "protecting the safety of its citizens" is "perhaps the most important of government functions."  937 F. Supp. 2d at 176.

Commissioner Evans' policy is substantially related to these important functions.  As this Court has explained, "the government's regulation need only be 'substantially related' to its important objectives to promote public safety and prevent crime in order to pass constitutional muster."  Batty, 2017 WL 740989, at *13.  What is more, this Court has explicitly held that "the placing of target and hunting restrictions on the licenses of applicants who do not show good reason to fear injury is substantially related to the important governmental objective of public safety, and therefore does not violate the Second Amendment."  Id.

The material facts of this case are nearly identical to those contemplated by the Court in Batty, and Plaintiffs do not contest this.  Plaintiffs' Mem., ECF No. 57, at 21 ("If the right to bear arms can be limited only to those citizens who have a special 'need' to exercise their right, then there is really no good reason that Winchester's policy and practice would pass muster, while the policies and practices in Boston and Brookline would not.").  Batty concerned a policy whereby unrestricted Class A licenses were only issued to applicants who could show a particular "reason to fear."  Batty, 2017 WL 740989, at *3.  Under that policy, requests for unrestricted licenses were assessed on a case-by-case basis, with the licensing authority evaluating the basis for each request.  Id.

As in Batty, the Boston Police Department imposes "three varieties of restrictions": "Target & Hunting," "Sporting," and "Employment" restrictions, and these restrictions are

identical in scope to those considered in <u>Batty</u>.  <u>Cf.</u> 2017 WL 740989, at \*3 <u>and</u> Evans' SOF, at

¶¶ 2-3, <u>Exhibit 4</u>.  As in <u>Batty</u>, the Boston Police Department issues unrestricted Class A licenses

on an individual, case-by-case basis, subject to the Licensing Unit's evaluation of the reasons

and supporting information supplied by each applicant.  Evans' SOF, at ¶ 1.  As in <u>Batty</u>, the

Boston Police Department issues unrestricted Class A licenses to applicants who can

demonstrate "good reason to fear injury" that distinguishes them from the general population.[6]

<u>Id.</u> at ¶¶ 7, 10-11.  As in <u>Batty</u>, where an applicant is unable to make some special showing, the

Boston Police Department will issue a Class A license with a restriction, and it typically applies

the "Target & Hunting" restriction.  <u>Id.</u> at ¶ 12; Pls'. SOF, ECF No. 58, at ¶ 5.

There is a final similarity between the instant case and <u>Batty</u>.  The plaintiffs in <u>Batty</u> did

not provide "good reason to fear injury" that distinguished them from the general population.

<u>Batty</u>, 2017 WL 740989, at \*4-5 (discussing general requests for "all lawful purposes").

Likewise, in the instant case, Plaintiffs do not contend that their restricted licenses violate the

Massachusetts licensing statutes.  <u>See generally</u> Amd. Compl.  Rather, as in <u>Batty</u>, Plaintiffs cite

only a general desire for personal protection or self-defense as justification for their claims.

Evans' SOF, at ¶¶ 18-21; Pls.' SOF, ECF No. 58, at ¶¶ 45-46, 54, 60, 65, 77.[7]

---

[6] As noted in Section II, <u>supra</u>, the Licensing Unit draws a distinction between victims of random crime and victims who were specifically targeted, with the former being less likely to establish "good reason to fear injury."  Evans' SOF, at ¶ 10.

[7] Plaintiff Stanton made a second request for an unrestricted license, citing in his letter a theft that had occurred and his desire for personal protection.  Pls.' SOF, at ¶ 77.  Nevertheless, Mr. Stanton did not claim that he was specifically targeted by the theft.  <u>See</u> Evans' SOF, at ¶ 22. Neither does Plaintiff Stanton or any other Plaintiff claim that any of Commissioner Evans' policies or determinations, including the determination that Mr. Stanton did not have a "good reason to fear injury," violated Massachusetts state law.  <u>See generally</u> Amd. Compl.; <u>see also</u> Evans' SOF, at ¶¶ 18-21.

Due to the material similarities between these cases, the Court's holding in <u>Batty</u> applies directly to the facts in this case.  Plaintiffs agree, though they urge the Court to reconsider that decision for reasons addressed in Section A.2., <u>infra</u>.  Plaintiffs' Mem., ECF No. 57, at 21.  As a result, the Court should reach the same conclusion it reached in <u>Batty</u> and find as to Commissioner Evans' policy that "the placing of target and hunting restrictions on the licenses of applicants who do not show good reason to fear injury is substantially related to the important governmental objective of public safety, and therefore does not violate the Second Amendment." <u>Batty</u>, 2017 WL 740989, at *13.

**2. The Second Amendment Does Not Entitle Plaintiffs To Unrestricted Class A Licenses.**

The Second Amendment does not entitle Plaintiffs to unrestricted Class A licenses.  The First Circuit held in a very recent decision that there is no Second Amendment right to a Class A license for the purpose of self-protection in one's home.  While the First Circuit has not directly addressed whether there is a Second Amendment right to carry outside one's home, it has plainly held that any such right is outside the "core" of the Second Amendment's protections, and it has held that certain benefits of unrestricted Class A licenses are not protected by the Second Amendment.  Perhaps most importantly, the U.S. Supreme Court has held "unequivocally" that "the Constitution does not create a right to carry a firearm 'in any manner whatsoever and for whatever purpose.'" <u>Pineiro</u>, 937 F. Supp. 2d at 174 (quoting <u>District of Columbia v. Heller</u>, 554 U.S. 570, 626, 630 (2008) and <u>McDonald v. City of Chicago</u>, 130 S. Ct. 3020, 3036, 3047 (2010)).  Nevertheless, this is in essence the relief Plaintiffs seek.  For these reasons, explicated more fully below, the Court should find that Plaintiffs' Second Amendment rights have not been violated.

a. <u>Plaintiffs' licenses already permit possession and carrying outside the home for specific purposes.</u>

In order to succeed on their as-applied challenges, Plaintiffs cannot rest on their assertion of a vaguely-defined "right to bear arms in public." <u>See</u> Plaintiffs' Mem., ECF No. 57, at 24. Rather, Plaintiffs must specifically establish their entitlement to the additional benefits conferred by an unrestricted Class A license "over and above those granted" by their restricted licenses. <u>Hightower v. City of Boston</u>, 693 F.3d 61, 71-72 (1st Cir. 2012) (requiring plaintiff who sought "the right to publicly carry a handgun outside of her home for self defense" to show entitlement to "carry concealed handguns in public"). Plaintiffs' restricted licenses already permit them to possess and carry firearms in their homes for self-defense. Evans' SOF, at ¶ 3, <u>Exhibit 4</u>.

What is more, Plaintiffs' restricted licenses permit them to possess and carry outside the home in certain defined circumstances. Specifically, the "Target & Hunting" restriction, as applied by the Boston Police Department, permits Plaintiffs to possess and carry firearms outside their home for target shooting and hunting activities and while traveling to and from such activities. Pls.' SOF, ECF No. 58, at ¶ 12; Evans' SOF, at ¶¶ 3-4, <u>Exhibit 4</u>. The "Sporting" restriction, which is also used by the Boston Police Department, permits license-holders to possess and carry firearms outside their home for recreational and sporting activities and while traveling to and from such activities. Pls.' SOF, ECF No. 58, at ¶ 13; Evans' SOF, at ¶¶ 3-4, <u>Exhibit 4</u>. Finally, the "Employment" restriction, which is also used by the Boston Police Department, permits license-holders to possess and carry firearms outside their home for work or business activities, including "maintaining proficiency" and travel to and from the activity location. Pls.' SOF, ECF No. 58, at ¶ 14; Evans' SOF, at ¶¶ 3-4, <u>Exhibit 4</u>. In the case of each of these restrictions, including the Plaintiffs' "Target & Hunting" restrictions, a license-holder may carry the firearm openly or concealed on his person during travel to and from the activity

location.  Evans' SOF, at ¶¶ 3-4, Exhibit 4; see also Mass. Gen. Laws c. 140, §131C(a) (permitting transport of firearms in vehicles where it is under the "direct control" of the license-holder).

Therefore, Plaintiffs must show that they are entitled to the additional benefits conferred by an unrestricted Class A license above and beyond possession and carrying in the home for self-defense, and above and beyond the possession and carrying outside the home that is permitted by their restrictions.  See Hightower, 693 F.3d at 71-72.  For the reasons detailed in subsection b., infra, Plaintiffs are unable to show that they are entitled to the additional benefits conferred by unrestricted Class A licenses.

> b.  There is no Second Amendment right to an unrestricted Class A license for self-protection inside or outside the home.

The First Circuit very recently held that there is no Second Amendment right to a Class A license for the purpose of self-defense in the home.  Morin v. Leahy, 862 F.3d 123, 127 (1st Cir. 2017) ("[T]he denial of an application for a Class A License does not infringe upon the Second Amendment right to possess a firearm within one's home[.]").  While the First Circuit has not directly decided whether the Second Amendment protects the possession of firearms outside the home, it has nevertheless suggested that such activity would be outside the "core" of the Second Amendment.  In the First Circuit, the "core" of the Second Amendment is defined as "the possession of operative firearms for use in defense of the home[.]"  Hightower, 693 F.3d at 72. By contrast, the First Circuit "flatly reject[ed]" the proposition that Heller and McDonald establish a right that "encompasses one's 'person' unrelated to the home."  Powell v. Tompkins, 783 F.3d 332, 347-48 (1st Cir. 2015), cert. denied, 136 S. Ct. 1448 (2016).

The First Circuit also rejected a similar proposition in Hightower v. City of Boston.  693 F.3d at 71-72.  Just as in the instant case, the plaintiff in Hightower argued that she was "entitled

to a declaration that the Second Amendment secures the right to publicly carry a handgun outside of her home for self defense[.]" Id. at 71.  Specifically, the plaintiff sought the restoration of her unrestricted Class A license.  Id.  The Court held that the interest advanced by the plaintiff "in carrying concealed weapons outside the home is distinct from [the] core interest emphasized in Heller." Id. at 72.  Although the First Circuit made particular reference to concealed carrying, the "operative distinction" in Hightower "was whether the individual asserted his Second Amendment right outside or inside the home." See Batty, 2017 WL 740989, at *9.   These decisions show that in the First Circuit, carrying a firearm outside the home is not within the "core" of the Second Amendment.

Indeed, an unrestricted Class A license entails privileges that go well beyond what the Second Amendment protects.  Class A licenses are the least restrictive licenses available under the Massachusetts system, and an unrestricted Class A license permits its holder to possess large capacity firearms and even to carry concealed and loaded firearms in public.  Morin, 862 F.3d at 124 n.1; Hightower, 693 F.3d at 66.  It follows that there is no Second Amendment right to an unrestricted Class A license, and the case law compels this conclusion in no uncertain terms.  The First Circuit held in Hightower that the plaintiff could not make out her Second Amendment claim as to her unrestricted Class A license because "[u]nder our analysis of Heller . . . , the government may regulate the carrying of concealed weapons outside the home" even to the point of total prohibition.  Id. at 73.  There is likewise no Second Amendment right to possess large capacity firearms, the possession of which is permitted by an unrestricted Class A license.  See id. at 71; United States v. Rene E., 583 F.3d 8, 12 (1st Cir. 2009).   Moreover, the Massachusetts Supreme Judicial Court recently concluded that "the denial of a Class A license to carry a concealed firearm . . . falls outside the Second Amendment[.]"  Holden, 470 Mass. at 853.

Therefore, as there is no right to an unrestricted Class A license for self-defense in the home, as possessing and carrying a firearm outside the home is not a "core" Second Amendment activity, and as an unrestricted Class A license entails privileges that are unprotected by the Second Amendment, the Court should find that there is no Second Amendment right to an unrestricted Class A license.

c. <u>Wrenn v. District of Columbia is inapposite because it contradicts binding First Circuit precedent.</u>

Plaintiffs argue that the Court should reconsider the logic of its analysis in <u>Batty</u>, pointing instead to a recent panel decision of the D.C. Circuit, but that case is inapposite because it is in direct conflict with the case law in the First Circuit. Plaintiffs cite <u>Wrenn v. District of Columbia</u>, 864 F.3d 650, 667 (D.C. Cir. 2017), for two propositions: (1) that carrying outside the home is part of the Second Amendment's "core," and (2) that means-end scrutiny need not be applied to a policy similar to Commissioner Evans' policy. Plaintiffs' Mem., ECF No. 57, at 21-24.

As a matter of law, however, <u>Wrenn</u> contradicts binding First Circuit precedent regarding the scope of the Second Amendment. As noted above, the First Circuit has defined the "core" of the Second Amendment to be "the possession of operative firearms for use in defense of the home." <u>Hightower</u>, 693 F.3d at 72. The First Circuit has stated in no uncertain terms that it does not read <u>Heller</u> or <u>McDonald</u> to include a right to keep and bear arms unrelated to the home. <u>Powell</u>, 783 F.3d at 347-48. Therefore, the <u>Wrenn</u> Court's reading of <u>Heller</u> to establish a right to carry outside the home is incompatible with the First Circuit's reading of <u>Heller</u>.[8]   <u>See Wrenn</u>, 864 F.3d at 657-58.

---

[8] The "ample channels" standard that the <u>Wrenn</u> Court uses to assess this purported right has never been adopted or applied in the First Circuit. <u>See Wrenn</u>, 864 F.3d at 662.

Plaintiffs also cite Wrenn for its refusal to apply standards of scrutiny in analyzing a similar policy, but this conclusion is likewise incompatible with First Circuit precedent. Id. at 664-67; Plaintiffs' Mem., ECF No. 57, at 23-24. The First Circuit has stated that "a categorical ban on gun ownership by a class of individuals" can be justified by where there is a substantial relationship between the restriction and an important governmental objective. Booker, 644 F.3d at 25. As this Court has explained, the First Circuit's analysis in several cases, including Hightower and Booker, strongly suggests the application of means-end scrutiny to any categorical limits on Second Amendment rights. Batty, 2017 WL 740989, at *7. By contrast, the Wrenn Court refused to apply means-end scrutiny to a categorical limit on Second Amendment Rights. Wrenn, 864 F.3d at 664-67.

Perhaps most importantly, the Wrenn decision gives short shrift to the historically robust role that states have had in regulating the possession and carrying of firearms in public. Id. at 669 (Henderson, J., dissenting); Kachalsky v. Cty. of Westchester, 701 F.3d 81, 96 (2d Cir. 2012) ("[O]ur tradition . . . clearly indicates a substantial role for state regulation of the carrying of firearms in public[.]"); Drake v. Filko, 724 F.3d 426, 430 n.5, 433 (3rd Cir. 2013) (finding analogous "'justifiable need' standard fits comfortably within the longstanding tradition of regulating the public carrying of weapons for self-defense"); see also United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011) (noting the "longstanding out-of-the-home/in-the-home distinction"). Because the Wrenn decision contradicts First Circuit precedent regarding the scope of the Second Amendment and the appropriate scrutiny to apply to Second Amendment challenges, it is unhelpful in the instant case, and the Court should not apply it here.

**B. Plaintiffs Fail To State An Equal Protection Claim.**

Plaintiffs' equal protection claim must fail because Plaintiffs do not establish disparate treatment, because Plaintiffs are not part of a suspect or quasi-suspect class, and because Commissioner Evans' actions survive rational basis scrutiny. The Fourteenth Amendment to the U.S. Constitution provides for "equal protection of the laws." In order to allege an equal protection violation, a plaintiff must "attempt to demonstrate that [he] was treated differently from other similarly situated individuals." Hightower, 693 F.3d at 83 n.21 (citing Kuperman v. Wrenn, 645 F.3d 69, 77-78 (1st Cir. 2011)); accord Pineiro, 937 F. Supp. 2d at 175-76. As this Court explained, once disparate treatment is established, it is then assessed under one of three categories of means-end analysis:

> The Supreme Court has held that differential treatment based on suspect classifications (race, national origin, religion, or alienage) is subject to strict scrutiny; differential treatment based on quasi-suspect classifications (gender or illegitimacy) is subject to intermediate scrutiny; and differential treatment based on all other classifications simply must survive a rational basis inquiry.

Pineiro, 937 F. Supp. 2d at 176.

In Batty v. Albertelli, this Court dismissed an identical equal protection claim where the plaintiffs did not develop their equal protection claims at summary judgment. See Batty, 2017 WL 740989, at *13; Amended Compl., Batty v. Albertelli, No. 15-cv-10238, ECF No. 9, at ¶¶ 70-71 (D. Mass. Mar. 11, 2015). Specifically, the Court found that there was "no suspect class at issue" and that the challenged classification "[did] not impermissibly interfere with the exercise of a fundamental right." Batty, 2017 WL 740989, at *13.

In the instant case, as in Batty, Plaintiffs have not developed and do not advance their equal protection claim at the summary judgment stage. See generally, Plaintiffs' Mem., ECF No. 57. Moreover, as in Batty, Plaintiffs do not allege that they are members of any suspect or

quasi-suspect classification.  <u>See</u> Amd. Compl., ECF No. 7, at ¶¶ 25-26, 66-68.  Therefore, the imposed restrictions are subject only to rational basis inquiry.  <u>Pineiro</u>, 937 F. Supp. 2d at 176 (holding that plaintiff had not met his "very heavy" and "demanding" burden in challenging a classification under the "rational basis" standard).  As described in Section A.1., <u>supra</u>, Commissioner Evans' actions do not interfere with a fundamental right, and they survive heightened or intermediate scrutiny.  It necessarily follows that they also satisfy the lower standard of rational basis scrutiny.

As Plaintiffs have not developed or advanced their equal protection argument, as Plaintiffs are not members of a suspect or quasi-suspect class, and as Commissioner Evans' actions do not interfere with a fundamental right and survive rational basis scrutiny, Commissioner Evans therefore respectfully requests that the Court dismiss with prejudice Count II of Plaintiffs' Amended Complaint insofar as it applies to Commissioner Evans.

### C.  <u>Plaintiff Commonwealth Second Amendment, Inc. Lacks Standing.</u>

Plaintiff Commonwealth Second Amendment, Inc. ("Comm2A") lacks standing.  An organization has standing to sue where:

> [I]ts members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

<u>Draper</u>, 98 F. Supp. 3d at 80 (quoting <u>Friends of the Earth, Inc. v. Laidlaw Envt'l Serves. (TOC), Inc.</u>, 508 U.S. 167, 181 (2000)).  Broadly speaking, standing must be established "through specific facts" that a plaintiff would be "directly affected apart from their special interest in the subject."  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 563 (1992) (internal quotations omitted).  That is, "[a] mere interest in an event—no matter how passionate or sincere the interest and no matter how charged with public import the event—will not substitute for an

actual injury." <u>Guckenberger v. Boston Univ.</u>, 957 F. Supp. 306, 320 (D. Mass. 1997) (quoting <u>United States v. AVX Corp.</u>, 962 F.2d 108, 108 (1st Cir. 1992)).

In <u>Draper v. Healey</u>, the U.S. District Court for the District of Massachusetts held that organizational plaintiffs lacked standing despite "spend[ing] time and resources" analyzing the challenged regulation and "incurr[ing] financial loss in sponsoring the lawsuit." 98 F. Supp. 3d at 80-81. Specifically, the Court held that these investments were not concrete injuries. <u>Id.</u>; <u>Guckenberger</u>, 957 F. Supp. at 320 (holding that "expend[ing] resources" is insufficient to establish organizational standing).

Comm2A is an advocacy organization. Its foremost purpose is to coordinate Second Amendment litigation against Massachusetts cities and towns. Evans' SOF, at ¶ 23. As an organizational plaintiff in this case, Comm2A sees its role as helping recruit and organize the individual plaintiffs, as well as representing the interests of its other members who are not named in the lawsuit. <u>Id.</u> at ¶ 24. Comm2A premises its standing on (1) allegations that it "expends significant resources" assisting those with restricted licenses and (2) alleged injuries to its individual members, including the named Plaintiffs. Amd. Compl., ECF No. 7, at ¶¶ 59-60; Plaintiffs' Mem., ECF No. 57, at 16-17.

As to the first basis, the Court's holding in <u>Draper</u> makes plain that expending resources does not constitute a concrete injury, and it is therefore insufficient to establish standing. 98 F. Supp. 3d at 80-81; <u>see also</u> <u>Guckenberger</u>, 957 F. Supp. at 320. As to the second basis, the only specific allegations in this case against Commissioner Evans relate to Plaintiffs Weng, Hart, Vallaster, Zesch, and Stanton. Amd. Compl., at ¶¶ 27-51. Nevertheless, these individual Plaintiffs were all made honorary members of Comm2A without their knowledge for purposes of this lawsuit. Pls.' SOF, ECF No. 58, at ¶¶ 90-91; Evans' SOF, at ¶ 25; Decl. of B. Carlton, ECF

No. 64, at ¶¶ 5-7.  Until very recently, they did not even know they were members of Comm2A, nor did they receive any benefits of membership.  Id.

It is apparent that the case or controversy as to Comm2A was manufactured at the inception of this lawsuit.  See id.  This is not to deny that Comm2A has an interest in this case. It is evident, however, that its interest is a more general interest in issue-based advocacy.  See Evans' SOF, at ¶ 23; Decl. of B. Carlton, ECF No. 64, at ¶ 3.  Such an interest does not amount to a concrete injury and is insufficient to establish standing.  Guckenberger, 957 F. Supp. at 320.[9] For these reasons, Commissioner Evans requests that the Court dismiss with prejudice all claims brought against him in this case by Comm2A.

## V.   **CONCLUSION**

Therefore, for the reasons set forth above, Commissioner Evans respectfully requests that the Court render summary judgment in his favor, dismiss with prejudice all Plaintiffs' claims and counts against him, and deny Plaintiffs' Motion for Summary Judgment.

---

[9] Although Comm2A has identified additional members by name who purportedly possess restricted LTCs in the City of Boston, there are no specific allegations or evidence sufficient to establish Comm2A's standing on these grounds.  See Guckenberger, 957 F. Supp. at 320-21; compare Amd. Compl., ECF No. 7, at ¶¶ 27-51, with Decl. of B. Carlton, ECF No. 64, at ¶ 8.

Dated:  October 6, 2017

Respectfully submitted,

WILLIAM B. EVANS, in his official capacity as Commissioner of the Boston Police Department,

By his attorneys:

Eugene L. O'Flaherty,
Corporation Counsel

/s/ Matthew M. McGarry
Matthew M. McGarry (BBO# 678363)
Assistant Corporation Counsel
City of Boston Law Department
Room 615, City Hall
Boston, MA 02201
(617) 635-4042
matthew.mcgarry@boston.gov

/s/ Peter M. Geraghty
Peter M. Geraghty (BBO# 664197)
Special Assistant Corporation Counsel
Boston Police Department
Office of the Legal Advisor
One Schroeder Plaza
Boston, MA 02120
(617) 343-4550
peter.geraghty@pd.boston.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2017, this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

Date:  October 6, 2017

/s/ Matthew M. McGarry
Matthew M. McGarry