**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CIVIL ACTION NO. 1:16-cv-10181-FDS

|   |   |
|---|---|
| DANNY WENG, CHRISTOPHER HART, MARKUS VALLASTER, SARAH ZESCH, JOHN STANTON, MICHAEL GOULD and COMMONWEALTH SECOND AMENDMENT, INC., <br> Plaintiffs, <br> v. <br><br> WILLIAM B. EVANS, in his Official Capacity as Commissioner of the Boston Police Department, and DANIEL C. O'LEARY, in his Official Capacity as Chief of the Brookline Police Department, <br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DANIEL C. O'LEARY'S OPPOSITION AND CROSS MOTION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

The defendant Town of Brookline Police Chief Daniel C. O'Leary (Chief O'Leary), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, hereby moves this Court for summary judgment. In addition, Chief O'Leary opposes plaintiffs' Motion for Summary Judgment.

**I. INTRODUCTION**

The Complaint alleges in two counts that the defendants' practice of imposing restrictions on licenses to carry firearms violates the Second and Fourteenth Amendments. Specifically, plaintiff Michael Gould, the only Brookline plaintiff, contends that Chief O'Leary's imposition of "employment" and "porting" restrictions on his license is unconstitutional because these restrictions "expressly *do not* allow people to carry handguns for the purpose of self-defense,

except within their homes." Plaintiffs Brief, p. 1. Nothing could be further from the truth. In addition to allowing Mr. Gould to exercise his core Second Amendment right, "the right of law abiding, responsible citizens to use arms in the defense of hearth and home," *Heller v. District of Columbia*, 554 U.S. 570, 635 (2008), these restrictions allow Mr. Gould to carry a firearm for self-defense any time he is working in his business as a professional photographer and during almost any outdoor sporting activity, the only occasions when he stated, in writing in his application, that he needed to carry a gun.

As will be set forth in more detail below, the restrictions attached to Mr. Gould's license are constitutionally permissible because: (1) Nothing in *Heller* or in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), bar Chief O'Leary's practice of implementing restrictions under the Massachusetts licensing scheme, (2) the practice is constitutional under the scrutiny standard adopted by this Court in *Batty v. Albertelli*, and (3) Chief O'Leary's use of the discretion afforded him by Mass. Gen. Laws ch. 140, Section 131 does not run afoul of the Equal Protection Clause.

## II. SUMMARY JUDGMENT STANDARD

Defendant Chief O'Leary adopts the summary judgement standard of review set forth by this Court in *Batty v. Albertelli*, Case 1:15-cv-10181, 2017 WL 740989, p. 6 (D. Mass. February 24, 2017).

## III. FACTS

**A.    Massachusetts Regulatory Framework**

Defendant Chief O'Leary adopts the framework set forth by this Court in *Batty v. Albertelli*, Case 1:15-cv-10181, 2017 WL 740989, pp. 2-5 (D. Mass. February 24, 2017).

B.     **Brookline Gun Licensing Process**

Chief O'Leary and Sargent Christopher Malinn are the two Brookline Police Officers who conduct firearms licensing in Brookline. Brkln. 56.1, ¶ 1. Sargent Malinn is the contact person and investigator for all firearms license applicants in Brookline. Brkln. 56.1, ¶ 2. Sargent Malinn gathers all of the facts, discusses the matter with applicants and answers their questions. Brkln. 56.1, ¶ 2. In the firearms licensing process, Chief O'Leary reviews all of the information about the applicant submitted to Sgt. Malinn and makes the decision whether or not to impose restrictions, or to reconsider a previous decision to do so. Brkln. 56.1, ¶ 3. When an applicant for a license to carry or a license holder wishes to meet with Chief O'Leary to discuss their application and/or license, he is always willing to do so. When an applicant or license holder wishes to provide Chief O'Leary with additional information he is always willing to accept and consider that information. Brkln. 56.1, ¶ 4. From January 1, 2015 through the present, 17 people have requested that Chief O'Leary reconsider his decision to impose restrictions on their licenses. Brkln. 56.1, ¶ 5.  Of those 17 people, 3 people have been given unrestricted licenses and seven have had their restrictions modified. Brkln. 56.1, ¶ 5.

Since January 1, 2015, Chief O'Leary has placed the following restrictions on firearms licenses: target, hunting, sporting, employment, collecting, transport and in home. Brkln. 56.1, ¶ 6.  The in home restriction was imposed because it was specifically requested by the applicant. Brkln. 56.1, ¶ 6. Except for the in home restriction, each of these restrictions allows license holders to carry a firearm outside of the home for self-protection consistent with the restriction. Brkln. 56.1, ¶ 6. For example, a self-employed license holder with an employment restriction, like Mr. Gould, can carry outside of the home any time he is engaged in his business. O'Leary Brkln. 56.1, ¶ 6. Similarly, license holders with a sporting restriction, like Mr. Gould, can carry

outside of the home while target shooting, competing at shooting events, hunting and while engaged in outdoor recreational activities such as camping, hiking and cross country skiing. Brkln. 56.1, ¶ 6. During any time the license holder can carry the firearm, including when traveling to and from the permitted activity, the firearm can be used for self-defense. Brkln. 56.1, ¶ 6.

The Brookline Police Department devotes more time and resources to reviewing firearm license applications than most if not all other cities and towns in Massachusetts. Brkln. 56.1, ¶ 7. Because of the Department's and Chief O'Leary's careful attention to these applications and the applicants, within the Massachusetts licensing scheme Chief O'Leary provides the gun-owning community the rights secured by the Second Amendment while at the same time protects the public as much as possible given the reach of these rights. Brkln. 56.1, ¶ 7. From his almost 40 year of experience as a police officer, Chief O'Leary knows that any time a gun is present, the risk to public safety is increased. Brkln. 56.1, ¶ 7. By limiting the right to carry a firearm to those occasions when an applicant has stated in his or her application that they need a firearm and supported that claim with some information, Chief O'Leary improves public safety in the Town of Brookline. Brkln. 56.1, ¶ 7.

C.      **License Application of Michael Gould.**

On or about July 8, 2014, Michael Gould met with Sargent Malinn at the Brookline Police Station for the purpose of renewing his firearms license. Brkln. 56.1, ¶ 8. He had been issued a license by the Town of Weymouth Police Chief on March 18, 2009, which was due to expire on November 20, 2014. Brkln. 56.1, ¶ 8. The Weymouth license had the restrictions "Target Hunting Employment." Brkln. 56.1, ¶ 8.  Mr. Gould is a professional photographer who operates his own photography business. Brkln. 56.1, ¶ 9. Sargent Malinn took information from

4

Mr. Gould and filled out the application for his firearms license. Brkln. 56.1, ¶ 10. Mr. Gould answered "yes" to question 10 on his application, which asks "Have you ever appeared in any court as a defendant for any criminal offense?" Brkln. 56.1, ¶ 10. He further explained his answer by stating that in 1989 he had been charged with trespass on school property in Kingston, Massachusetts when participating in a senior prank and that the charges had been dismissed. Brkln. 56.1, ¶ 10.

Mr. Gould sought a firearms license for "all lawful purposes," which means a license without restrictions. Brkln. 56.1, ¶ 11. In the July 8, 2014 meeting Mr. Gould requested a license for the reasons that are set forth in his September 29, 2014 letter to Chief O'Leary. Brkln. 56.1, ¶ 11. These reasons were restated in the Chief's decision letter dated October, 16, 2014. Brkln. 56.1, ¶ 11. In the July 8, 2014 meeting Mr. Gould did not state that he sought an unrestricted license for any purpose other than those purposes set forth in his September 29, 2014 letter. Brkln. 56.1, ¶ 11. During the July 8, 2014 meeting, Sargent Malinn did not "instruct" Mr. Gould on what to write in his September 29, 2014 letter to Chief O'Leary nor did he instruct him on what information to submit. Brkln. 56.1, ¶ 12. Mr. Gould told Sargent Malinn that he needed to carry a gun because of his work. Brkln. 56.1, ¶ 12. In an effort to help Mr. Gould, Sargent Malinn suggested the type of information he could provide to Chief O'Leary to support this position. Brkln. 56.1, ¶ 12. To the extent Mr. Gould is stating that Sargent Malinn misled him in some manner and it was his intent to do so, Sargent Malinn disagrees completely. Brkln. 56.1, ¶ 12. If Mr. Gould had provided Sargent Malinn with other reasons why he needed a firearm for self-defense (other than his work), Sargent Malinn would have suggested the information he could have provided to support this. Brkln. 56.1, ¶ 12. But in the July 8, 2014 meeting, Mr. Gould stated no other self-defense reasons why he was requesting to renew his firearms license

for all lawful purposes. Brkln. 56.1, ¶ 12.

After considering all of the information provided by Mr. Gould in the application process, Chief O'Leary offered Mr. Gould a license with "sporting" and "employment" restrictions. Brkln. 56.1, ¶ 13. In an October 23, 2014 email, Sargent Malinn explained to Mr. Gould that the new license would expand his right to carry a gun. Brkln. 56.1, ¶ 13. The "sporting" restriction, in addition to allowing one to carry a gun for target shooting, competition and hunting, allows one to carry a gun during other outdoor recreational activities, such as camping, hiking and cross country skiing. Brkln. 56.1, ¶ 13. Such a license was offered because it allowed Mr. Gould to carry a gun on all of the occasions when he indicated he wanted to carry a firearm (*i.e.* for target shooting and to protect himself while in possession of valuable works of art and camera equipment, which was, at times, in remote places). Brkln. 56.1, ¶ 13. In his email, Sargent Malinn offered to proceed with the license renewal with the two restrictions. Brkln. 56.1, ¶ 13. In his email response, Mr. Gould stated that Sargent Malinn should proceed with the renewal with the restrictions. Brkln. 56.1, ¶ 13. A new license with the sporting and employment restrictions was issued to Mr. Gould on or about November 20, 2014. Brkln. 56.1, ¶ 14. Mr. Gould did not appeal the license pursuant to Mass. Gen. Laws. Ch. 140, §131(f). Brkln. 56.1, ¶ 14. Since his license was issued, neither the Mr. Gould nor any representative of Mr. Gould has provided Chief O'Leary with any additional facts to support his position that he should receive an unrestricted license. Brkln. 56.1, ¶ 15.

## IV. ARGUMENT

Chief O'Leary submits that *Batty v. Albertelli* was correctly decided and that the Court's conclusion there is equally applicable to the facts presented in this case.  The Complaint alleges in two counts violations of the Second and Fourteenth Amendments under 42 U.S.C. 1983. To

succeed under 42 U.S.C. 1983, plaintiffs most prove that (1) the conduct complained of was carried out under color of state law and (2) defendant's action deprived plaintiff of rights, privileges or immunities secured by the Constitution of laws of the United Stated. *Batty* at 9 citing *Collins v. Nuzzo*, 244 F.3d 246, 250 (1st Cir. 2001). There is no dispute that Chief O'Leary was acting under color of state law in issuing Michael Gould's license.

The Complaint alleges that Chief O'Leary's polices violate the Second Amendment and Equal Protection Clause by (1) imposing "sporting," "target," "hunting," and/or "employment" restrictions on plaintiffs licenses and (2) that these decisions turn on "arbitrary considerations, such as whether an individual resides … on the correct side of a local boundary line, is wealthy and/or has a lot of cash, has a particular occupation …" Am. Complaint ¶¶62-68. In short, Plaintiff Gould takes the position that the Supreme Court in *Heller* and *McDonald* protects his right to carry a handgun in public for the purpose of self-defense. The plaintiffs' claims must fail because neither *Heller* not *McDonald* extended the right to carry a firearm for personal protection outside of the home. Moreover, assuming *arguendo* that there is a right to carry for personal protection outside of the home, Mr. Gould's license allows him to do so while employed as a photographer (he is self-employed) and any time he is engaged in outdoor activities thereby covering all activities for which Mr. Gould stated in his application that he wanted to carry a firearm. Because the license has been tailored to …………..

**A.    Second Amendment and the *Heller* and *McDonald* Standards**

The Second Amendment to the United State Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In the 2008 *Heller* case, the United States Supreme Court held that the District of Columbia's "ban on handgun possession in the home violates the Second

Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Heller*, 554 U.S. at 635. At issue in *Heller* was the blanket ban on handgun ownership enacted by the District. In its decision, the Court held for the first time that the Second Amendment protects an individual's right to keep and bear firearms in the home for the purpose of self-defense rather than as a collective right to possess and carry for the purpose of maintaining a State militia. *Id.* at 594 to 620. It declared that the Amendment guarantees "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. The Supreme Court qualified the right as "not unlimited." *Id.* at 626. The Court held stated that a citizen's Second Amendment right did not prohibit laws regulating who may possess and carry weapons or purchase them, or where such weapons may be carried. It stated:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualification on the commercial sales of arm.

*Heller* at 626-627. The Count made clear that this list was not comprehensive. It stated:

> We identify theses presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.

*Heller* at 627, n. 26. Finally, the Court made clear that "we do not read the Second Amendment to protect the rights of citizens to carry arms for *any* sort of confrontation." *Heller* at 595.

In the 2010 *McDonald* case, the Supreme Court affirmed that the right to possess a handgun in the home for the purposes of self-defense is incorporated into the protections against infringement by the states provided by the Fourteenth Amendment. *McDonald*, 561 U.S. at 791. The Court, however, affirmed the position taken in *Heller* that a citizen's rights under the Second Amendment are not unlimited. The Court explained:

>It is important to keep in mind that *Heller,* while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." [*Heller, supra* at 626]. We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' [*Id.* at 626-627, 128 S. Ct. 2783.] We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms.

*Id*. at 786.

**B.      The First Circuit Standard**

Defendant Chief O'Leary adopts the framework set forth by this Court in *Batty v. Albertelli*, Case 1:15-cv-10181, 2017 WL 740989, pp. 11-19 (D. Mass. February 24, 2017). More specifically, Chief O'Leary adopts the two-step approach used in other Circuits and, even though he does not believe it is necessary to reach the analysis in this case, Chief O'Leary adopts the *Booker* scrutiny test set forth in *Batty* at 17-19.

**C.      The License Granted to Plaintiff Allows Him to Exercise His Core Second Amendment Rights and Much More.**

While his authority is rightly constrained by the Second Amendment, the Massachusetts Legislature has granted Chief O'Leary broad discretion in granting firearms licenses. Mass. Gen. Laws ch. 140, §131. Under the statute Chief O'Leary "may issue" a license if "it appears" that the applicant is both (1) not a "prohibited person" and (2) has a "proper purpose" for carrying a firearm. *Ruggiero v. Police Commissioner of Boston*, 18 Mass. App. Ct. 256, 259 (1984). The first prong of the test is not at issue in this case. Mr. Gould is not a "prohibited person." As for the second prong, the statute states that the licensing authority "may issue" a license if the applicant (1) "has good reason to fear injury to the applicant or the applicant's property" or (2) "for any other reason, including the carrying of firearms for the use in sport or target practice

9

only, subject to the restrictions expressed or authorized under this section." Mass. Gen. Laws ch. 140, §131(d). According to the *Ruggiero* Court, this means "[w]ithout excluding other valid reasons for being licensed, the statute identifies two purposes which will furnish adequate cause to issue a license—'good reason to fear injury to a person or property' and an intent to carry a firearm for use in target practice." 18 Mass. App. Ct. at 259. Plaintiff argues that Chief O'Leary's practice of placing restrictions on firearms licenses precludes any restricted license holder from carrying a firearm outside the home for self-defense (Plntff. Memo p. 6) which, according to the plaintiff, is a "core" right granted by the Second Amendment (Plntff. Memo, p. 19).

Plaintiff's argument is particularly flawed because it relies on an incorrect reading of both the facts and the law. As for the facts, plaintiff Gould was issued a license with employment and sporting restrictions. The employment restriction allows Mr. Gould to carry a weapon during the hours he is operating his business, "Michael Gould Photography." Therefore, Mr. Gould can carry his firearm for self-defense outside the home any time he is operating his business. In addition, Mr. Gould's license contains a sporting restriction. With this restriction, he can carry a firearm for self-defense while hunting and for other outdoor recreational activities such as hiking, camping, cross-country skiing. With the sporting restriction, he can also carry a firearm while engaged in firearms target practice, recreational shooting or competition. During these activities, he can also use a firearm outside of the home for self-defense. Finally, while Chief O'Leary requires the plaintiff to keep the firearm unloaded and encased while traveling to and from these authorized activities, plaintiff can use the firearm for self-defense outside the home during this travel time. Thus, plaintiff's statement that Chief O'Leary has prevented him from defending himself outside the home is baseless.

As to the law, relying on a nonbinding case from the D.C. Circuit, *Wrenn v. District of Columbia*, 864 F.3d 650 (DC Cir. 2017), plaintiff argues that self-defense outside of the home is now a core right of the Second Amendment. While the *Wrenn* Court worked hard to glean this holding from *Heller* and *McDonald*, it is at odds with the approach of the First and several other Circuits. See *Drake v. Filko*, 723 F.3d 426, 431 (3d Cir. 2013); *Kachalsky v. Country of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012); *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013). Twice the First Circuit has declined to reach the issue of the scope the Second Amendment for carrying firearms outside the home. See *Hightower v. City of Boston*, 693 F.3d 61, 72 n. 8 (1st Cir. 2012); *Powell v. Tomkin*, 783 F.3d 332, 348 (1st Cir. 2015). As wisely held by this Court:

> … [P]recendent does not clearly dictate whether the Second Amendment extends to protect the right of law-abiding citizens to carry firearms outside the home for the purpose of self-defense. In the face of this conflicting authority the Court will heed the caution urged by the First Circuit that the Second Amendment is an area that "courts should enter only upon necessity and only then by small degree." [*Hightower v. City of Boston*, 693 F.3d 61, 74] (quoting [*United States v.*] *Masciandaro*, 638 F.3d [458, 475 (4th Cir. 2011)]).

*Batty* at 16. Because there is no question that plaintiff possesses his core Second Amendment right to carry a firearm for self-defense in his home and because he possesses considerable rights to carry his firearm for self-defense outside of the home there is no infringement on plaintiff's Second Amendment rights.

### D. If Plaintiffs' Second Amendment Rights Have Been Infringed, It Is Lawful Because It Is Substantially Related to the Important Governmental Objective of Public Safety.

The standard of scrutiny for challenges to firearms regulation in the First Circuit was articulated in *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011), as whether defendant has shown a "substantial relationship between the restriction and an important governmental

objective." *Batty* at 19. The Court here must find that there is a reasonable fit between the gun license restrictions and an important or substantial governmental interest, a fit "that employs not necessarily the least restrictive means but … a means narrowly tailored to achieve the desired objective." *Board of Trustees of State University of New York v. Fox*, 492 U.S 469, 480 (1989). The restrictions imposed on plaintiff's license pursuant to Mass. Gen. Laws ch. 140, §131 are reasonable and easily pass the *Booker* standard set forth above. The Supreme Court has recognized that the government interest in public safety is both compelling and significant. See *United States v. Salerno*, 481 U.S. 739, 745 (1987). The Massachusetts Appeals Court described the Mass. Gen. Laws ch. 140, §131 as follows:

> The goal of firearms control legislation in Massachusetts is to limit access to deadly weapons by irresponsible persons. A wide range of methods has been adopted by the Legislature to accomplish this goal, including the requirement of licenses for the sale or possession of firearms and ammunition, and the imposition of serious penalties for infractions of the firearms control laws. From a realization that prevention of harm is often preferable to meting out punishment after an unfortunate event, G.L. c. 140, §131, was enacted as a first-line measure in the regulatory scheme. It has been said about § 131 that it was intended "to have local licensing authorities employ every conceivable means of preventing deadly weapons in the form of firearms [from] coming into the hands of evildoers." Rep. A.G., Pub. Doc. No. 12, at 233-234 (1964).

*Ruggiero* at 258-259. Clearly there is a substantial governmental interest at play here.

The next question in the analysis is whether the means is narrowly tailored to achieve the desired objective. The answer in this case is unquestionably yes. The grant of an unrestricted license in Massachusetts is an extraordinary right. It allows the recipient to carry a large capacity firearm anywhere, anytime, concealed or open. In recognition of this, Chief O'Leary and his staff put significant effort into reviewing firearms license application. Their goal is to give applicants the right to a carry when they want to, but not to unnecessary extend their ability to so. This diminishes the chance of firearms being introduced into a situation or circumstance where they could present a hazard to the public.
12

Mr. Gould's case is a good example of the utility of the Brookline licensing process. In his application Mr. Gould stated that he wanted a license for all lawful purposes. During the license application process, however, the only reasons he articulated for carrying a firearm were to protect him while he was working as a photographer and for target and competitive shooting. Mr. Gould also mentioned hiking in the woods. As a result, Chief O'Leary issued him a license with employment and sporting restrictions so that he could carry a gun in all of these circumstances. This approach provides Mr. Gould the ability to carry, in general, when he wants while at the same time requiring him to secure his firearm in his home when he is done with these activities. The more a firearm is outside the home, the more likely it is that it will be stolen, fall into the wrong hands or be used inappropriately. In Chief O'Leary's opinion, restricting carrying rights in this manner improves public safety in the Town of Brookline. In this way the restrictions on Mr. Gould's license have been narrowly tailored to achieve the desired result of greater public safety.

**E.      Plaintiffs' Equal Protection Claims Must Fail.**

The Fourteenth Amendment to the U.S. Constitution provides equal protection of the laws. In order to perfect such a claim, the plaintiffs must demonstrate that they were treated differently than others similarly situated. *Hightower*, 693 F.3d at 83, n. 31. An Equal Protection claim is subject to strict scrutiny only when plaintiff has been subject to disparate treatment based on a suspect classification (race, national origin, religion or alienage); because plaintiffs are not part of a suspect or quasi suspect classification (gender or illegitimacy), their alleged claims of differential treatment must only survive rational basis scrutiny. *Piniero v. Gemme*, 937 F. Supp. 2d 161, 176 (D. Mass. 2013).

If the Court finds that there is no violation of plaintiffs' Second Amendment rights, then

plaintiffs' Equal Protection claim must fail. Should the Court, however, need to address the Equal Protection Claim, it should find that Chief O'Leary's practice of imposing restrictions on firearms licenses is lawful.

Plaintiffs' first argument, that Chief O'Leary issues fewer unrestricted licenses than other communities, can be easily disposed of. Chief O'Leary licenses only applicants who reside or own businesses in Brookline, or who work as police officers in Brookline. Because Chief O'Leary has no control over what happens in the comparison communities, an Equal Protection Claim will not stand. Furthermore, Chief O'Leary and his staff put considerable effort into reviewing firearms license applications. It is not surprising that this process yields fewer unrestricted licenses than in communities where applications may not be as closely scrutinized.

Plaintiffs next argue that Chief O'Leary has treated them differently because he issues unrestricted licenses to those in certain occupations at a greater rate than them. The figures are somewhat in dispute, but in general 60 percent of medical and dental professionals were granted unrestricted licenses (9 of 15), 96 percent of law enforcement officers (24 of 25) and 67 percent of attorneys (24 of 25). This compares to a rate of less than 25 percent of all of the other occupations, a class that plaintiff are in. These figures are based on the licenses issued by Chief O'Leary from January 1, 2015 through July 18, 2017. Putting aside the question of whether the sample size is large enough to draw any definitive conclusions, the Chief's practice should survive rational basis scrutiny. Many in the medical and dental fields in Brookline run their own businesses. These include psychiatrist and physiologists that may be treating patients who could pose a threat. It is therefore not unreasonable that these professionals may be able to meet the standard for an unrestricted license more readily that those in other professions. Likewise it is not surprising that attorneys, who may be managing irrational or even criminal clients, have been

able to meet the standard. Finally, it is uncontroverted that police officers are on the front lines in managing and investigating potentially dangerous individuals. It is there reasonable that those in this occupation can meet the standard more readily.

## V. CONCLUSION

For the reasons set forth above, the plaintiffs Second and Fourteenth Amendment claims should be denied and defendant Chief O'Leary's Motion for Summary Judgment should be granted.

Respectfully submitted,

Defendant DANIEL C. O'LEARY in his
Official Capacity as Chief of the Brookline
Police Department,
By his attorney,

    /s/ John Buchheit
John J. Buchheit, Esq.
Office of Town Counsel
333 Washington Street, 6th Floor
Brookline, MA 02445
jbuchheit@brooklinema.gov
617-730-2190
BBO # 634717

Dated: October 6, 2017

## CERTIFICATE OF SERVICE

I, John J. Buchheit, hereby certify that on this 6th day of September, 2017, I have served the foregoing document on all counsel of record by Electronic Mail.

    /s/ John Buchheit