**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

DANNY WENG; CHRISTOPHER HART; MARKUS VALLASTER; SARAH ZESCH; JOHN STANTON; MICHAEL GOULD; and COMMONWEALTH SECOND AMENDMENT, INC.,

Plaintiffs,

-against-

WILLIAM B. EVANS, in his Official Capacity as Commissioner of the Boston Police Department; and DANIEL C. O'LEARY, in his Official Capacity as Chief of the Brookline Police Department,

Defendants.

CIVIL ACTION NO. 1:16-cv-10181-FDS

**PLAINTIFFS' OPPOSITION AND REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION .......... 1

I) The Issue Here is the Ability to Bear Arms in Public for the Purpose of Personal Protection—A Right Defendants Presumptively Deny to All .......... 2

II) Plaintiffs Have Standing .......... 3

a. Michael Gould Sought an Unrestricted LTC .......... 3

b. While the Court Need Not Reach the Issue, Comm2A Has Standing .......... 4

III) In Fact, Wrenn is Very Consistent with First Circuit Precedent .......... 6

IV) The Equal Protection Clause Retains Independent Worth .......... 12

V) Amicus's Historical Authorities Do Not Countenance a Ban on Bearing Arms .......... 12

a. The Majority of Historical American Authorities Do Not Uphold Broad Preclusions on Bearing Arms .......... 13

b. The Statute of Northampton Did Not Prohibit the Peaceful Bearing of Arms .......... 15

c. Nineteenth Century Surety Laws are Inapposite .......... 19

CONCLUSION .......... 20

**TABLE OF AUTHORITIES**

**CASES**

Andrews v. State, 50 Tenn. 165 (1871) ........ 13

Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977)........ 5

Aymette v. State, 21 Tenn. 154 (1840) ........ 14

Batty v. Albertelli, no. 15-10238-FDS, 2017 U.S. Dist. LEXIS 26124 (D. Mass. Feb. 24, 2017)........ *passim*

Casey v. City of Newport, R.I., 308 F.3d 106 (1st Cir. 2002) ........ 3

Davis v. Grimes, 9 F. Supp. 3d 12 (D. Mass. 2014) ........ 3, 5

District of Columbia v. Heller, 554 U.S. 570 (2008)........ *passim*

Guckenberger v. Boston Univ., 957 F. Supp. 306 (D. Mass.1997) ........ 5

Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011) ........ 10

Hightower v. City of Boston, 693 F.3d 61 (1st Cir. 2012) ........ *passim*

Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333 (1977)........ 5

In re Brickey, 70 P. 609, 8 Idaho 597 (1908) ........ 14-15

Lakewood v. Pillow, 501 P.2d 744, 180 Colo. 20 (1972)........ 14

Las Vegas v. Moberg, 485 P.2d 737, 82 N.M. 626 (App. Ct. 1971) ........ 14-15

McDonald v. City of Chicago, 561 U.S. 742 (2010) ........ *passim*

Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971 (1st Cir 1989) ........ 5

Moore v. Madigan, 702 F.3d 933 (7th Cir. 2013)........ 11-12

Morial v. Judiciary Comm'n of Louisiana, 565 F.2d 295 (5th Cir. 1977)........ 12

N.Y. City Transit Auth. v. Beazer, 440 U.S. 568 (1979)........ 12

National Socialist Party of America v. Skokie, 432 U.S. 43 (1977)........ 10

Nunn v. State, 1 Ga. 243 (1846) ........ 13

People v. Zerillo, 189 N.W. 927, 219 Mich. 635 (1922) ........ 15

Peruta v. County of San Diego, 742 F.3d 1144 (9th Cir. 2014), vacated 781 F.3d 1106 (9th Cir. 2015) (en banc) ........ 13, 15

Powell v. Tompkins, 783 F.3d 332 (1st Cir. 2015) ........ 7-9

Simpson v. State, 13 Tenn. (1 Yer.) 356 (1833)........ 18

State ex rel. Princeton v. Buckner, 377 S.E.2d 139, 180 W. Va. 457 (1988)........ 14-15

State v. Chandler, 5 La. Ann. 489 (1850)........ 13

State v. Huntly, 25 N.C. (3 Ired.) 418 (1843) ........ 19

State v. Reid, 1 Ala. 612 (1840) .......... 14
State v. Woody, 47 N.C. (2 Jones L.) 335 (1855) .......... 19
Summers v. Earth Island Inst., 555 U.S. 488 (2009) .......... 6
Tilley v. TJX Cos., 345 F.3d 34 (1st Cir. 2003) .......... 5
United States v. Armstrong, 706 F.3d 1 (1st Cir. 2013) .......... 9
United States v. AVX Corp., 962 F.2d 108 (1st Cir. 1992) .......... 5
United States v. Booker, 644 F.3d 12 (1st Cir. 2012) .......... 7-9
United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011) .......... 7, 9
United States v. Rene E., 583 F.3d 8 (1st Cir. 2009) .......... 8-10
Warth v. Seldin, 422 U.S. 490 (1975) .......... 6
Watt v. Energy Action Educational Found., 454 U.S. 151 (1981) .......... 4
Wrenn v. District of Columbia, 864 F.3d 650 (D.C. Cir. 2017) .......... *passim*

**STATUTES**

1694 Mass. Laws 12, no. 6 .......... 18
1794 Mass. Acts c. 26 .......... 18
Mass. Rev. Stat. c. 134, § 16 (1835) .......... 20
18 U.S.C. § 922 .......... 9

**OTHER AUTHORITIES**

THE AMERICAN STUDENTS' BLACKSTONE (G. Chase ed. 1884) .......... 13
WILLIAM BLACKSTONE, COMMENTARIES .......... 17
KENNETH CHASE, FIREARMS: A GLOBAL HISTORY TO 1700 .......... 15
Clayton E. Cramer, The Racist Roots of Gun Control, 4 KAN. J.L. & PUB. POL'Y 17 (1995) .......... 14
WILLIAM LAMBARD, EIRENARCHA (1588) .......... 17
JOYCE LEE MALCOLM, GUNS AND VIOLENCE: THE BRITISH EXPERIENCE (2002) .......... 18
JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS (1994) .......... 16
WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA (1825) .......... 19
JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON (1804) .......... 19

**BRITISH AUTHORITIES**

Statute of Northampton, 2 Edw. III, c. 3 (1328) .......... 16
Gun License Act, 1870, 33 & 34 Vic. c. 57 .......... 17

Firearms Act, 1920, 10 & 11 Geo. 5 c. 43 ........ 18

Chune v. Piott, 80 Eng. Rep. 1161 (K.B. 1615) ........ 17

King v. Dewhurst, 1 St. Tr. 529 (Lancaster Assize 1820) ........ 17

Queen v. Soley, 88 Eng. Rep. 935 (Q.B. 1701) ........ 17

Rex v. Knight, 90 Eng. Rep. 330 (K.B. 1686) ........ 16

Rex v. Meade, 19 L. Times Repts. 540 (1903) ........ 17

Rex v. Smith, 2 Ir. Rep. 190 (K.B. 1914) ........ 17

Sir John Knight's Case, 87 Eng. Rep. 75 (K.B. 1686) ........ 16

**INTRODUCTION**

There is no dispute that both the Boston and Brookline Police Departments presumptively issue LTCs subject to restrictions that do not allow individuals to carry handguns in public for the purpose of self-protection. An "average" member of the public, who is unable to show (what Defendants consider to be) an above-average "need" will receive a restriction that prevents bearing arms for this purpose. Yet, it is self-protection that is "the core lawful purpose" the Second Amendment's protects. District of Columbia v. Heller, 554 U.S. 570, 630 (2008); accord McDonald v. City of Chicago, 561 U.S. 742, 767-68 (2010). Thus, Defendants' policies deprive Plaintiffs of the core of the Second Amendment's protection when they are away from their homes, except to the extent that the need for defense might arise incidental to an authorized activity such as hunting. These policies could only be constitutional if the Second Amendment has no application outside the home.

In their moving papers, Plaintiffs conceded that this Court's prior ruling in Batty v. Albertelli, no. 15-10238-FDS, 2017 U.S. Dist. LEXIS 26124 (D. Mass. Feb. 24, 2017), ought to be dispositive here—unless revisited. Plaintiffs then identified a more recent decision from the D.C. Circuit that casts doubt on the approach this Court previously took. See Wrenn v. District of Columbia, 864 F.3d 650 (D.C. Cir. 2017).

Defendants and the Commonwealth respond by attempting to distinguish Wrenn, by pointing to statutory distinctions between concealed and open carry that no longer exist, and by emphasizing that their restrictions still permit self-defense in the home and the use of guns for permitted purposes like target shooting. In addition, Boston argues that Comm2A lacks standing, and Brookline suggests (but does not argue) that Plaintiff Michael Gould also lacks standing. Finally, Amicus Everytown for Gun Safety attempts to complicate matters by injecting historical arguments back into the debate. Plaintiffs address these various contentions.

**I) The Issue Here is the Ability to Bear Arms in Public for the Purpose of Personal Protection—A Right Defendants Presumptively Deny to All**

The issue presented here is the ability to carry *some* type of functional handgun in *some* manner while in public—and to do so not for the purpose of target shooting or employment, but "for the core lawful purpose of self-defense." Heller, 554 U.S. at 630; accord McDonald, 561 U.S. at 767-68. Plaintiffs' moving papers establish two key points. The first—which neither party can dispute, and on which this Court has already ruled—is that there is only one license or permit available that allows an individual to carry a handgun away from the home for any purpose: the Class A LTC. The "Class B" LTC, which allowed a narrower scope of arms-bearing activities, has not been available since 2014. Pl. Br. p. 4; see also Batty, 2017 U.S. Dist. LEXIS 26124 at *3 n.3. The second key point is that none of the restrictions used by either Defendant allow a licensee to carry of a handgun for the purpose of their own personal self-defense in public. If an individual seeks to carry a handgun in public for the purpose of personal protection, then the only license that either of the Defendants makes available is a Class A LTC without a restriction. Pl. Br. p. 6. Notably, while Brookline purports to dispute this last proposition, it does so on the circular reasoning that "[w]henever a gun can be lawfully carried, it can be used for self-defense (*e.g.* during employment with an 'employment' restriction)." Brookline 56.1 Response ¶ 17. But this is just begging the question—ignoring that the Plaintiffs *cannot* carry guns for the purpose of personal protection, except incidental to one of the activities that the restrictions allow.

While the scope of activities at issue is clear, both Boston (pp. 11, 13-14) and Brookline (p. 12) attempt to confuse matters by linking the Plaintiffs' claims for relief to the narrower concepts of concealed manner and "large capacity" firearms. Boston asserts (p. 13) that "an unrestricted Class A license entails privileges that go well beyond what the Second Amendment

protects," and concludes that "there is *no* Second Amendment right to an unrestricted Class A license" (emphasis added). And Brookline contends (p. 12) that "[t]he grant of an unrestricted license in Massachusetts is an extraordinary right" in that it "allows the recipient to carry a large capacity firearm anywhere, anytime, concealed or open." But these arguments just ignore the activity actually at issue—the ability to carry of some sort of functional handgun in some manner while in public, and to do so for the purpose of self-defense. The only license that Defendants making available that allows this activity is an unrestricted Class A LTC.

**II) Plaintiffs Have Standing**

Plaintiffs have demonstrated that each individual Plaintiff has standing because each applied for an LTC, requested a license without restrictions (either at the time of issuance or later), and received an LTC subject to restrictions. See Pl. Br. pp. 7-12. As this Court has previously recognized, "the denial of a firearms license constitutes an injury that satisfies the minimum requirements of Article III standing," and "a party whose cognizable interest has been injured by a firearms license restriction has standing to challenge that restriction." Davis v. Grimes, 9 F. Supp. 3d 12, 23 (D. Mass. 2014) (citing Hightower v. City of Boston, 693 F.3d 61, 70 (1st Cir. 2012); Casey v. City of Newport, R.I., 308 F.3d 106, 118-19 (1st Cir. 2002)).

**a. Michael Gould Sought an Unrestricted LTC**

Brookline does not challenge Plaintiff Michael Gould's standing—indeed, its brief does not even include the word "standing." However, its brief does assert (p. 6) that the "Sporting" and "Employment" restrictions that Chief O'Leary placed on Mr. Gould's LTC "allowed Mr. Gould to carry a gun on all of the occasions when he indicated he wanted to carry a firearm (*i.e.* for target shooting and to protect himself while in possession of valuable works of art and camera equipment, which was, at times, in remote places)."

To the extent this language might be taken as suggesting that Mr. Gould did not request an unrestricted LTC, the record is plainly to the contrary. Brookline itself concedes (p. 5) that "Mr. Gould sought a firearms license for 'all lawful purposes,' which means a license without restrictions." And, when Sgt. Malinn offered Mr. Gould an LTC with these restrictions, he told Mr. Gould by email that "we do not believe you have provided enough information that would demonstrate a need for an unrestricted license," Pl. 56.1 ¶ 84, and that "I do not believe that additional information would lead to an LTC for All Lawful Purposes," Pl. 56.1 ¶ 85. Plainly, Brookline was giving him *less* than what he had requested—an LTC without restrictions. While Brookline apparently does not consider personal self-protection to be an adequate "reason" (at least standing alone), the lack of a reason deemed adequate is not the same as the lack of a request. Mr. Gould requested an unrestricted LTC, and Defendant said, "no." He has standing.

**b. While the Court Need Not Reach the Issue, Comm2A Has Standing**

Plaintiffs showed in their moving papers that Comm2A has standing to assert its claims on two independent grounds: (1) as the representative of its members, who themselves have standing; and (2) on its own behalf, due to the organizational resources that Comm2A dedicates to addressing and responding to Defendants' policies. See Pl. Br. pp. 12-13. In response, Chief Evans argues (p. 19 & n.9) that Comm2A lacks representative standing because: (1) the individual Plaintiffs in this case did not "know they were members of Comm2A" until recently; and (2) as to the other individual members Comm2A has identified (who are not parties in this case) "there are no specific allegations or evidence sufficient to establish Comm2A's standing."

But the reality is that there is no need to reach this issue. No less authority than the Supreme Court has recognized, repeatedly, that there is no need to address an organization's standing when it is clear that the remaining Plaintiffs have standing. See Watt v. Energy Action Educ. Found., 454 U.S. 151, 160 (1981); Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S.

252, 264 (1977); see also Tilley v. TJX Cos., 345 F.3d 34, 36 (1st Cir. 2003) ("So long as one

petitioner has standing, the proceeding may go forward without any consideration of the standing

of co-petitioners."); Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971, 976 (1st Cir 1989).

Indeed, this Court has also recognized this principle in a decision it rendered in one of the related

cases.  See Davis, 9 F. Supp. 3d at 24 n.12.

        In any event, should the Court elect to engage in this foray, Comm2A has

representational standing because: (1) Comm2A's members have standing to sue; (2) the

interests that Comm2A seeks to protect—Second Amendment rights—are germane to

Comm2A's purposes; and (3) the claim for declaratory and injunctive relief does not require the

participation of individual members in the lawsuit.  See Hunt v. Wash. State Apple Adver.

Comm'n, 432 U.S. 333, 343 (1977); see also United States v. AVX Corp., 962 F.2d 108, 116 (1st

Cir. 1992).  As this Court has recognized, "[b]ecause [Comm2A's] standing relies on the

standing of its members and because its claims appear to be essentially derivative of the claims

of its members, the organization's claims can be decided on the same grounds as those of the

individual plaintiffs without separate analysis."  Batty, 2017 U.S. Dist. LEXIS 26124 at *11

(citing AVX Corp., 962 F.2d at 116).  While Boston argues (pp. 18-19) that standing is somehow

lacking because the individual Plaintiffs only learned of their membership status recently, there

is no dispute that these Plaintiffs are indeed members.  Tellingly, Boston's motion cites *no*

authority whatsoever to support its contention that an individual must knowingly be a member of

an organization for some prolonged period of time.

        Furthermore, while Boston claims (p. 19 n.9) that the other, non-party Comm2A

members who have restricted LTCs "lack specific allegations or evidence," the only authority it

cites—Guckenberger v. Boston Univ., 957 F. Supp. 306, 320-21 (D. Mass.1997)—is readily

distinguished.  There, the complaint alleged that the organization had members who were or would be students at the defendant university, but it did not allege that it had members who "are suffering immediate or threatened injury as a result of the challenged action."  Id. at 320 (quoting Warth v. Seldin, 422 U.S. 490, 512 (1975)).  In marked contrast, the Amended Complaint here alleges (¶ 59) that Comm2A has "members and supporters who hold LTC's that the Brookline and Boston Police Departments have issued with 'sporting,' 'target,' 'hunting,' and/or 'employment' restrictions," and further, that but for these restrictions, they "would possess, use, and carry handguns for the purpose of self- protection."

There is no difficulty responding to Boston's demand that Plaintiffs identify specific individuals who have standing.  Aside from the individual Plaintiffs identified in ¶ 59 of the Amended Complaint, Plaintiffs identified additional members both in discovery responses and in affidavit testimony submitted in support of Plaintiffs' moving papers.  The Supreme Court itself has countenanced the use of affidavits to identify specific organization members and establish the facts giving rise to their standing.  See Summers v. Earth Island Inst., 555 U.S. 488, 494 (2009) (looking to affidavits submitted to the district court).

**III)     In Fact, Wrenn is Very Consistent with First Circuit Precedent**

While Plaintiffs have conceded the import of this Court's reasoning in Batty, Plaintiffs have also directed the Court's attention to the D.C. Circuit's ruling in Wrenn to support taking a different approach—specifically, defining the scope of the right "by reference to the language of the constitutional guarantee," rather than "by reference to the facts in Heller."  Pl. Br. p. 19.

Defendants and the Commonwealth respond by contending that Wrenn conflicts with First Circuit precedent.  See Boston Br. p. 14; Brookline Br. p. 11; Commonwealth Br. pp. 9-10.  Boston takes the strongest position, citing Hightower to contend (p. 14) that "the First Circuit has *defined* the 'core' of the Second Amendment to be 'the possession of operative firearms for use

in defense of the home'" (emphasis added).  The Commonwealth's characterization of the First

Circuit's caselaw is somewhat more subdued.  Looking to Hightower, as well as Powell v.

Tompkins, 783 F.3d 332 (1st Cir. 2015), and United States v. Booker, 644 F.3d 12 (1st Cir.

2012), the Commonwealth (p. 9) characterizes the First Circuit's approach to the issue as "an

appropriately more cautious, incremental approach" than that of the D.C. Circuit.  And finally,

Brookline observes (p. 11) that the First Circuit "declined to reach the issue of the scope the

Second Amendment for carrying firearms outside the home" in both Hightower and Powell, and

generally urges a guarded approach.

Brookline is correct in its observation that, in both Hightower and Powell, the First

Circuit expressly declined to reach the issue.  See Hightower, 693 F.3d at 74; Powell, 783 F.3d at

348.  However, in both of these cases, the scope of conduct at issue was significantly more

limited than is the scope of conduct at issue here.  In Hightower, the issue was "the revocation of

a firearms license on the basis of providing false information as to the existence of pending

complaints or charges on the firearms license application form."  Hightower, 693 F.3d at 74.

Furthermore, the license at issue was a pre-2014 Class A LTC, and the court characterized the

issue as concealed carry, rather than the general ability to bear arms in some manner.  See id. at

70.  Reasoning that the challenge "fails whatever standard of scrutiny is used," the court declined

to reach the issue of "'what sliding scales of scrutiny might apply.'"  Id. at 74 (quoting United

States v. Masciandaro, 638 F.3d 458, 475 (4th Cir. 2011) (op. of Wilkinson, J.)).  And in Powell,

a habeas corpus petition, the primary issue was the "requirement that a defendant accused of

unlawful possession of a firearm bear the burden of producing evidence of a proper license as an

affirmative defense."  Powell, 783 F.3d at 334.  Observing that "[t]his circuit has yet to weigh in

on 'the scope of the Second Amendment as to carrying firearms outside the vicinity of the

home,'" the court found that the petitioner had waived any Second Amendment argument by providing only "about one page" of briefing. See id. at 348 (quoting Hightower, 693 F.3d at 72).

As to the First Circuit's discussion of the "core" of the Second Amendment, 7 of the 13 First Circuit decisions that cite Heller contain the term "core," and 4 of them discuss the concept in a meaningful manner. The first is United States v. Rene E., 583 F.3d 8 (1st Cir. 2009), where the court characterized Heller as having found that the District of Columbia's laws were unconstitutional because they prohibited handguns and "ma[d]e it impossible for citizens to use [guns] for the core lawful purpose of self-defense." Id. at 11 (quoting Heller, 554 U.S. at 630). The next is Booker, where the court referenced "the 'core' constitutional right *recognized* in Heller [as the right] to 'possess firearms in the home.'" Booker, 644 F.3d at 25 (emphasis added). The court explained that "[w]hile we do not attempt to discern the 'core' Second Amendment right vindicated in Heller, we note that Heller stated that the Second Amendment 'elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" Id. at 25 n.17 (quoting Heller, 554 U.S. at 635). Next is Hightower, where the court wrote that "[c]ourts have consistently recognized that Heller established that the possession of operative firearms for use in defense of the home constitutes the 'core' of the Second Amendment" and went on to reason that "the interest . . . in carrying concealed weapons outside the home is distinct from this core interest emphasized in Heller." Hightower, 693 F.3d at 72. And finally, in Powell the court characterized Hightower as "hav[ing] held that any individual right 'in carrying concealed weapons outside the home is distinct from [the] core interest emphasized in Heller,' and that under Heller, '[l]icensing of the carrying of concealed weapons is presumptively lawful.'" Powell, 783 F.3d at 348 (quoting Hightower, 693 F.3d at 72-74 & n.8). Thus, these decisions recognize that the core purpose of

the right is self-defense, that the core includes the keeping of arms at home, and that the interest in carrying concealed guns is distinct—but they do not *limit* the reach of the Second Amendment to the home, nor do they definitively establish the scope of the Second Amendment's "core."

Rather than representing a conflict with the D.C. Circuit, these First Circuit decisions actually reflect the nature and scope of the issues that were before the court.  And even if "courts should enter [the issue of carrying guns in public] only upon necessity and only then by small degree," Hightower, 693 F.3d at 74 (quoting Masciandaro, 638 F.3d at 475 (op. of Wilkinson, J.)), the issue is necessarily presented here—the basic ability of the law-abiding public to bear arms in public for the core purpose of self-defense is too broad to avoid.

Both Boston (p. 15) and the Commonwealth (p. 10) contend that Wrenn is "incompatible" or "out of step" with precedents in the First Circuit because Wrenn declined to use an approach that relies on standards of scrutiny (*i.e.* intermediate and strict).  But contrary to their arguments, this consideration actually weighs in favor of using Wrenn's approach—and for at least two reasons.  The first reason is that the First Circuit has expressly *declined* to adopt "intermediate scrutiny" as the standard that governs burdens on the right to keep and bear arms. See United States v. Armstrong, 706 F.3d 1, 8 (1st Cir. 2013) ("this court has not adopted intermediate scrutiny"); see also Powell, 783 F.3d at 347 n.9; Booker, 644 F.3d at 25.  Indeed, the First Circuit has not always used means-end analysis to evaluate Second Amendment burdens.  The most notable example is Rene E., where the issue was a federal law that prohibits those under the age of 18 from possessing handguns.  See Rene E., 583 F.3d at 9; see also 18 U.S.C. § 922(x)(2)(A).  There, the court examined the contours of other contemporary gun laws, how state courts had treated analogous legal issues, and what historical sources from the eighteenth and nineteenth centuries revealed about the Founders' attitudes.  See Rene E., 583

F.3d at 12-16.  The court upheld the law because it found there was "a longstanding tradition of prohibiting juveniles from both receiving and possessing handguns."  Id. at 12.  Significantly, the court's analysis rested on its assessment of historical evidence, rather than the use of means-end scrutiny.  See id. at 16.

The second problem with this argument is that it rests on an errant premise.  Rather than eschewing the use of means-end scrutiny, precedents from the D.C. Circuit have actually adopted the model—for laws that are "significantly less severe than the total prohibition of handguns at issue" in Heller.  See Heller v. District of Columbia, 670 F.3d 1244, 1266 (D.C. Cir. 2011).  The distinction between the two analytic approaches—a "categorical" approach versus a means-end based approach—is the breadth of the burden at issue.  The Supreme Court did not use tiered standards of scrutiny to resolve either Heller or McDonald, explaining that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to 'keep' and use for protection of one's home and family would fail constitutional muster."  Heller, 554 U.S. at 628-29 (quotation omitted); see also McDonald, 561 U.S. at 791.  Indeed, one telling aspect of the Court's decision in Heller is its citation to National Socialist Party of America v. Skokie, 432 U.S. 43 (1977), where it had summarily reversed local officials who had refused to allow a neo-Nazi group to parade through their town.  See Heller, 554 U.S. at 635.  The Court in Heller explained that it had refused to "apply an 'interest-balancing' approach to the prohibition of a peaceful neo-Nazi march through Skokie"—and it then explained that the Second Amendment's protection "is no different."  Id. A flat prohibition on activities that the Constitution protects is unconstitutional without regard to the balance of competing interests.

And in this connection, it is significant to note that neither Heller nor McDonald concerned restrictions that actually amounted to complete *bans* because both jurisdictions allowed individuals to possess "grandfathered" handguns that had been registered before the respective prohibitions took effect. See McDonald, 561 U.S. at 750; Heller, 554 U.S. at 575-76. Just as D.C.'s "good reason" standard did not deprive everyone in D.C. of the right, and just as Defendants' policies do not deprive everyone subject their jurisdiction of the right, prohibition was the rule that applied by default—that is, in the absence of an exception, a prohibition was in place. In all of these instances, the ultimate question was whether the government could continue to presumptively preclude protected activities.

The final objection made to Wrenn is (simply stated) that other circuits have ruled differently. Boston (p. 15), Brookline (p. 11), and the Commonwealth (p. 12) all cite decisions from the Second, Third, and Fourth Circuits that found broad preclusions on carrying guns constitutional using (generally) an "intermediate scrutiny" approach that was premised on the finding that the bearing of arms in public is outside the "core" of the Second Amendment's protection. As the Commonwealth puts it (p. 12), this is "the weight of decisions from other circuits." And while it is obviously true that three is greater than two, the fact remains that two Circuits have now found that "the interest in self-protection is as great outside as inside the home." Moore v. Madigan, 702 F.3d 933, 941 (7th Cir. 2013); see also Wrenn, 864 F.3d at 664 ("carrying beyond the home, even in populated areas, even without special need, falls within the Amendment's coverage, indeed within its core"). The ultimate question is not which approach proves numerically more popular within the appellate courts, but rather, what the language of the Second Amendment protects. And that language, protecting "the right of the people to keep and bear arms," does not make any reference to an in-the-home distinction.

**IV)    The Equal Protection Clause Retains Independent Worth**

Defendants move for dismissal of Plaintiffs' equal protection claim, but they have not established that relief is unavailable under the Equal Protection Clause as a matter of law. Rather, while Plaintiffs' focus is on the Second Amendment—which Defendants' policies contravene on their own—equal protection analysis "retains independent worth" because it "serves to illumine the state's interest in burdening those of the plaintiff's class and the necessity of doing so in order to advance that interest." Morial v. Judiciary Comm'n of Louisiana, 565 F.2d 295, 304 (5th Cir. 1977) (en banc).  Here, Defendants' policies particularly raise equal protection concerns because they have "a special impact on less than all the persons subject to [Defendants'] jurisdiction."  N.Y. City Transit Auth. v. Beazer, 440 U.S. 568, 587-88 (1979).

**V)    Amicus's Historical Authorities Do Not Countenance a Ban on Bearing Arms**

Before the Court issued its ruling in Batty, Plaintiffs had submitted extensive briefing that addressed the historical treatment of the language of the Second Amendment.  See Plaintiffs' Br. (Dkt. #56) at 10-12, 17-18; Plaintiffs' Opp. (Dkt. #66) at 8-9.  As Plaintiffs explained in those submissions, much of Heller focused on precisely this issue, as the outcome of the case turned on the historical meaning of the phrase "to keep and bear arms."  See generally Heller, 554 U.S. at 581-626.  The Court's conclusion—that the words of the Second Amendment "guarantee the individual right to possess and carry weapons in case of confrontation"—was one that was "strongly confirmed by the historical background of the Second Amendment." Id. at 592.

In the case at bar, Plaintiffs took note of the Court's ruling in Batty, which had considered those points, and attempted to expedite matters by focusing on developments since the Court's February 2017 decision.  While both Defendants and the Commonwealth have remained similarly focused, Amicus attempts to rehash historical matters.  But see Moore, 702 F.3d at 935 ("The appellees ask us to repudiate the Court's historical analysis. That we can't

do."). Amicus contends that early American authorities upheld broad preclusions on carrying guns as constitutional, that the Statute of Northampton represents a tradition of prohibiting the peaceful bearing of arms, and that "surety" laws from the nineteenth century provide a historical justification for modern statutes that make the issuance of licenses to carry guns discretionary. Endeavoring to keep matters simple, Plaintiffs respond briefly.

**a. The Majority of Historical American Authorities Do Not Uphold Broad Preclusions on Bearing Arms**

As the original Ninth Circuit panel concluded after an exhaustive survey of early American case law, although "some courts approved limitations on the manner of carry outside the home, none approved a total destruction of the right to carry in public." Peruta v. County of San Diego, 742 F.3d 1144, 1160 (9th Cir. 2014), vacated 781 F.3d 1106 (9th Cir. 2015) (en banc). In the nineteenth century, state high courts in Georgia and Tennessee overturned state laws that prohibited the carry of guns in any manner as unconstitutional. See Andrews v. State, 50 Tenn. 165, 187-88 (1871) (while the legislature "may by a proper law regulate the carrying of this weapon publicly, or abroad," the ban on carrying handguns in any manner "is too broad to be sustained."); Nunn v. State, 1 Ga. 243, 251 (1846) ("so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void. . . ."). Conversely, state courts upheld restrictions on carrying concealed guns on the general rationale "that statutes prohibiting the carrying of concealed weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms in a particular manner[.]" THE AMERICAN STUDENTS' BLACKSTONE 84 n.11 (G. Chase ed. 1884) (emphases omitted); see State v. Chandler, 5 La. Ann. 489, 489-90 (1850);

Aymette v. State, 21 Tenn. 154, 160-61 (1840); State v. Reid, 1 Ala. 612, 616-17 (1840).  During

the twentieth century, state courts continued to find preclusions on carrying guns in any manner

unconstitutional.  See State ex rel. Princeton v. Buckner, 377 S.E.2d 139, 146, 180 W. Va. 457,

464 (1988); Lakewood v. Pillow, 501 P.2d 744, 745, 180 Colo. 20, 23 (1972); Las Vegas v.

Moberg, 485 P.2d 737, 438-39, 82 N.M. 626, 628-29 (App. Ct. 1971); In re Brickey, 70 P. 609,

609, 8 Idaho 597, 599 (1902).

Amicus contends (p. 12) that this line of authority represents an "alternative (and

minority) tradition," and it attempts to draw a guilt-by-association link "to the South's peculiar

history and the prominent institution of slavery."  However, the Supreme Court itself

acknowledged the veracity of this line of authority in Heller.  See Heller, 554 U.S. at 612-14,

626.  Moreover, while Amicus cites no primary-source evidence that pro-slavery reasoning

motivated the antebellum courts that enforced the Second Amendment, the historical record does

show that such racist reasoning motivated attempts by Southern states to restrict the bearing of

arms both before and after the war.  See Clayton E. Cramer, The Racist Roots of Gun Control, 4

KAN. J.L. & PUB. POL'Y 17 (1995).  As the Supreme Court explained at length in McDonald, the

Reconstruction Congress labored mightily to entomb this legacy of prejudice, which culminated

in the adoption of the Fourteenth Amendment and ensured the right of all Americans, regardless

of race, to carry firearms to defend themselves.  See McDonald, 561 U.S. at 770-77.

Amicus cites an assortment of territorial laws and city ordinances from the last few

decades of the nineteenth century (pp. 13-14, 16-18), but these outlier laws hardly amount to a

longstanding tradition.  Aside from being enacted nearly a century after the founding, many of

these laws were never challenged in court—due either to their short lifespan or to a lack of

enforcement.  And of those that were challenged, many did not stand.  For example, Amicus

points to broad preclusions on carry that legislatures in Idaho and West Virginia enacted, but it ignores that the supreme courts of both states ultimately ruled those laws unconstitutional. See Buckner, 377 S.E.2d at 146, 180 W. Va. at 464; Brickey, 70 P. at 609, 8 Idaho at 599. Likewise, while broad prohibitions were in force for a time in Michigan and New Mexico, the courts of both states have since ruled that complete preclusions on carry are unconstitutional. See Las Vegas, 485 P.2d at 438-39, 82 N.M. at 628-29; People v. Zerillo, 189 N.W. 927, 928, 219 Mich. 635, 639 (1922). It is true that the Texas Supreme Court upheld a broad preclusion on bearing arms as constitutional, but significantly, it did so on the militia-centered rationale that Heller rejected—giving it little (if any) residual weight. See Peruta, 742 F.3d at 1160.

**b. The Statute of Northampton Did Not Prohibit the Peaceful Bearing of Arms**

Amicus is wrong in its assertion that the Statute of Northampton represents an established tradition of prohibiting the peaceful bearing of arms in public. Rather, in both the United States and England, the Statute of Northampton prohibited the act of terrifying the public by carrying "dangerous and unusual" weapons, or by carrying weapons with evil intent—as the Supreme Court itself observed in Heller. See Heller, 554 U.S. at 627; see also Wrenn, 864 F.3d at 660.

The Statute of Northampton dates to 1328, a time that predates the development and recognition of the right to arms in English law. Indeed, at that time firearms were little known novelties that had just begun to appear in Europe. See KENNETH CHASE, FIREARMS: A GLOBAL HISTORY TO 1700 59 (2003) (observing that "[t]he earliest records of firearms in Europe date from 1326"). The text of the Statute of Northampton provided that:

> [I]t is enacted, that no man . . . of what condition soever he be, except the king's servants in his presence, and his ministers . . . and such as be in their company assisting them, and also [upon a cry made for arms to keep the peace, and the same in such places where such acts happen,] be so hardy to *come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go*

> *nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere*, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure.

2 Edw. III, c. 3 (1328) (emphasis added), quoted in Wrenn, 864 F.3d at 659 (alterations in source). Thus, the terms of the statute covered three acts: (1) coming before "the King's justices, or other . . . ministers . . . with force and arms"; (2) "bring[ing] . . . force in affray of the peace"; and (3) "rid[ing] armed by night [or] by day, in fairs, markets, . . . in the presence of the justices or other ministers, [or] in [any] part elsewhere."

To the extent the third set of prohibitions could be read broadly as prohibiting riding armed without regard to manner or place—a construction that, significantly, would render the first two prohibitions superfluous—a long line of judicial decisions stand to the contrary. The most explicit recognition of Northampton's limited scope was prompted by King James II's attempt to use the ancient statute to disarm his Protestant detractors. To test that power, in 1686 the King had a case brought against Sir John Knight, "a Bristol merchant and militant Anglican" who had led an effort to enforce the laws against Catholic worship. See JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 104 (1994). James had Knight prosecuted before the King's Bench for violating the Statute of Northampton by going armed "into the Church of St. Michael in Bristol in the time of Divine Service." Id. The jury acquitted Knight, and Chief Justice Holt interpreted Northampton as merely declaring the common-law rule against "go[ing] armed to terrify the King's subjects." Sir John Knight's Case, 87 Eng. Rep. 75, 76 (K.B. 1686). "[T]ho' this statute be almost gone in desuetudinem," Holt added, "yet where the crime shall appear to be malo animo"—that is, with a specific, evil intent—"it will come within the Act (tho' now there be a general connivance to gentlemen to ride armed for their security)." Rex v. Knight, 90 Eng. Rep. 330 (K.B. 1686) (different reporter).

Numerous other cases from the era reflect this understanding of the statute's reach. See, e.g., Queen v. Soley, 88 Eng. Rep. 935, 936-37 (Q.B. 1701); Chune v. Piott, 80 Eng. Rep. 1161, 1162 (K.B. 1615); King v. Dewhurst, 1 St. Tr. 529, 601- 02 (Lancaster Assize 1820). Blackstone himself recognized this as the proper construction of the statute:

> The offence of *riding or going armed*, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land, and is particularly prohibited by the statute of Northampton, 2 Edw. III c. 3, upon pain of forfeiture of the arms, and imprisonment during the king's pleasure[.]

4 WILLIAM BLACKSTONE, COMMENTARIES *148-49; see also WILLIAM LAMBARD, EIRENARCHA 135 (1588) (crime to carry weapons "which [are] not usually worne and borne").

This understanding continued into the twentieth century. One particular example is Rex v. Smith, 2 Ir. Rep. 190, 204 (K.B. 1914), where King's Bench reversed a conviction for carrying a loaded revolver on a public road because there had been no proof that the defendant had acted "*in terrorem populi*" (to the terror of the people). The court explained that "[t]he words 'in affray of the peace' in the statute, being read forward into the 'going armed,' render the former words part of the description of the statutable offence" and accordingly mandate "two essential elements of the offence – (1) That the going armed was without lawful occasion; and (2) that the act was *in terrorem populi*." Id. at 204; see also Rex v. Meade, 19 L. Times Repts. 540, 541 (1903) (statute covered one who made himself "a public nuisance by firing a revolver in a public place, with the result that the public were frightened or terrorized").

Other developments in English law duly confirm the Statute's limited reach. One significant development took place in 1870, when Parliament enacted the Gun License Act and mandated that "every person who shall use or carry a gun in the United Kingdom" obtain an annual license. 33 & 34 Vic. c. 57 s. 3 (1870). However, the Act required no license unless an individual sought to "use or carry a gun elsewhere than in a dwelling-house or the curtilage

thereof," and further, the Act provided an exemption for licensed hunters. See id. s. 7. Thus, it was the act of carrying guns—in public, and for reasons other than hunting—that gave rise to the requirement of a license. Indeed, on the floor of Parliament the bill's sponsor had expressed his desire to limit the carrying of revolvers, while opponents of the bill had objected that it was "'unconstitutional,' since it would disarm the country to a great extent." See JOYCE LEE MALCOLM, GUNS AND VIOLENCE: THE BRITISH EXPERIENCE 117-18 (2002). And when Parliament later enacted Firearms Act, 1920—which *for the first time* imposed a requirement that an individual seeking a gun license show "good reason" to the satisfaction of a government official—debate on the floor recognized that "one of the most jealously guarded rights of the English was that of carrying arms." See id. at 146-48; see also Firearms Act, 1920, 10 & 11 Geo. 5 c. 43, s. 1(2). Plainly, all understood that the Statute of Northampton did not already prohibit the act of carrying guns in public.

The understanding was the same on this side of the pond. For example, the version of the Statute enacted in Massachusetts explicitly applied only to those who "shall ride or go armed offensively, *to the fear or terror of the good citizens of this Commonwealth*, or such others as may utter any menaces or threatening speeches[.]" 1794 Mass. Acts c. 26 (emphasis added); see also 1694 Mass. Laws 12, no. 6 (power to arrest "all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed *Offensively*. . ." (emphasis added)). American courts also understood the Statute's limited reach. The Tennessee Supreme Court, for example, explained in 1833 that because the state constitution "hath said the people may carry arms," it would be impermissible to "impute to the acts thus licensed such a necessarily consequent operation as terror to the people to be incurred thereby." Simpson v. State, 13 Tenn. (1 Yer.) 356, 360 (1833). In like form, the North Carolina Supreme Court explained that "the carrying of

a gun per se constitutes no offence," because "[f]or any lawful purpose . . . the citizen is at perfect liberty to carry his gun. It is the wicked purpose—and the mischievous result—which essentially constitute the crime." State v. Huntly, 25 N.C. (3 Ired.) 418, 422-23 (1843); see also State v. Woody, 47 N.C. (2 Jones L.) 335, 337 (1855).

And the views of contemporary commentators also confirm this understanding. William Rawle wrote in his "influential treatise," Heller, 554 U.S. at 607, that "the carrying of arms abroad by an individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them, would be sufficient cause to require him to give surety of the peace," WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 123 (1825). Similarly, James Wilson, a leading Framer and Supreme Court Justice, described Northampton in his widely read Lectures on Law as reaching only the carrying of "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804).

**c. Nineteenth Century Surety Laws are Inapposite**

The surety-style laws that some states adopted in the nineteenth century did not prohibit citizens from bearing arms peacefully, and they provide no support for modern laws that do. If anything, these laws were analogous to the modern day restraining order directed at a specific individual—which is a far cry from a statutory preclusion that applies by its terms to all.

The surety law enacted in Massachusetts provided in full that:

> If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, *on complaint of any person having reasonable cause to fear an injury, or breach of the peace*, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

Mass. Rev. Stat. c. 134, § 16 (1835) (emphasis added). Thus, before a person could be required to provide a surety, another person first needed to lodge a "complaint." And even then, relief was only justified on findings both that the complainant "had reasonable cause to fear injury," and that the other person lacked "reasonable cause to fear an assault or other injury, or violence." This law did not operate to preclude the general public from bearing arms.

If anything, the relevance of this surety law is that it undercuts the revisionist contention that the Statute of Northampton stood as a general prohibition on the bearing of arms in public. After all, if the Statute already made the bearing of arms illegal, then a law authorizing magistrates to impose a temporary restriction on the bearing of arms would have been pointless and superfluous. Indeed, this same observation is true of the carry restrictions enacted during the nineteenth century. If the Statute of Northampton had precluded the carry of arms since the fourteenth century, as Amicus suggests, then there would have been no point in enacting new laws that restated this same prohibition. In reality, the subsequent enactment of additional restrictions shows the limited application of both the Statute of Northampton and the surety laws.

## CONCLUSION

Since the Supreme Court has already ruled that the right "to keep and bear arms" protects "the individual right to possess and carry weapons," Heller, 554 U.S. at 592, the only real question is whether this protection ends at the threshold of one's home. By its terms, it does not. And as such, Defendants' policies—which preclude the bearing of arms by default, in the absence of an exception—breach the guarantee.

Dated: October 24, 2017

Respectfully submitted,

**DAVID JENSEN PLLC**

By: ____________________
David D. Jensen, Esq.
111 John Street, Suite 420
New York, New York 10038
Tel: 212.380.6615
Fax: 917.591.1318
david@djensenpllc.com

Patrick M. Groulx, Esq.
BBO No. 673394
Isenberg Groulx LLP
368 W Broadway, Suite 2
Boston, Massachusetts 02127
Tel: 617.859.8966
Fax: 617.859.8903
pmgroulx@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 24, 2017.

/s/ David D. Jensen
David D. Jensen, Esq.