## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| **MICHAEL GOULD, CHRISTOPHER HART, DANNY WENG, SARAH ZESCH, JOHN STANTON and COMMONWEALTH SECOND AMENDMENT, INC.,** | ) ) ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **16-10181-FDS** |
| | ) | |
| **DANIEL O'LEARY, in his official capacity as Chief of the Brookline Police Department, and WILLIAM EVANS, in his official capacity as Commissioner of the Boston Police Department,** | ) ) ) ) | |
| | ) | |
| **Defendants,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **COMMONWEALTH OF MASSACHUSETTS,** | ) | |
| | ) | |
| **Intervenor Defendant.** | ) | |

_____)

## MEMORANDUM AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a federal constitutional challenge to the firearm licensing policies of the Town of

Brookline and the City of Boston.  Plaintiffs Michael Gould, Christopher Hart, Danny Weng,

Sarah Zesch, John Stanton, and Commonwealth Second Amendment, Inc. have brought suit

under 42 U.S.C. § 1983, contending that policies of the Brookline and Boston Police

Departments that restrict the ability of applicants to obtain licenses to carry firearms violate the

Second and Fourteenth Amendments.  The named defendants are Daniel O'Leary, the chief of

the Brookline Police Department, and William Evans, the commissioner of the Boston Police

Department.  The Commonwealth of Massachusetts has intervened to defend the constitutionality of its state licensing scheme.

The parties have cross-moved for summary judgment.  For the following reasons, defendants' motions will be granted, and plaintiffs' motion will be denied.

## I.     Background

The facts set forth below are undisputed.

### A.     Massachusetts Regulatory Framework

In Massachusetts, it is a crime to possess a firearm in public without a valid license to carry.  Mass. Gen. Laws ch. 269, § 10(a).[1]  Licenses to carry ("LTC") firearms may be requested by application pursuant to Mass. Gen. Laws ch. 140, § 131(d).  Applications are made to a "licensing authority," which is defined as either the applicant's local police chief or the board or officer having control of the police in a city or town.  *Id.* §§ 121, 131(d).  Massachusetts law specifies the circumstances under which a licensing authority may grant licenses, when licenses may be revoked, and what restrictions licenses may contain.  *Id.* § 131.

Under the statute, a licensing authority "may issue" a license if "it appears" that the applicant satisfies both parts of a two-step inquiry, demonstrating that he or she (1) is not a "prohibited person" and (2) has a "proper purpose" for carrying a firearm.  *Ruggiero v. Police Comm'r of Boston*, 18 Mass. App. Ct. 256, 259 (1984) (discussing an earlier, similarly worded version of the statute); Mass. Gen. Laws ch. 140, § 131(d).[2]

---

[1] With limited exceptions, a "firearm" is defined as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured."  Mass. Gen. Laws ch. 140 § 121.

[2] Prior to 2014, a licensing authority could issue licenses in two forms:  Class A or Class B.  Mass. Gen. Laws. ch. 140, § 131(a-b).  A Class A license permitted an individual to carry a concealed firearm in public and to possess a large-capacity firearm, while a Class B license permitted only open carry of firearms that were not classified as large-capacity.  *Id.*  In 2014, the Massachusetts legislature amended the licensing laws, eliminating Class B licenses, effective in 2021.  *See* Mass. Acts ch. 284, § 101.  However, effective immediately, licensing

At the first step of the inquiry, the licensing authority examines whether the applicant is a "prohibited person."  Mass. Gen. Laws ch. 140, § 131(d).  An applicant may be categorically prohibited from possessing a firearm (for example, minors).  *Id.*  Alternatively, an applicant may be found to be a prohibited person if the licensing authority, in the reasonable exercise of his or her discretion, determines that the applicant is "unsuitable" based on evidence or factors that suggest the applicant would cause a risk to public safety.  *Id.*  The parties agree that plaintiffs here are not categorically prohibited from obtaining a license.

At the second step of the inquiry, the licensing authority is required to consider whether the applicant has a "proper purpose" for carrying a firearm.  *Ruggiero*, 18 Mass. App. Ct. at 259. The statute does not provide an exhaustive list of purposes for which an applicant may properly request a license.  Instead, it states that the licensing authority "may issue" a license if the applicant (1) "has good reason to fear injury to the applicant or the applicant's property" or (2) "for any other reason, including the carrying of firearms for use in sport or target practice only, subject to the restrictions expressed or authorized under this section."  Mass. Gen. Laws ch. 140, § 131(d).  In *Ruggiero*, the Massachusetts appellate court summarized an earlier version of the statute as follows:  "Without excluding other valid reasons for being licensed, the statute identifies two purposes which will furnish adequate cause to issue a license—'good reason to fear injury to person or property' and an intent to carry a firearm for use in target practice."  18 Mass. App. Ct. at 259.  When an applicant seeks a license solely for self-protection, the licensing authority may require that the applicant distinguish his or her own specific need for protection from the needs of members of the general public.  *Id.* at 261 (finding that, under an earlier,

---

authorities were directed to refrain from issuing Class B licenses and to issue new and renewed licenses as Class A licenses.  *Id.*

similarly worded version of the statute, an applicant's stated purposes to avoid "spend[ing] his entire life behind locked doors [and to prevent becoming] a potential victim of crimes" did not require issuance of a license for self-defense in public).

Even when an applicant otherwise meets the requirements for license approval, the licensing authority may issue the license "subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper." Mass. Gen. Laws ch. 140, § 131(a-b). Pursuant to that provision, the licensing authority may restrict a license to those uses for which the authority determines there to be an appropriate reason. *See Ruggiero*, 18 Mass. App. Ct. at 260 (upholding issuance of license with target, hunting, and sporting restriction where applicant requested license for self-defense purposes).

A licensing authority's decision to deny or restrict a license is subject to judicial review. Mass. Gen. Laws ch. 140, § 131(f). An applicant who has been denied a license must challenge the denial within ninety days. *Id.* By comparison, an applicant who has been granted a license with restrictions may challenge the restrictions in court at "any time." *Id.* Upon judicial review, the licensing authority's determination to impose restrictions may be reversed only if the authority had "no reasonable ground for . . . restricting the license" or the determination is "arbitrary, capricious, or an abuse of discretion." *Id.*; *Chief of Police of Shelburne v. Moyer,* 16 Mass. App. Ct. 543, 546 (1983)).

Unless revoked or suspended, a license "shall be valid" for between five and six years, and shall expire on the licensee's birthday. Mass. Gen. Laws ch. 140, § 131(i). The licensing authority "shall" revoke or suspend a license "upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed." *Id.* § 131(f). Additionally, a license "may be" revoked or suspended if the licensee is "no longer a

suitable person." *Id.* The determination to revoke or suspend a license is also subject to judicial review. *Id.*

## B. Brookline Firearm Licensing Policy

Daniel O'Leary is the Chief of the Brookline Police Department. (Def. O'Leary's SMF ¶ 1). He and Sergeant Christopher Malinn are the two officials who administer the firearms-licensing process in Brookline. (*Id.*). Sgt. Malinn is the "contact person and investigator" for firearm-license applicants. (*Id.* ¶ 2). However, as Police Chief, O'Leary is the ultimate authority responsible for issuing firearm licenses to Brookline residents pursuant to Mass. Gen. Laws ch. 140, § 131. (*Id.* ¶ 3). Chief O'Leary states that it is his practice to review personally all the information concerning applicants submitted to Sgt. Malinn. (*Id.*). He also states that he is always willing to meet with applicants to discuss their applications or licenses. (*Id.* ¶ 4).

Chief O'Leary will issue unrestricted LTCs to qualified individuals who show "good reason to fear injury to his person or property." (Def. O'Leary's Ans. to Interrog. No. 9). An otherwise-qualified applicant who fails to show "good reason to fear injury" will receive a restricted license. When deciding which restrictions to impose, Chief O'Leary states that he takes into account all information provided in the application, including field of employment and any training or experience with firearms. (*Id.* at Nos. 11-12).

Since January 1, 2015, Brookline has imposed seven types of restrictions on firearm licenses: (1) target, (2) hunting, (3) transport, (4) sporting, (5) employment, (6) in home, and (7) collecting. (Def. O'Leary's SMF ¶ 6).[3] Descriptions of those restrictions are as follows:

> **TARGET** – allows firearms to be carried while engaged in firearms target practice at a firearms club or firearms school. Included is reasonable traveling time to and from said club or firearms school, with any weapon(s). The firearm cannot be carried outside the home for another purpose.

---

[3] The in home restriction was created only because one applicant specifically requested it. (Def. O'Leary's SMF ¶ 6).

> **HUNTING** – allows firearms to be carried while hunting and while going to or
> coming from a hunting area, when in possession of a valid hunting license.  The
> firearm cannot be carried outside of the home for another purpose.
>
> **TRANSPORT** – allows one to transport firearms from one home to another.
> Note that all of the restrictions allow one to transport the firearm to the allowed
> activity.  The firearm cannot be carried outside the home for another purpose.
>
> **SPORTING –** allows the firearm to be carried for the purpose of target practice,
> recreational shooting or competition, the lawful pursuit of game animals and
> birds, and for outdoor recreational activities such as hiking, camping, cross
> country skiing, and other related activities.  The firearm cannot be carried outside
> of the home for any other purpose.
>
> **EMPLOYMENT** – allows the firearm to be carried only during the hours one is
> actually employed by, and/or operating at their company/employer.  This includes
> reasonable time traveling to and from the company/employer.  The firearm cannot
> be carried outside the home for any other purpose.
>
> **IN HOME** – allows one to keep the firearm in the home.  It cannot be carried
> outside of the home.
>
> **COLLECTING** – allows one to carry the firearm for the purpose of firearms
> collecting.  Firearms cannot be carried outside the home for any other purpose.

(Def. O'Leary's Ans. to Interrog. No. 3).

Between January 1, 2015, and July 18, 2017, Chief O'Leary issued a total of 191 LTCs.

(Stipulation at 1).  Of those 191 LTCs, 68 (35.6%) were unrestricted and 123 (64.4%) contained

at least one restriction.  (*Id.*).  However, members of certain professions were more likely to

receive unrestricted licenses.  (*Id.*).  During that time period, 22 of 24 law enforcement officers

(91.7%), 10 of 14 physicians (71.4%), and 4 of 6 attorneys (66.7%) received unrestricted

licenses.  (*Id.*).

### C.    Plaintiff Gould's Application

In 2014, Michael Gould lived in Brookline.  (Pls.' SMF ¶ 81).  He works as a

professional photographer at a fine arts museum and also operates his own photography business.

(*Id.* ¶ 79; Gould Aff. ¶ 1).  He previously lived in Weymouth, Massachusetts, where he had a LTC from the Weymouth Police Department with the restriction of "Target Hunting Employment."  (Pls.' SMF ¶ 80).  On July 8, 2014, he applied to renew his LTC for "all lawful purposes" with the Brookline Police Department.  (*Id.* ¶ 81).  During an interview with Sgt. Malinn, he stated that he wanted an unrestricted LTC for self-defense.  (*Id.* ¶ 82).  Sgt. Malinn advised that unrestricted LTCs were difficult to obtain in Brookline and that Gould would need to obtain specific documentation to support his request.  (*Id.*).

On September 29, 2014, Gould mailed a letter to Chief O'Leary detailing his request for an unrestricted LTC.  (*Id.* ¶ 83).  In his letter, he stated that he needed an unrestricted LTC because he routinely worked with "valuable photography equipment as well as extremely valuable works of art."  (Gould Aff. Ex. 4, at 1).   He further emphasized his experience with firearms.  (*Id.*).

Chief O'Leary denied Gould's application for an unrestricted LTC in a letter dated October 16, 2014, but offered to issue an LTC with the "Sporting" and "Employment" restrictions.  (Pls.' SMF ¶ 84).  On October 23, 2014, Sgt. Malinn explained to Gould that those restrictions would allow him to carry a firearm on all occasions identified in his letter.  (Def. O'Leary's SMF ¶ 13).  Gould signed forms accepting a LTC with those two restrictions on November 10, 2014, and received it on November 20, 2014.  (Pls.' SMF ¶¶ 86-87).  He did not appeal the license restrictions pursuant to Mass. Gen. Laws. ch. 140, § 131(f).  (Def. O'Leary's SMF ¶ 14).

### D.    Boston Firearm Licensing Policy

William Evans is the Commissioner of the Boston Police Department.  (Pls.' SMF ¶ 1).  He has delegated his responsibilities as a licensing authority to Lt. Det. John McDonough, the

head of the Boston Police Department's Licensing Unit.  (*Id.*).

The Licensing Unit will issue unrestricted LTCs to qualified individuals who "show 'good reason to fear injury' that distinguishes them from the general population," or "are engaged in certain occupations."  (*Id.* ¶ 2).  Occupations that typically qualify for unrestricted LTCs include law enforcement officer, medical doctor, and lawyer.  (*Id.* ¶ 3).  In addition, the Licensing Unit will issue an unrestricted LTC to an applicant who has already been issued an unrestricted LTC anywhere else in Massachusetts.  (*Id.* ¶ 4).  If an individual does not meet one of these requirements, the Licensing Unit will typically issue the LTC subject to a "Target & Hunting" restriction.  (*Id.* ¶ 5).

The Licensing Unit imposes three varieties of restrictions on firearm licenses:  (1) employment, (2) target and hunting, and (3) sporting.  A written policy describing those restrictions states as follows:

> **EMPLOYMENT** – restricts possession to a business owner engaged in business activities, or to an employee while engaged in work related activities, and maintaining proficiency, where the employer requires carry of a firearm (i.e. armored car, security guard, etc.).  Includes travel to and from the activity location.
>
> **TARGET AND HUNTING** – restricts possession to the purpose of lawful recreational shooting or competition; for use in the lawful pursuit of game animals and birds; for personal protection in the home; and for the purpose of collecting (other than machine guns).  Includes travel to and from activity location.
>
> **SPORTING –** restricts possession to the purpose of lawful recreational shooting or competition; for use in the lawful pursuit of game animals and birds; for personal protection in the home; for the purpose of collecting (other than machine guns); and for outdoor recreational activities such as hiking, camping, cross country skiing, or similar activities.  Includes travel to and from activity location.

(Def. Evans's SMF, Ex. 4).

The Licensing Unit does not have a formal internal written policy for determining whether an applicant has shown good "reason" or "proper purpose" for obtaining an unrestricted

LTC.  (Def. Evans's SMF ¶ 5).  However, the Licensing Unit does follow general guidelines.
(*Id.* ¶ 6).  For example, the Licensing Unit draws a distinction between victims of random crime
and victims who were specifically targeted; the latter are more likely to show the "good reason to
fear injury" required for an unrestricted LTC.  (*Id.* ¶ 10).  The Licensing Unit does not define
"good reason to fear injury" with regard to high-crime areas.  (*Id.* ¶ 11).  In addition, applicants
requesting an unrestricted LTC must submit a letter and supporting documentation to Lt. Det.
McDonough.  (*Id.* ¶ 13).  Lt. Det. McDonough states that he reviews those documents to
determine eligibility for an unrestricted LTC on an individualized, case-by-case basis.  (*Id.* ¶ 14).

Between January 1, 2015, and July 18, 2017, the Licensing Unit issued a total of 3,684
LTCs.  (Pls.' SMF ¶ 21).  Of those 3,684 LTCs, 1,576 (42.8%) were unrestricted and 2,108
(57.2%) contained at least one restriction.  (*Id.*).[4]  During that time period, 842 of 884 law
enforcement officers (95.25%), 29 of 40 physicians (72.5%) and 78 of 86 attorneys (90.7%)
received unrestricted licenses.  (*Id.* ¶¶ 22-24).  Excluding members of those three professions,
the Licensing Unit issued 2,674 LTCs, of which 628 (23.5%) were unrestricted.  (*Id.* ¶ 25).

### E.     Boston Plaintiffs' Applications

Four plaintiffs are residents of the City of Boston:  Christopher Hart, Danny Weng, Sarah
Zesch, and Josh Stanton.

### 1.     Christopher Hart

Christopher Hart works as the general manager of a restaurant in Boston.  (*Id.* ¶ 48).  He
previously lived in Connecticut, where he possessed a "State Permit to Carry Pistols and
Revolvers."  (*Id*. ¶ 49).  He previously possessed handgun carry licenses from Florida, Maine,

---

[4]  The most common restriction imposed was "Target & Hunting," which was placed on 1,815 LTCs.  (Def.
Evans's SMF ¶ 26).  The Licensing Unit also issued 17 LTCs with "Sporting" restrictions and 34 LTCs with
"Employment" restrictions.  (*Id.*).  There were 242 LTCs issued with some combination of those three categories of
restrictions.  (*Id.*).

and New Hampshire.  (*Id.*).

On June 4, 2014, he applied for an LTC with the Licensing Unit.  (*Id.* ¶ 50).  On his

application, Hart wrote that he was seeking a license for "personal protection both in/out of my

home."  (*Id.*).  He then had an interview with Officer Angela Coleman.  (*Id.* ¶ 51).  After the

interview, Officer Coleman completed a Massachusetts Instant Record Check System

("MIRCS") application for Hart and wrote "Target and Hunting" under the section "Reason(s)

for requesting the issuance of a card or license."  (*Id.* ¶ 52).  Although Hart also submitted a

letter to Lt. Det. McDonough requesting an unrestricted LTC for self-defense, he never received

a reply.  (*Id.* ¶¶ 54-55).

On July 2, 2014, the Licensing Unit issued a LTC to Hart with the restriction of "Target

& Hunting."  (*Id.* ¶ 56).  The following month, he visited the Licensing Unit and asked about the

possibility of removing the restriction.  (*Id.* ¶ 57).  Because his employer declined to provide

documentation to justify an additional "Employment" exception, Hart did not appeal the license.

(*Id.*).

### 2.    Danny Weng

Danny Weng is a software engineer who was honorably discharged from the U.S. Army.

(*Id.* ¶ 37).  He applied for a LTC with the Licensing Unit on January 13, 2014.  (*Id.* ¶ 38).  On his

application, he stated that he was seeking a LTC for "all lawful purposes/target shooting."  (*Id.*).

He then interviewed with Officer Patricia McGoldrick, who completed a MIRCS application on

his behalf.  (*Id.* ¶ 40).  Officer McGoldrick wrote "Target and Hunting" on his MIRCS

application under the section "Reason(s) for requesting the issuance of a card or license."  (*Id.* ¶

42).

On February 18, 2014, the Licensing Unit issued a LTC to Weng with the restriction of

"Target & Hunting."  (*Id.* ¶ 44).  Nine months later, on November 14, 2014, he wrote a letter to

Lt. Det. McDonough reiterating his desire for an unrestricted LTC, emphasizing his military

experience and desire for additional protection.  (*Id.* ¶ 45).  He followed up with another letter on

March 13, 2015, adding that he wanted flexibility to participate in competitive shooting.  (*Id.* ¶

46).  Lt. Det. McDonough replied on April 4, 2015, denying the request for an unrestricted LTC

because he "could not show that [he had a] proper purpose to possess [an unrestricted] license."

(*Id.* ¶ 47).

### 3.     Sarah Zesch

Sarah Zesch is a Boston native who recently graduated from college and works for a state

agency.  (*Id.* ¶ 58).  On January 6, 2015, she applied for a LTC with the Licensing Unit.  (*Id.* ¶

59).  She did not answer the question on the application form, "For what purpose do you require

a License to Carry Firearms?"  (*Id.*).  She then interviewed with Officer Coleman, and indicated

she wanted an unrestricted LTC for self-protection.  (*Id.* ¶¶ 60-61).

After the interview, Officer Coleman wrote "Target and Hunting" on her MIRCS

application under the section "Reason(s) for requesting the issuance of a card or license."  (*Id.* ¶

63).  Although she also submitted a letter to Lt. Det. McDonough requesting an unrestricted LTC

for personal protection, she never received a reply.  (*Id.* ¶¶ 65, 67).  On March 10, 2015, the

Licensing Unit issued a LTC to her with the restriction of "Target & Hunting."  (*Id.* ¶ 66).

### 4.     John Stanton

John Stanton is a professional musician.  (*Id.* ¶ 68).  On December 15, 2014, he applied

for a LTC with the Licensing Unit.  (*Id.* ¶ 69).  He listed "self-defense, target shooting, hunting,

and all other lawful purposes" as reasons for requiring a LTC.  (*Id.*).  He then interviewed with

Officer Coleman, who wrote "Target and Hunting" on his MIRCS application under the section

"Reason(s) for requesting the issuance of a card or license." (*Id.* ¶ 72). On January 15, 2015, the

Licensing Unit issued a LTC to him with the restriction of "Target & Hunting." (*Id.* ¶ 74).

On March 13, 2015, Stanton wrote a letter to Lt. Det. McDonough requesting removal of

that restriction. (*Id.* ¶ 75). Lt. Det. McDonough denied the request on June 9, 2015, on the

ground that Stanton "could not show that [he had a] proper purpose to possess [an unrestricted]

license." (*Id.* ¶ 76).

Within the next two months, Stanton was the victim of a theft. (*Id.* ¶ 77). On July 30,

2015, he again wrote to Lt. Det. McDonough and reiterated his prior request, emphasizing that

he wanted an unrestricted LTC for personal protection. (*Id.*). Lt. Det. McDonough denied the

request on August 6, 2015, stating he had still failed to provide justification for an unrestricted

LTC. (*Id.* ¶ 78).

## F.   **Commonwealth Second Amendment, Inc.**

Plaintiff Commonwealth Second Amendment, Inc. is a Massachusetts-based non-profit

corporation organized for the purpose of education, research, and legal action regarding what it

contends is the constitutional right to possess and carry firearms. (*Id.* ¶¶ 88-89). The individual

plaintiffs were made honorary members of the organization without their knowledge for

purposes of this suit. (Def. Evans's SMF ¶ 25). However, since the filing of this suit, the

individual plaintiffs have accepted membership offers and are now "knowing" members of the

organization. (Pls.' Resp. to Def. Evans's SMF ¶ 25). Because Commonwealth Second

Amendment, Inc.'s standing relies on the standing of its members and because its claims appear

to be essentially derivative of the claims of its members, the organization's claims can be

decided on the same grounds as those of the individual plaintiffs without separate analysis. *See*

*United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir. 1992).

### G.    Procedural Background

On February 4, 2016, plaintiffs Gould, Hart, and Commonwealth Second Amendment, Inc., brought this lawsuit against defendants O'Leary and Evans.[5]  Plaintiffs amended the complaint on April 14, 2016, to add individual plaintiffs Weng, Zesch, and Stanton.

On January 27, 2017, defendant Evans filed a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  The Court denied the motion on March 6, 2017, finding that the amended complaint plausibly stated a claim for relief and raised factual issues that required the development of a factual record.  After discovery concluded, plaintiffs filed a motion for summary judgment, and defendants O'Leary and Evans filed cross-motions for summary judgment.

## II.    Analysis

### A.    Cross-Motions for Summary Judgment

The two-count amended complaint alleges violations of the Second and Fourteenth Amendments under 42 U.S.C. § 1983.  To succeed on a claim under 42 U.S.C. § 1983, plaintiffs must prove that (1) the conduct complained of was carried out under color of state law and (2) defendant's actions deprived plaintiffs of rights, privileges, or immunities secured by the Constitution or laws of the United States.  *Collins v. Nuzzo*, 244 F.3d 246, 250 (1st. Cir. 2001).

There is no dispute that defendants O'Leary and Evans were acting under color of state law in issuing plaintiffs' restricted licenses.  The complaint alleges that Massachusetts's firearm licensing scheme and defendants' licensing policies violate the Second Amendment and the Equal Protection Clause by (1) permitting the imposition of restrictions such as "sporting," "target," "hunting," and "employment" on their licenses and (2) allowing issuance of permits to

---

[5] The original complaint listed Irwin Cruz as a plaintiff and Chief David Provencher of the New Bedford Police Department as a defendant.  Neither individual is a current party to the case.

turn on "arbitrary considerations, such as whether an individual resides or previously resided on the correct side of a boundary line, is wealthy and/or has a lot of cash, has a particular occupation, or has a place of business in another locality that issues unrestricted LTC[ ]s."  Am. Compl. ¶¶ 62-68.  In essence, plaintiffs contend that the Second Amendment, as interpreted by the Supreme Court decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), protect the right of law-abiding citizens to carry handguns in public for the purpose of self-defense.

Defendants contend that neither the municipal policies in question nor the state statutory scheme implicate a Second Amendment right because that right is limited to personal protection within the home.[6]

### 1.     <u>Standard of Review</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves,*

---

[6] In *Batty v. Albertelli*, 2017 WL 740989 (D. Mass. Feb. 24, 2017), this Court upheld the constitutionality of the Town of Winchester's firearm licensing scheme against a challenge virtually identical to that made by plaintiffs here.  Indeed, plaintiffs concede that the Court's ruling in *Batty* "ought to be dispositive here—unless revisited."  (Pls.' Opp. and Reply at 1).

994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

### 2.      The Second Amendment

The Second Amendment to the United States Constitution provides as follows:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In 2008, the Supreme Court struck down a District of Columbia ordinance that prohibited the possession of handguns in the home, declaring that the Amendment guarantees "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *Heller*, 554 U.S. at 635.  In 2010, the Court affirmed that the "right to possess a handgun in the home for the purpose of self-defense" is incorporated into the protections against infringement by the states provided by the Fourteenth Amendment.  *McDonald*, 561 U.S. at 791.  In *Heller*, however, the Supreme Court qualified its holding, stating that "[l]ike most rights, the right secured by the Second Amendment is not unlimited. . . . [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  554 U.S. at 626-27.

As the First Circuit has recognized, several circuits use a two-part framework to evaluate a claim of Second Amendment infringement.  *Powell v. Tompkins*, 783 F.3d 332, 347 n.9 (1st Cir. 2015).  Under that framework, courts

15

> first consider whether the challenged law imposes a burden on conduct that falls
> within the scope of the Second Amendment's guarantee as historically understood,
> and if so, . . . next determine the appropriate form of judicial scrutiny to apply
> (typically, some form of either intermediate scrutiny or strict scrutiny).

*Id.* (citing *Jackson v. City and Cty. of San Francisco,* 746 F.3d 953, 962-63 (9th Cir. 2014);

*Drake v. Filko,* 724 F.3d 426, 429 (3d Cir. 2013); *Woollard v. Gallagher,* 712 F.3d 865, 874-75

(4th Cir. 2013); *Nat'l Rifle Assn'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, &*

*Explosives,* 700 F.3d 185, 194 (5th Cir. 2012); *United States v. Greeno,* 679 F.3d 510, 518 (6th

Cir. 2012); *Heller v. District of Columbia,* 670 F.3d 1244, 1252 (D.C. Cir. 2011) ("*Heller II*");

*Ezell v. City of Chicago,* 651 F.3d 684, 701-04 (7th Cir. 2011); *United States v. Reese,* 627 F.3d

792, 800-01 (10th Cir. 2010); *United States v. Marzzarella,* 614 F.3d 85, 89 (3d Cir. 2010); *cf.*

*Kwong v. Bloomberg,* 723 F.3d 160, 167 (2d Cir. 2013); *United States v. Bena,* 664 F.3d 1180,

1182-85 (8th Cir. 2011); *United States v. Skoien,* 614 F.3d 638, 639-43 (7th Cir. 2010) (*en*

*banc*)).

Although the First Circuit has not explicitly adopted that two-step approach, the cases in

which it has directly analyzed Second Amendment issues appear to fall under either the first or

second step of the framework.  For example, in *United States v. Rene E.*, the court concluded that

the federal statute criminalizing firearm possession by juveniles did not violate the Second

Amendment because it was one of the "longstanding prohibitions" that *Heller* did not call into

question.  *See* 583 F.3d 8, 15-16 (1st Cir. 2009).  While the court in *Rene E.* did not specifically

hold that the statute only burdened conduct outside the scope of Second Amendment protection,

the analysis it followed was almost identical to those of other circuits when conducting the first

step in their Second Amendment analysis.  *Compare, e.g., Rene E.*, 583 F.3d at 13-16 (surveying

nineteenth-century state laws and the founders' attitudes on juvenile handgun possession) *with*

*National Rifle Ass'n of Am.*, 700 F.3d at 200-04 (surveying founding-era attitudes and

nineteenth-century opinion on juvenile firearm possession).

In *United States v. Booker*, 644 F.3d 12 (1st Cir. 2011) and *United States v. Armstrong*, (1st Cir. 2013), the First Circuit upheld a federal statute criminalizing firearm possession by persons convicted of misdemeanor crimes of domestic violence.  In doing so, it found that the statute, although falling within one of the "presumptively lawful" categories of firearm regulation in *Heller*, required some form of means-ends scrutiny because it was a categorical limit on the Second Amendment right.  *Booker*, 644 F.3d at 25; *Armstrong*, 706 F.3d at 7-8.

In *Hightower v. City of Boston*, the First Circuit concluded that revoking an individual's license to carry a concealed weapon based on the fact that her firearm license application contained a false statement did not violate the Second Amendment under any standard of heightened scrutiny.  693 F.3d 61, 74 (1st Cir. 2012).  Thus, the analysis in *Booker*, *Armstrong*, and *Hightower* was similar to the analysis performed by other circuits at the second step of the Second Amendment analytical framework.  *Compare Hightower*, 693 F.3d at 73-76 (regulation upheld under any standard of heightened means-ends scrutiny) *with Woollard*, 712 F.3d at 880-82 (regulation upheld under intermediate scrutiny).

Accordingly, the Court will first analyze the scope of the Second Amendment to determine whether the disputed restrictions impose a burden on the right to keep and bear arms protected by the Second Amendment's guarantee as historically understood.  Next, the Court will analyze what form of means-ends scrutiny the restrictions must satisfy.  Finally, the Court will apply the appropriate level of scrutiny to the restrictions at issue.

### a.    <u>Scope of the Second Amendment</u>

*Heller* specifically precluded from Second Amendment protection three categories of firearm regulation:  "longstanding prohibitions on the possession of firearms by felons and the

mentally ill, . . . laws forbidding the carrying of firearms in sensitive places, [and] laws imposing conditions and qualifications on the commercial sale of arms."  554 U.S. at 626-27.  The court identified these laws as examples of "presumptively lawful" regulatory measures, while explicitly describing the list as non-exhaustive.  *Id.* at 627 n.26.  Courts have interpreted *Heller* as delimiting the scope of the Second Amendment, placing regulations that are sufficiently rooted in history and tradition as to rise to the level of "presumptively lawful" outside its protection.  *See, e.g., Rene E.,* 583 F.3d at 12.

Plaintiffs contend that the restrictions imposed on their licenses do not comport with historical understandings of the Second Amendment right as interpreted by *Heller*.  They contend that the Second Amendment squarely protects the right of law-abiding citizens to carry handguns in public for the purpose of self-defense, which defendants have infringed by requiring them to show a specific "reason to fear" in order to receive unrestricted licenses.  Like the Third Circuit in *Drake*, this Court is "not inclined to address this [issue] by engaging in a round of full-blown historical analysis, given other courts' extensive consideration of the history and tradition of the Second Amendment."  724 F.3d at 431.

It is now well-established "that the possession of operative firearms for use in defense of the home constitutes the 'core' of the Second Amendment."  *Hightower*, 693 F.3d at 72; *see also Powell*, 783 F.3d at 347.   However, *Heller* and *McDonald* were not intended to describe the full scope of the Second Amendment right, and neither squarely addresses whether the Second Amendment right extends beyond the home.  *See Heller*, 554 U.S. at 595 (finding that "the Second Amendment conferred an individual right to keep and bear arms," but also that the Second Amendment did not "protect the right of citizens to carry arms for *any sort* of confrontation").  As a result, the lower federal courts have wrestled with the questions of

whether, and to what extent, the right protected by the Second Amendment extends beyond the home.  *See Hightower*, 693 F.3d at 74 (describing the matter as a "vast *terra incognita*") (quoting *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011)).  Twice, the First Circuit has declined to reach the issue of "the scope of the Second Amendment as to carrying firearms outside the vicinity of the home."  *Hightower,* 693 F.3d at 72 n.8; *Powell,* 783 F.3d at 348 (quoting *Hightower*, 693 F.3d at 72 n.8).

Decisions from the other courts of appeals offer mixed guidance.  The Second, Third, and Fourth Circuits have "assumed for analytical purposes" that the Second Amendment has some application outside the home, without deciding the issue.  *See Powell*, 783 F.3d at 348 n.10; *see also Drake*, 724 F.3d at 431; *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012); *Woollard*, 712 F.3d at 876.

In contrast, the Seventh Circuit held that the "Supreme Court has decided that the [Second] [A]mendment confers a right to bear arms for self-defense, which is as important outside the home as inside."  *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012).  The Ninth Circuit originally agreed with the Seventh Circuit's analysis.  *See Peruta v. County of San Diego*, 771 F.3d 570 (9th Cir. 2014).  However, it reversed that decision upon rehearing *en banc*, and determined that although the Second Amendment does not encompass a right to carry a concealed weapon in public, "[t]here may or may not be a Second Amendment right for a member of the general public to carry a firearm openly in public."  *Peruta v. County of San Diego*, 824 F.3d 919, 939 (9th Cir. 2016).

More recently, the District of Columbia Circuit held that the Second Amendment protects an individual's right to carry firearms outside the home for self-defense.  *See Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017).  In *Wrenn*, the court, in a 2-to-1 decision, found

that the "core" of the Second Amendment protected "the individual right to carry common firearms beyond the home for self-defense—even in densely populated areas, even for those lacking special self-defense needs." *Id.* at 661.

The court invalidated the District of Columbia's "good-reason" law as a categorical restriction on a "'core' Second Amendment right." *Id.* at 657.[7] It stated that the historical analysis of the Supreme Court in *Heller* showed that when the Second Amendment was ratified, the so-called Northampton laws that restricted carrying firearms in crowded areas only barred the carrying of "dangerous and unusual" weaponry. *Id.* at 660 (citing *Heller*, 554 U.S. at 627).[8] In addition, English "surety laws" requiring firearm carriers to post a bond to cover any potential damage "did not deny a responsible person carrying rights . . . [t]hey only burdened someone reasonably accused of posing a threat." *Id.* at 661. Because the good-reason law infringed on the "constitutional right to bear common arms for self-defense in any fashion at all," the court found it unnecessary to conduct a means-end analysis. *Id.* at 665-66 ("It's appropriate to strike down such 'total ban[s]' without bothering to apply tiers of scrutiny because no such analysis could ever sanction obliterations of an enumerated constitutional right.") (alteration in original).[9]

No federal court of appeals has held that the Second Amendment does not extend beyond

---

[7] The District of Columbia's "good-reason" law is an "ensemble of [D.C.] Code provisions and police regulations" limiting LTCs to those showing a "good reason to fear injury to [their] person or property" or "any other proper reason for carrying a pistol." *Wrenn*, 864 F.3d at 655-56.

[8] The Statute of Northampton was passed during the early reign of Edward III. The Statute restricted the possession of pistols and other weapons in public locations. 2 Edw. 3, c. 3 (1328). Several colonies (and later, states) adopted similar laws in the 18th and 19th centuries. *Wrenn*, 864 F.3d at 659.

[9] *Wrenn* appears to conflict, at least to some degree, with First Circuit precedent. As noted, the First Circuit has stated "that the possession of operative firearms for use in defense of the home constitutes the 'core' of the Second Amendment." *Hightower*, 693 F.3d at 72. *See also Powell*, 783 F.3d at 347 ("Together, *Heller* and *McDonald* establish that states may not impose legislation that works a complete ban on the possession of operable handguns in the home by law-abiding, responsible citizens for use in immediate self-defense."). In addition, while the First Circuit has consistently declined to explicitly adopt intermediate scrutiny for reviewing Second Amendment challenges, *see Armstrong*, 706 F.3d at 8, its language has strongly suggested that an analogous level of means-end scrutiny is warranted. *See Booker*, 644 F.3d at 25.

the home.  *But see Williams v. State*, 10 A.3d 1167, 1169, 1177 (Md. 2011) (holding that a

statute requiring a permit to carry a handgun outside the home "is outside of the scope of the

Second Amendment" and stating that "[i]f the Supreme Court . . . meant its holding to extend

beyond home possession, it will need to say so more plainly").

    In *Hightower*, the First Circuit stated that "[i]t is plain that the interest . . . in carrying

concealed weapons outside the home is distinct from [the] core interest emphasized in *Heller*."

693 F.3d at 72.  Although *Hightower* did not consider the constitutionality of regulating the open

carrying of weapons outside the home, the authority it cited did not distinguish between the two,

suggesting that the operative distinction was whether the individual asserted his Second

Amendment right outside or inside the home.  *See id.* (collecting cases for the proposition that

"[c]ourts have consistently recognized that *Heller* established that the possession of operative

firearms for use in defense of the home constitutes the 'core' of the Second Amendment.").

    In short, precedent does not clearly dictate whether the Second Amendment extends to

protect the right of law-abiding citizens to carry firearms outside the home for the purpose of

self-defense.  In the face of this conflicting authority, the Court will heed the caution urged by

the First Circuit that the Second Amendment is an area that "courts should enter only upon

necessity and only then by small degree."  *Id.* at 74 (quoting *Masciandaro*, 638 F.3d at 475).

Accordingly, the Court will follow the approach taken by the Second, Third, and Fourth Circuits,

and assume for analytical purposes that the Second Amendment extends to protect the right of

armed self-defense outside the home.  The remaining question is whether the restrictions here

survive the applicable level of constitutional scrutiny.

### b.    <u>Level of Scrutiny</u>

    Assuming without deciding that the restrictions at issue burden the Second Amendment

right, they must survive some form of means-ends scrutiny to be constitutional.  *See Hightower*, 693 F.3d at 74 (regulation upheld "whatever standard of scrutiny is used, even assuming there is some Second Amendment interest in carrying the concealed weapons at issue.").

In *Hightower*, the First Circuit explicitly refrained from deciding what standard of scrutiny applied to the concealed-carry regulation.  *Id.*  In *Booker*, however, the court found that "a categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective."  644 F.3d at 25.

*Booker's* language has been interpreted as a description of intermediate scrutiny.  *See, e.g., Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 692 (6th Cir. 2016) (describing *Booker* as "applying the equivalent of intermediate scrutiny"); *Kachalsky*, 701 F.3d at 93 n.17; *Williams v. Puerto Rico*, 910 F. Supp. 2d 386, 396 (D.P.R. 2012).  Indeed, the normal definition of "intermediate scrutiny" is a showing that "the challenged classification is 'substantially related to an important government objective.'"  *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 47 (1st Cir. 2003) (quoting *Clark v. Jeter*, 486 U.S. 456, 461 (1988)).  That definition is virtually indistinguishable from the standard used in *Booker*.  In *Armstrong*, however, the First Circuit stated plainly that "this court has not adopted intermediate scrutiny as the appropriate type of review for a [Second Amendment] challenge such as Armstrong's."  706 F.3d at 8.

The regulation at issue in *Booker* and *Armstrong* was substantially different from the ones in this case, perhaps necessitating a different level of scrutiny.  However, the Second, Third, and Fourth Circuits have explicitly adopted the intermediate scrutiny standard when examining regulations burdening an alleged Second Amendment right to carry weapons outside the home.

*Kachalsky*, 701 F.3d at 96; *Drake*, 724 F.3d at 435; *Masciandaro*, 638 F.3d at 470-71.[10]  In

reaching that conclusion, those circuits have carefully parsed the language of *Heller* and

*McDonald*, noted the longstanding tradition of firearms regulation in this country, and made

parallels to situations where different levels of scrutiny are applied in the First Amendment

context.

For example, the Second Circuit in *Kachalsky* noted that "when analyzing First

Amendment claims, content-based restrictions on noncommercial speech are subject to strict

scrutiny while laws regulating commercial speech are subject to intermediate scrutiny."  701

F.3d at 94 (citations omitted).  *Kachalsky* concluded that "applying less than strict scrutiny when

the regulation does not burden the 'core' protection of self-defense in the home makes eminent

sense in this context and is in line with the approach taken by our sister circuits."  *Id*. at 93.  The

Third Circuit in *Drake* also analogized the Second Amendment to the First Amendment,

concluding that intermediate scrutiny applied because strict scrutiny was only triggered when the

core "right to possess usable handguns *in the home* for self-defense" was implicated.  724 F.3d at

436 (emphasis in original).  Finally, the Fourth Circuit in *Masciandaro* noted that "as we move

outside the home, firearm rights have always been more limited, because public safety interests

often outweigh individual interests in self-defense."  638 F.3d at 470.  Because of the

longstanding tradition of regulating the carrying of firearms in public, *Masciandaro* concluded

those regulations need only satisfy intermediate scrutiny to survive constitutional challenge.  *Id.*

---

[10] In addition, other circuits have used the intermediate scrutiny standard when evaluating other types of
firearms regulations outside the "core" right of armed self-protection within the home.  *See, e.g.*, *Nat'l Rifle Ass'n of
Am.*, 700 F.3d at 205 (federal ban on sale of handguns to juveniles); *Heller II*, 670 F.3d at 1257 (gun registration
laws); *Reese*, 627 F.3d at 802 (prohibition on firearms ownership by individuals subject to a domestic protective
order).  No court has applied strict scrutiny to regulations burdening Second Amendment restrictions outside the
home, although the Seventh Circuit invalidated an Illinois law without applying a particular level of heightened
scrutiny.  *Moore*, 702 F.3d at 941.  As noted, the D.C. Circuit in *Wrenn* did not subject the law at issue even to strict
scrutiny analysis.  864 F.3d at 664-66.

at 471.

This Court agrees that intermediate scrutiny, or a related analogue, is the appropriate standard to assess the constitutionality of the restrictions in question.  The challenged restrictions allow for use of a firearm in defense of the home, and therefore only implicate an individual's ability to carry a firearm in public.  Because that interest is not at the "core" of the Second Amendment right recognized by *Heller*, analysis at a level of scrutiny lower than the strict scrutiny standard appears to be appropriate.  *See Hightower*, 693 F.3d at 72 ("It is plain that the interest . . . in carrying concealed weapons outside the home is distinct from [the] core interest emphasized in *Heller*.").

However, because *Armstrong* plainly stated that the First Circuit has not yet adopted the intermediate scrutiny standard for Second Amendment challenges to firearm regulations, the Court will avoid using that specific label.  Instead, the Court's analysis will focus on whether defendant has shown a "substantial relationship between the restriction and an important governmental objective."  *Booker*, 644 F.3d at 25.

### c.      Application

"In reviewing the constitutionality of a statute, courts must accord substantial deference to the predictive judgments of [the legislature]."  *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (quotation marks and citation omitted).  "The Supreme Court has long granted deference to legislative findings regarding matters that are beyond the competence of the courts." *Kachalsky*, 701 F.3d at 97 (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010)).

As described, the Massachusetts firearm regulatory regime allows, but does not require, a local licensing authority to impose restrictions on firearm licenses that the authority "deems proper."  Mass. Gen. Laws ch. 140, § 131(a-b).  Massachusetts law further provides that a

licensing authority "may issue" a license if the applicant either has a good reason to fear injury or "for any other reason, including the carrying of firearms for use in sport or target practice only, subject to the restrictions expressed or authorized under this section." *Id.* § 131(d). Pursuant to that broad grant of authority, defendants have policies of imposing various restrictions on applicants who do not show a "good reason to fear injury" that distinguishes them from the general population.

The purpose of the licensing provisions of Mass. Gen. Laws ch. 140, § 131, is "to protect the health, safety, and welfare of [Massachusetts] citizens." *Chardin v. Police Comm'r of Boston*, 465 Mass. 314, 327 (2013). Massachusetts undoubtedly has a substantial interest in promoting public safety and preventing crime. *See McCullen v. Coakley*, 571 F.3d 167, 178 (1st Cir. 2009) (evaluating whether restriction on free speech was "reasonably related to the legislature's legitimate public safety objectives"); *Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357, 376 (1997) (noting "the governmental interest in public safety is clearly a valid interest"); *United States v. Salerno*, 481 U.S. 739, 750 (1987) (describing "the [g]overnment's general interest in preventing crime" as "compelling"). The question is whether defendants' policies of imposing restrictions on the licenses of applicants who fail to show a specific "reason to fear" have a sufficiently substantial relationship to public safety to withstand constitutional scrutiny.

The New York licensing scheme considered by the Second Circuit in *Kachalsky* is similar to the Massachusetts regulatory regime. New York law generally prohibits citizens from possessing firearms without a valid license to carry. *Kachalsky*, 701 F.3d at 85. Several types of firearm licenses are available for individuals who work in certain types of employment. *Id.* at 86. The only license that allows the carrying of a handgun without regard to employment is New

York Penal Law § 400.00(2)(f), which requires an applicant to demonstrate "proper cause" in order to receive a license.  *Id.*  Thus, individuals "who desire to carry a handgun outside the home and who do not fit within one of the employment categories [allowing handgun possession] must demonstrate proper cause pursuant to section 400(2)(f)."  *Id.*

Although "proper cause" is not defined in the statute, "New York state courts have defined the term to include carrying a handgun for target practice, hunting, or self-defense."  *Id.*  Licenses that are issued for the purpose of target practice or hunting can be restricted to those purposes.  *Id.*  To establish proper cause to obtain an unrestricted license, an applicant must "demonstrate a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession."  *Id.* (quoting *Klenosky v. New York City Police Dep't,* 428 N.Y.S. 2d 256, 257 (N.Y. App. Div. 1980)).

Three of the plaintiffs in *Kachalsky* were granted licenses limited to the purpose of target shooting and sought to remove that restriction.  *Id.* at 88 n.7.  When the relevant licensing officers refused to do so, the plaintiffs filed suit, contending that the refusal to remove the restriction violated their right to armed self-defense outside the home and that New York could not force them to demonstrate proper cause to exercise that right.  *Id.* at 88.

After reviewing the legislative history of the New York licensing regime, the Second Circuit found that New York's decision to regulate the number of handguns in public "was premised on the belief that it would have an appreciable impact on public safety and crime prevention."  *Id.* at 98.  It concluded that "[r]estricting handgun possession in public to those who have a reason to possess the weapon for a lawful purpose is substantially related to New York's interests in public safety and crime prevention."  *Id.*

As noted, the licensing regime in New York is substantially similar to the one challenged

in this case.  In New York, an applicant can receive an unrestricted license if he or she shows a special need for self-protection distinguishable from that of the general public.  *Id*. at 86.  By comparison, in Massachusetts, an applicant can receive a license if he or she shows "good reason to fear injury to the applicant or the applicant's property or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to the restrictions expressed or authorized under this section."  Mass. Gen. Laws ch. 140, § 131(d).  Although no authority directly on point has interpreted the phrase "good reason to fear injury," Massachusetts courts have made clear that without such a showing, restrictions can be placed on a firearm license that limit the holder's ability to carry a firearm.  *See Ruggiero*, 18 Mass. App. Ct. at 261 (plaintiff's request for unrestricted license because he "is a potential victim of crimes against his person" did not make the decision to deny him an unrestricted license arbitrary, capricious, or an abuse of discretion); *Stanley v. Neilen*, 2003 WL 1790853, at *2 (D. Mass. Mar. 31, 2003) (restriction on plaintiff's license because he "did not sufficiently demonstrate that he had good reason to fear injury to his person or property—a requirement that has been part of the Massachusetts gun licensing scheme at least since 1936" upheld).  In some respects, the Massachusetts law is less restrictive than the New York law, because while in New York an applicant must show a special need to obtain an unrestricted license, Massachusetts law permits, but does not require, a licensing authority to demand applicants demonstrate a special need for self-defense before being issued an unrestricted license.

Massachusetts adopted its licensing requirement "as a first-line measure in the regulatory scheme" as a result of the "realization that prevention of harm is often preferable to meting out punishment after an unfortunate event."  *Ruggiero*, 18 Mass. App. Ct. at 258-59.  The requirement "was intended 'to have local licensing authorities employ every conceivable means

of preventing deadly weapons in the form of firearms [from] coming into the hands of evildoers.'" *Id.* at 259 (quoting Rep. A.G., Pub. Doc. No. 12, at 233-34 (1964) (alteration in original)).  As in New York, the Massachusetts legislature decided "not to ban handgun possession, but to limit it to those individuals who have an actual reason . . . to carry the weapon." *Kachalsky*, 701 F.3d at 98.

To the extent that imposing "sporting," "target," "hunting," and "employment" restrictions on applicants who fail to show "good reason to fear injury" burdens conduct protected by the Second Amendment, that requirement is substantially related to the state's important objective in protecting public safety and preventing crime.  As other courts have found, "requiring a showing that there is an objective threat to a person's safety—a special need for self-protection—before granting a carry license is entirely consistent with the right to bear arms." *Id.* at 100 (quotation marks omitted).  *See also Woollard*, 712 F.3d at 880 ("there is a reasonable fit between the good-and-substantial-reason requirement and Maryland's objectives of protecting public safety and preventing crime"); *Drake*, 724 F.3d at 439-40 (the "justifiable need" standard is a "measured approach [that] neither bans public handgun carrying nor allows public carrying by all firearm owners; instead, the . . . [l]egislature left room for public carrying by those citizens who can demonstrate a 'justifiable need' to do so.").  In making those findings, courts have acknowledged the deference given to the legislature in matters of public policy.  *See, e.g., Kachalsky,* 701 F.3d at 99 ("It is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments.").  Although the empirical data may be less than conclusive, the government's regulation need only be "substantially related" to its important objective of promoting public safety and preventing crime in order to pass constitutional muster.  Instead of banning the carrying of firearms in public outright, the Massachusetts legislature has

balanced the need to reduce the number of firearms in public with the needs of individuals who have a heightened need to carry firearms in public for self-defense.

In short, the policy that requires applicants to show a specific reason to fear in order to be issued unrestricted firearm licenses, and its authorizing statute, are constitutional.  The Court agrees in substance with the Second, Third, and Fourth Circuits, which have upheld similar requirements in other firearm-licensing regimes.  *See id.* at 100-01 (upholding "proper cause" requirement for unrestricted licenses in New York); *Drake*, 724 F.3d at 440 (upholding "justifiable need" requirement for licenses in New Jersey); *Woollard*, 712 F.3d at 881 (upholding "good-and-substantial reason" requirement for licenses in Maryland).  Those requirements, although phrased differently, are "essentially the same—the applicant must show a special need for self-defense distinguishable from that of the population at large, often through a specific and particularized threat of harm."  *Drake*, 724 F.3d at 442 (Hardiman, J., dissenting).  The courts analyzing these requirements have concluded that they are substantially related to the important governmental objective of promoting public safety and preventing crime.  The Court respectfully disagrees with the majority opinion of the D.C. Circuit in *Wrenn*, principally for the reasons stated by the dissenting judge, 864 F.3d at 668-71, and finds the Seventh Circuit's opinion in *Moore* to be distinguishable.[11]

---

[11] In *Moore*, the court considered a Second Amendment challenge to a "blanket prohibition on carrying [a] gun in public" in Illinois.  702 F.3d at 940.  In holding that prohibition unconstitutional, the court noted that "[r]emarkably, Illinois is the *only* state that maintains a flat ban on carrying ready-to-use guns outside the home." *Id.* (emphasis in original).  The Illinois law had no exception for individuals who showed an objective, heightened need for a firearm for self-defense.  *Id.* at 934.  Indeed, *Moore* specifically noted that "[n]ot even Massachusetts has so flat a ban as Illinois." *Id.* at 940.  Ultimately, the Seventh Circuit struck down the law, concluding that Illinois had failed "to justify the most restrictive gun law of any of the 50 states." *Id.* at 941.  Even then, the court stayed its entry of judgment for 180 days to "allow the Illinois legislature to craft a new gun law that will impose reasonable limitations, consistent with public safety and the Second Amendment as interpreted in this opinion, on the carrying of guns in public." *Id.* at 942.  The logical inference is that the Seventh Circuit concluded that some limitation on the carrying of firearms is reasonable.  As *Moore* did not consider a restriction that permitted individuals with a special need for self-defense to obtain unrestricted firearm licenses, it is of limited persuasive value.

Accordingly, the placing of restrictions such as "sporting," "target," "hunting," and "employment" on the licenses of applicants who do not show good reason to fear injury is substantially related to the important governmental objective of public safety, and therefore does not violate the Second Amendment.

### 3.      Equal Protection Claim

The amended complaint alleges a violation of the Equal Protection Clause of the Fourteenth Amendment, contending that the Massachusetts regulatory regime, and in particular Mass. Gen. Laws ch. 140, § 131(a) and (d), restricts the ability of law-abiding citizens to bear arms based on arbitrary considerations. Like the Second Amendment claim, this issue is ripe for disposal on summary judgment. "[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976). Here, the classification does not impermissibly interfere with the exercise of a fundamental right, and there is no suspect class at issue. Thus, "[g]iven that the Second Amendment challenge fails, the Equal Protection claim is subject to rational basis review." *Hightower,* 693 F.3d at 83. For the same reasons that the regulatory regime is substantially related to the important governmental objectives of promoting public safety and preventing crime, it also survives rational basis review.

## III.   Conclusion

For the foregoing reasons, plaintiffs' motion for summary judgment is DENIED. Defendants' motions for summary judgment are GRANTED.

**So Ordered.**

                                        /s/  F. Dennis Saylor
                                        F. Dennis Saylor IV
                                        United States District Judge

Dated: December 5, 2017